1   Christopher M. Curran (*pro hac vice*)
    Email: ccurran@whitecase.com
2   Martin M. Toto (*pro hac vice*)
    Email: mtoto@whitecase.com
3   John H. Chung (*pro hac vice*)
    Email: jchung@whitecase.com
4   **WHITE & CASE**LLP
    1155 Avenue of the Americas
5   New York, NY 10036
    Telephone:    (212) 819-8200
6   Facsimile:    (212) 354-8113

7   *Attorneys for Toshiba Corporation,*
    *Toshiba Mobile Display Co., Ltd.,*
8   *Toshiba America Electronic*
    *Components, Inc., and Toshiba*
9   *America Information Systems, Inc.*

10

11                  **UNITED STATES DISTRICT COURT**

12                 **NORTHERN DISTRICT OF CALIFORNIA**

13                    **SAN FRANCISCO DIVISION**

14

| 15  16 | IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Case No. 3:12-cv-4114 SI (N.D. Cal.) MDL NO. 1827 |
|---|---|---|
| 17  18 | This Document Relates to Individual Case No. 3:12-cv-4114 SI: | **REPLY MEMORANDUM IN SUPPORT OF TOSHIBA ENTITIES' MOTION FOR SUMMARY JUDGMENT** |
| 19  20  21  22  23  24 | *Best Buy Co., Inc., et al.,*         Plaintiffs,  *v.*  *Toshiba Corp., et al.,*         Defendants. | **ORAL ARGUMENT REQUESTED**  Date:    July 9, 2013 Time:    9:00 a.m. Place:   Courtroom 10, 19th Floor Judge:   Hon. Susan Illston |

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………………….…......1

II.     ARGUMENT…………………………………………………………………......1

    A.   Best Buy Has Failed to Distinguish *Citric Acid*……………………….…......2

    B.   Toshiba's Motion is Governed by the Special Rule for Motions for
         Summary Judgment in Antitrust Cases……………………………………......5

    C.   Best Buy Has Not Offered Sufficient Proof to Tie Toshiba to the
         Alleged Overarching Conspiracy…………………………………………......7

         1.   Best Buy Improperly Opposes Toshiba's Motion with
              Inadmissible Evidence…………………………………..………………..8

         2.   There is No Direct Evidence of Toshiba's Participation in
              the Alleged Conspiracy…………………………………………………...11

         3.   Best Buy's Circumstantial Evidence, Taken as a Whole, Does
              Not Tend to Exclude the Possibility that Toshiba Acted
              Independently from the Alleged Conspiracy…………………………….16

         4.   The Evidence of Toshiba's Alleged Knowledge of Wrongdoing
              Does Not Tend to Exclude the Possibility that Toshiba Acted
              Independently from the Alleged Conspiracy……………………….……19

         5.   The Expert Testimony Is Insufficient to Create a Genuine
              Issue of Material Fact for Trial……………………………………….20

    D.   Best Buy Has Not Offered Proof Sufficient to Tie Together
         Disparate Instances of Anticompetitive Conduct into the Overarching
         Conspiracy it Has Alleged…………………………………………….22

         1.   It Is Best Buy's Burden to Demonstrate the Overarching Conspiracy it
              Alleges....................................……………………………………..24

         2.   Best Buy Has Offered No Rebuttal to the Unrefuted Evidence Limiting
              the Scope of the Alleged Conspiracy......................................................27

III.    CONCLUSION…………………………………………….…………….28

REPLY MEMORANDUM IN SUPPORT OF TOSHIBA ENTITIES' MOTION FOR SUMMARY JUDGMENT
No. 3:07-cv-1827 SI, MDL No. 1827

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## FEDERAL CASES

*Bailey v. S. Pac. Transp. Co.*,
  613 F.2d 1385 (5th Cir. 1980)............................................................................ 7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................... 5

*Beltz Travel Serv., Inc. v. Int'l Air Trasnp. Ass'n*,
  620 F.2d 1360 (9th Cir. 1980)............................................................................ 5

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................... 22

*Hangarter v. Provident Life & Accident Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004)............................................................................. 7

*Harrell v. DSC Equip. Leasing Corp.*,
  951 F.2d 1453 (5th Cir. 1992)............................................................................ 9

*Hollingsworth Solderless Terminal Co. v. Turley*,
  622 F.2d 1324 (9th Cir. 1980)............................................................................ 10

*LiButti v. United States*,
  107 F.3d 110 (2d Cir. 1997)............................................................................... 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................... 5, 6, 16, 23

*Monsanto Co. v. Spray-Rite Service Corp.*,
  465 U.S. 752 (1984) ......................................................................................... 22

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3rd Cir. 1999) .................................................................... passim

*In re Citric Acid Litig.*,
  191 F.3d 1090 (9th Cir. 1999)..................................................................... passim

*In re Citric Acid Litig.*,
  996 F. Supp. 951 (N.D. Cal 1998) ............................................................. passim

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
  768 F. Supp. 2d 961 (N.D. Iowa 2011) ............................................................. 24

*In re Optical Disk Drive Antitrust Litig.*,
  No. 10-md-2143, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011)......................... 2, 25

*Pepsico, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2nd Cir. 2002)............................................................................ 6

*Precision Assocs., Inc. v. Panalpina World Transport (Holding) Ltd.*,
　No. 08-cv-42, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) .................................................. 24

*Richards v. Neilsen Freight Lines*,
　810 F.2d 898 (9th Cir. 1987).................................................................................................. 12

*The Jeanery, Inc. v. James Jeans, Inc.*,
　849 F.2d 1148 (9th Cir. 1988)................................................................................................ 6

*United States v. Dunn*,
　564 F.2d 348 (9th Cir. 1977).................................................................................................. 6

*United States v. Nye*,
　220 Fed. Appx. 482 (9th Cir. 2007) ...................................................................................... 27

*United States v. Sargent Electric Co.*,
　785 F.2d 1123 (3rd Cir. 1986) .......................................................................................... 25, 26

*United States v. Wilshire Oil Co. of Tex.*,
　427 F.2d 969 (10th Cir. 1970) ............................................................................................... 26

*United States v. Zemek*,
　634 F.2d 1159 (9th Cir. 1980).......................................................................................... 2, 23, 27

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
　259 F.3d 1101 (9th Cir. 2001) ............................................................................................... 22

**FEDERAL RULES**

Fed. R. Civ. P. 37(c)(1) ............................................................................................................ 22

Fed. R. Civ. P. 45(b) ................................................................................................................. 7

Fed. R. Civ. P. 56(c) ................................................................................................................. 22

Fed. R. Civ. P. 56(e) ................................................................................................................. 7, 8

Fed. R. Evid. 804(b)(1) ............................................................................................................. 7

1    **I.        INTRODUCTION**

2           Concededly, there was a Crystal Meeting conspiracy that began in September 2001.  The

3    companies that have been found guilty or admitted to participating in that conspiracy are the

4    familiar six Taiwanese and Korean companies:  AUO, CMO, CPT, HannStar, LG and Samsung.

5    Japanese companies Epson, Hitachi and Sharp have pleaded guilty to participating in separate,

6    limited conspiracies to fix prices on LCD panels sold to specific customers for use in specific

7    products.  Best Buy alleges (as it is free to do) that all of these conspiracies were in fact part of a

8    single, overarching, marketwide conspiracy that began in 1996 and continued for ten years.

9    Toshiba's motion demands to know how Best Buy will tie together the disparate evidence in this

10   case in order to prove the decade-long, single overarching conspiracy that it has alleged.

11          To survive summary judgment, Best Buy must satisfy its burden under the special

12   framework for deciding motions for summary judgment in antitrust cases.  *Citric Acid*, 191 F.3d

13   at 1095.  Like the *Citric Acid* plaintiffs, Best Buy apparently hopes that "quantity will substitute

14   for quality" and that "voluminous but weak circumstantial evidence" will be sufficient to

15   withstand Toshiba's motion.  *Citric Acid*, 996 F. Supp. at 956.   None of the materials cited by

16   Best Buy constitutes direct evidence of Toshiba's participation in the alleged overarching

17   conspiracy, and Best Buy's circumstantial evidence does not "tend to exclude the possibility" that

18   Toshiba "acted independently" from the conspiracy that Best Buy has alleged, or establish that

19   the alleged single, overarching conspiracy ever existed.  *Citric Acid*, 191 F.3d at 1095.

20          Best Buy concedes that Toshiba never attended a Crystal Meeting, but maintains that

21   *Citric Acid* does not mandate dismissal here because Toshiba periodically exchanged information

22   with competitors.  Best Buy simply ignores the fact, noted in *Citric Acid*, that Cargill also

23   exchanged information with competitors concerning "the bidding price for specific citric acid

24   accounts" and that this evidence was not sufficient to defeat Cargill's motion for summary

25   judgment.  *Citric Acid*, 191 F.3d at 1105.  Rather than deal with the core issue — whether the

26   proffered evidence of Toshiba's complicity in the alleged single overarching conspiracy survives

27   the scrutiny of the *Citric Acid* framework — Best Buy focuses on a host of tangential and

28   insubstantial issues, such as the implications of a vacated jury verdict, invocations of the Fifth

1    Amendment that were long ago withdrawn, as well as the outcome of prior Toshiba motions for

2    summary judgment dealing with a very different evidentiary record or very different issues.

3            Best Buy simply has not raised a genuine issue of fact that the Crystal Meetings and the

4    other instances of alleged misconduct in this case were part of "one overall agreement" to fix the

5    price of nearly every LCD panel that was manufactured anywhere in the world between 1996 and

6    2006.  *Zemek*, 634 F.2d at 1167.  Indeed, Best Buy is unable to identify any evidence supporting a

7    single conspiratorial agreement so sweeping in scope and duration.  Courts in this district and

8    elsewhere commonly dismiss bare allegations of "overarching" antitrust conspiracies where the

9    evidence in fact shows separate instances of price-fixing or bid-rigging among discrete groups of

10   conspirators.  *See, e.g.*, *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376.  In light of

11   Best Buy's failure to exclude the possibility of Toshiba's independence from the overarching

12   conspiracy that Best Buy has alleged, and Best Buy's failure to demonstrate a connection between

13   the various instances of alleged misconduct to prove the overarching conspiracy it has alleged,

14   Toshiba's motion for summary judgment should be granted.

15   **II.    ARGUMENT**

16          **A.    Best Buy Has Failed to Distinguish *Citric Acid***

17          The parallels between *Citric Acid* and the LCD cases are striking.  In both cases, a group

18   of competitors organized a highly-formalized cartel involving most, but not all, of the key

19   manufacturers in the respective industries. The firms who did not participate in the formal cartel

20   meetings — Cargill in *Citric Acid* and Toshiba here — were never informed of the existence of

21   the cartel.  *Citric Acid*, 996 F. Supp. at 959 ("[Cargill's] meetings [with competitors] have even

22   less probative value when viewed in light of the way the conspiracy admittedly functioned.

23   When [the four conspirators] decided to fix prices, they did so by meetings among the 'masters'

24   exclusively devoted to price fixing.  Cargill was never present at those meetings.").  While the

25   cartel participants faced criminal charges, Cargill and Toshiba never admitted guilt and were

26   never indicted or convicted.  *Citric Acid*, 996 F. Supp. at 956 ("There was abundant direct

27   evidence of a conspiracy among four companies [other than Cargill].  In fact, all four companies

28

pled guilty to criminal charges and have been sentenced. None now have any reason to shield Cargill.").

Witnesses who attended formal cartel meetings confirmed that neither Cargill nor Toshiba participated in the cartels in each of their respective cases. *Citric Acid*, 996 F. Supp. at 955 ("Cargill offers convincing direct testimonial evidence that it was not involved in the conspiracy. Most persuasive is the testimony Hans Hartmann, the President of H&R GmbH, who pled guilty to being a member of the conspiracy. He stated that no one from Cargill attended any of the meetings at which the conspirators allocated market share . . . and that he never received sales figures from Cargill.").



In both *Citric Acid* and the LCD cases, the plaintiffs presented evidence of information exchanges with competitors who were involved in the respective cartels. In *Citric Acid*, ADM's Barrie Cox testified in a criminal proceeding that he discussed the "bidding price for certain [citric acid] accounts" with Cargill, and he also made statements to the FBI in which he claimed that "he had discussions with Cargill employee William Gruber regarding the bidding price for specific citric acid accounts." *Citric Acid*, 191 F.3d at 1104-05. Cox's statements showed "at best, that Cox engaged in sporadic price discussions with one individual at Cargill, which evidence is neither sufficient to survive summary judgment under *Baby Food* nor probative of the industry-wide conspiracy alleged . . . ." *Id.* at 1104. Best Buy's evidence of sporadic price

discussions involving Toshiba employees — largely evidence of such discussions between Samsung's H.B. Suh and TMD's Makoto Chiba — is similarly inadequate to exclude the possibility that Toshiba acted independently.

Best Buy's attempts to distinguish *Citric Acid* are either immaterial or flatly contradicted by the record. Although the Ninth Circuit has held explicitly that it is the plaintiff's burden to come forward with evidence tending to exclude the possibility of independent conduct, *Id.* at 1096, Best Buy improperly attempts to shift the burden to Toshiba to "query all participants to conclusively establish Toshiba [*sic*] supposed lack of participation." Opp'n at 28. Indeed, the district court opinion in *Citric Acid* relies largely upon the testimony of one conspirator, Hans Hartmann, and the testimony of Cargill's own witnesses to confirm that Cargill did not participate in the conspiracy. *Citric Acid*, 996 F. Supp. at 955. Nothing in the *Citric Acid* opinions suggests that the court required Cargill — the moving defendant — to canvas every meeting participant to affirmatively *dis*prove the plaintiffs' allegations. Moreover, in light of the "abundant direct evidence of a conspiracy among four companies" in the citric acid cartel, the "utter lack of any direct evidence against Cargill" was deemed "quite probative" of Cargill's non-participation. *Id.* at 956. The similar absence of evidence connecting Toshiba to the Crystal Meeting conspiracy should be deemed probative of Toshiba's non-participation in the conspiracy Best Buy has alleged.

Best Buy also perplexingly argues that there is "no evidence . . . that Toshiba 'immediately rejected' an offer to fix prices." Opp'n at 29. But this is exactly what occurred when Mr. Chiba objected to H.B. Suh's joking suggestion that the Japanese suppliers should form a cartel — a point raised in Toshiba's opening brief (and ignored by Best Buy). Mot. at 16 (citing Suh Test., DPP Trial Tr. at 310:6-13 ("Q. And, sir, in response to that joke, Mr. Chiba said you shouldn't do it, because it's against the law. Correct? A. Yes.")). Again, the parallels to *Citric Acid* are striking. There, the court held that "[i]t would not be reasonable to infer that Cargill engaged in illegal activities merely from evidence that an illegal course of action was suggested but immediately rejected." *Citric Acid*, 191 F.3d at 1098. Best Buy also argues that Toshiba has provided "no evidence that competitor pricing came from customers" and other non-competitor

sources, Opp'n at 29, but Toshiba in fact has provided droves of such evidence.  *See*, *e.g.*, TSB-LCD-0349114 (Chung Reply Decl. Ex. B) ("Below is the pricing which I received from my source in Dell today.").  Thus, the contentions in Best Buy's *Citric Acid* chart at pages 28-29 of its opposition are highly misleading.  Best Buy simply has failed to identify a meaningful factual or legal distinction between *Citric Acid* and the current case.

**B.     Toshiba's Motion is Governed by the Special Rule for Motions for Summary Judgment in Antitrust Cases**

There can be no serious question that the legal framework set out in *Citric Acid* (following *Matsushita*) controls the outcome of this motion.  *Citric Acid*, 191 F.3d at 1095 ("We have repeatedly applied this summary judgment framework, which, to repeat, we must apply whenever the plaintiff cannot establish *every element of its case* without asking the court to draw an inference in its favor.") (emphasis added).  As discussed in greater detail below, none of the evidence proffered in Best Buy's opposition is sufficient to link Toshiba to the Crystal Meeting conspiracy, or to link the Crystal Meeting conspiracy to the pre-Crystal Meeting conduct in the LCD industry.  Because all of Best Buy's evidence is circumstantial, Best Buy must offer proof sufficient to exclude the possibility that Toshiba acted independently from the agreements reached at the Crystal Meetings.

Best Buy improperly seeks to lessen its burden on this motion by relying on inapplicable case law.  It begins by misquoting case law discussing the general summary judgment standard, Opp'n at 4 (misquoting *Avalos v. Baca*, which concerned a *plaintiff's* motion for summary judgment), without acknowledging the "special rule," *Citric Acid*, 996 F. Supp. at 954, that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) ("at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently.").  Best Buy then unabashedly invokes old case law disfavoring summary judgment in antitrust cases, Opp'n at 5 (citing *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1364 (9th Cir. 1980), but that case law did not survive the Supreme Court's decision in Matsushita.  *See generally*, 2 Philip E.

Areeda & Herbert Hovenkampf, Antitrust Law, ¶ 308c2, at 133 (3d ed. 2007) ("In its *Matsushita* decision the Supreme Court . . . changed what courts had previously seen, perhaps incorrectly, as a presumption against the granting of summary judgment in complex antitrust cases. Any such presumption has now disappeared."). Indeed, following *Matsushita*, in antitrust cases "summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces." *Pepsico, Inc. v. Coca-Cola Co*., 315 F.3d 101, 104 (2nd Cir. 2002); *see also The Jeanery, Inc. v. James Jeans, Inc*., 849 F.2d 1148, 1160-61 (9th Cir. 1988) ("The Supreme Court [in *Matsushita*] has cautioned against letting unsupported allegations in an antitrust case reach a jury.").

Continuing to ignore *Matsushita* and its progeny, Best Buy contends that it needs to show only "slight evidence" connecting Toshiba to the Crystal Meeting conspiracy. But that standard has been strictly curtailed in the Ninth Circuit. *See United States v. Dunn*, 564 F.2d 348, 356 (9th Cir. 1977) (holding that "slight evidence" formulation is "highly misleading" and "obviously was intended to state the substantive law of conspiracy and not the law regarding evidence, burden of proof, or standards of appellate review as to the sufficiency of the evidence") (superseded by statute on other grounds). In *Citric Acid*, Judge Fern M. Smith confirmed that the discredited "slight evidence" rule is inconsistent with the summary judgment standard established in *Matsushita*. 996 F. Supp. at 955 ("Because defendant's connection to the conspiracy is precisely the issue here, and because the Court believes that following the slight evidence rule in a summary judgment motion would be inconsistent with the summary judgment standard established by the Supreme Court, the Court holds that the slight evidence rule does not apply."). Judge Smith further explained that the slight evidence rule is "a rule of criminal appellate procedure not properly applied to a motion for summary judgment." *Id.* Unsurprisingly, all of the cases cited by Best Buy that applied the slight evidence rule are cases concerning criminal appellate procedure. Best Buy has not identified any cases applying the slight evidence rule in the context of a motion for summary judgment. *Cf. id.* at 956 n.1 ("Such an egregious error on a central point of law diminishes plaintiffs' credibility . . . .").

Finally, Best Buy erroneously argues that the trial testimony of Brian Lee and C.C. Liu is

inadmissible hearsay that should not be considered by the Court. Opp'n at 2 n.3. Mr. Lee and Mr. Liu, both employees of Chunghwa in Taiwan, are "unavailable" within the meaning of Rule 804(b)(1) because they reside outside the geographical limits of the Court's subpoena power under Rule 45(b) of the Federal Rules of Civil Procedure, and their trial testimony is thus admissible. *See Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1019 (9th Cir. 2004) (finding that a witness was "unavailable" and that his prior testimony was admissible under Rule 804(b)(1), where the witness resided outside the geographical limits of the court's subpoena power); *Bailey v. S. Pac. Transp. Co.*, 613 F.2d 1385, 1389-90 (5th Cir. 1980) (same). In any event, Best Buy itself has designated testimony from numerous foreign witnesses who testified at the AUO and DPP trials in its recent pretrial disclosures. Best Buy cannot rely on this same prior testimony and now claim that it is inadmissible hearsay.

## C.    Best Buy Has Not Offered Sufficient Proof to Tie Toshiba to the Alleged Overarching Conspiracy

Like the plaintiffs in *Citric Acid*, Best Buy relies on "quantity over quality" to oppose summary judgment. *See Citric Acid*, 996 F. Supp. at 956 ("Apparently hoping that quantity will substitute for quality, plaintiffs have submitted voluminous but weak circumstantial evidence that they argue indicates that Cargill was a member of the conspiracy."). Certain materials cited by Best Buy — such as the vacated jury verdict, the withdrawn Fifth Amendment invocations of current and former Toshiba employees and the Samsung interrogatory responses that were never admitted at the DPP trial — do not even constitute admissible evidence. As such, those materials may not be considered by the Court in its decision on this motion. *Citric Acid*, 996 F. Supp. at 954 ("To withstand a motion for summary judgment, the opposing party must set forth specific facts, admissible in evidence, showing that there is a genuine issue of material fact in dispute." *Citric Acid*, 996 F. Supp. at 954 (citing Fed. R. Civ. P. 56(e)). Although Best Buy identifies a variety of materials as direct evidence in support of its claims, none of the evidence cited by Best Buy demonstrates, without the drawing of multiple inferences, that Toshiba participated in the alleged overarching conspiracy. *See Citric Acid*, 996 F. Supp. at 958 ("In sum, plaintiffs are asking the Court to peer through a triple lens of speculation . . . . Drawing an inference of

conspiracy on the basis of this evidence would be wholly improper for any rational trier of fact."). Nor does the indirect evidence identified by Best Buy tend to exclude the possibility that Toshiba acted independently, even when viewed as a whole. Accordingly, Toshiba's motion for summary judgment must be granted.

> **1.** **Best Buy Improperly Opposes Toshiba's Motion with Inadmissible Evidence**

It is well-established that the Court may consider only admissible evidence when deciding a motion for summary judgment. *See Citric Acid*, 996 F. Supp. at 954 ("To withstand a motion for summary judgment, the opposing party must set forth specific facts, admissible in evidence, showing that there is a genuine issue of material fact in dispute." (citing Fed. R. Civ. P. 56(e)).

> **a.** **The Vacated Jury Verdict from the DPP Trial Has No Evidentiary Value**

In spite of the fact that the jury verdict from the DPP trial has been vacated and is without evidentiary value, Best Buy argues that "the jury clearly found Toshiba participated in . . . the exact conspiracy that Best Buy alleges." Opp'n at 3 (quotation marks omitted). Not only is Best Buy's reliance on the vacated verdict improper, it is inconsistent with the verdict itself, which awarded the DPPs a mere 10% of the damages claimed. The jury's vacated finding that Toshiba participated in "a conspiracy," and its decision to award the DPPs 10% of their requested damages, is more consistent with a finding that Toshiba did *not* participate in the overarching conspiracy alleged by the DPPs.

Best Buy has also alleged that "THERE WAS ONE LENGTHY CARTEL AND TOSHIBA WAS A MEMBER." Opp'n at 29. But Best Buy offers no support for its illogical argument that the indefinite jury verdict (finding participation in "a conspiracy") relates to the "ONE" cartel that Best Buy has alleged. Moreover, Best Buy does not address the fact (raised in Toshiba's motion) that, at the time of the settlement, the DPPs faced motions for judgment as a matter of law that could have overturned the verdict outright.

Best Buy also unfairly describes Toshiba's settlement with the DPPs as a "scheme to erase that verdict," Opp'n at 3, and cites to the Court's comments at the initial settlement conference —

REPLY MEMORANDUM IN SUPPORT OF TOSHIBA ENTITIES' MOTION FOR SUMMARY JUDGMENT
No. 3:12-cv-1441 SI, MDL No. 1827

while ignoring the fact that the very "scheme" it decries ultimately received the approval of the Court. *See* Order Granting Final Approval of Settlement at 3, Dkt. No. 7372 (Dec. 18, 2012) (approving Toshiba's settlement with the DPPs and vacating the jury verdict). Moreover, Best Buy neglects to mention the Court's observation in the same hearing that "everyone recognized that Toshiba's liability was in a different posture from some of the other defendants and perhaps more gossamer thin in terms of its documentation." Dkt. 6738 at 15:18-21.

Equally unfounded is Best Buy's related argument that the Court's order denying Toshiba's motion for summary judgment against ATS, Dkt. No. 7113, controls the outcome of this motion. Toshiba did not raise arguments in the ATS motion based on the evidence introduced at the civil and criminal trials confirming that Toshiba did not participate in the alleged conspiracy. Instead, Toshiba argued that summary judgment was required because the unique, sole-source panels that ATS purchased could not have been the subject of a price-fixing conspiracy. As the Court explained, "[t]he crux of the instant motion is whether the panels that LG Display sold to Ricoh are outside the scope of any established or alleged price-fixing conspiracy." Dkt. No. 7113 at 6. Accordingly, the order on Toshiba's motion for summary judgment against ATS is not relevant to this motion.

### b. The Invocations of the Fifth Amendment Have No Probative Value and Are Not Admissible

Best Buy improperly seeks adverse inferences from invocations of the Fifth Amendment by certain current and former Toshiba employees. Opp'n at 6-7. The witnesses were merely proceeding under the framework for Fifth Amendment revocation set out by Special Masters Smith and Quinn, and all but one of these witnesses later revoked their invocations and provided substantive testimony in depositions and/or at trial. *See* Defendants' Motion *in Limine* No. 2 to Adopt Orders from the DPP Trial Regarding Fifth Amendment Invocations at 2, Dkt. No. 8127 (June 18, 2013); *Harrell v. DSC Equip. Leasing Corp.*, 951 F.2d 1453, 1465 (5th Cir. 1992) (noting the low "potential probative value" of a Fifth Amendment invocation that was subsequently revoked). Moreover, the invocations were made on the advice of counsel and are not probative of the witnesses' innocence or guilt. *See, e.g., Harrell*, 951 F.2d at 1465 ("[T]he

invocation of the privilege, particularly on the advice of counsel, is an ambiguous response."). In the DPP action, the Court excluded evidence of these witnesses' prior invocations of the Fifth Amendment, finding that the danger of unfair prejudice to Toshiba substantially outweighed any probative value the invocations might have. Final Pretrial Scheduling Order at 6, Dkt. No. 5597 (May 4, 2012). The only witness who has not revoked her invocation of the Fifth Amendment, Christina Caperton, is a former employee of Toshiba, Hitachi and Samsung, and Best Buy has made no attempt in its present motion to upset this Court's prior rulings that her invocation may not be imputed to Toshiba. *See id.*; *see also LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (discussing factors for imputing the Fifth Amendment invocation of a non-party witness to a party). Because the Fifth Amendment invocations are not evidence and may not be imputed to Toshiba, the Court should not consider the invocations in deciding this motion.

### c.    The Samsung Interrogatories Are Inadmissible Hearsay and Were Not Admitted at the DPP Trial

Best Buy has identified Samsung's March 8, 2011 interrogatory responses as "direct evidence" of Toshiba's participation in the alleged conspiracy. Opp'n at 7. This Court held that the interrogatory responses were inadmissible at the DPP trial and, accordingly, the Court may not consider them when deciding a motion for summary judgment. *See* Jury Instructions at 8, Dkt. No. 6036 (June 28, 2012) ("The Samsung interrogatory responses have not been admitted into evidence."); *Citric Acid*, 996 F. Supp. at 957 ("[T]he Court cannot consider inadmissible evidence on a summary judgment motion.") (citing *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 n.9 (9th Cir. 1980). In any event, the interrogatory responses make clear that their use of the term "understanding" to describe the interactions between H.B. Suh and certain Toshiba employees is broad enough to include general information exchange, rather than agreements to fix prices. *See* Samsung's Mar. 8, 2011 Interrog. Resps. at 4 (stating that "understanding" is used to include "the general level of prices in the market, or the price range or price trend that the parties to the communication anticipated").

**2.      There is No Direct Evidence of Toshiba's Participation in the Alleged Conspiracy**

Best Buy's so-called "direct evidence" of Toshiba's participation in the alleged conspiracy at most establishes that Toshiba engaged in legal information exchanges with competitors; Best Buy has offered no direct evidence that would allow the Court to conclude, without drawing any inferences, that Toshiba participated in the alleged conspiracy. *See Citric Acid*, 191 F.3d at 1093 ("[W]e can find nothing in the record that establishes, without requiring any inferences, that Cargill participated in the citric acid price-fixing conspiracy.") (citing *In re Baby Food*, 166 F.3d at 118 ("Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.")).

Best Buy has failed to identify any direct evidence that Toshiba entered price-fixing agreements with competitors, or that Toshiba agreed to participate in the overarching conspiracy that Best Buy has alleged. As anticipated, Best Buy relies primarily on H.B. Suh's interactions with Makoto Chiba in an effort to prove that Suh and Chiba "reached agreements on prices." Opp'n at 7. Mr. Suh, of course, never testified to reaching "agreements"; he used the more nebulous word "understanding" to describe the results of his interactions with competitors. Opp'n at 7 n.7 (citing Mr. Suh's deposition testimony concerning "understandings" of prices on panels sold to Motorola). Best Buy argues that the distinction between "understandings" and "agreements" raised in Toshiba's motion is purely semantical, but Best Buy never addresses the undeniable fact that neither Mr. Suh, nor any witness in this sprawling litigation, has testified to reaching price-fixing agreements with Toshiba. Nor does Best Buy address Mr. Suh's own explanation that his use of the term "understanding" meant that the information he received from competitors merely allowed him to "speculate" about his competitors' prices. *See* Mot. at 11-12. Such ambiguous testimony is insufficient to satisfy Best Buy's burden under *Citric Acid*. Indeed, the Ninth Circuit has found that the use of more explicit terms to describe interactions among competitors, such as "gentlemen's agreement" or "truce," were insufficient to "tend to exclude the possibility of legitimate behavior," as required to resist summary judgment. *See Citric Acid*,

191 F.3d at 1095, 1104 (discussing *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 903 (9th Cir. 1987) and *In re Baby Food*, 166 F.3d at 120).

Best Buy relies heavily on the minutes from a single Crystal Meeting, which contain unattributed and unconfirmed information about Toshiba pricing and stray speculation that the Japanese would "subtly cooperate" with the alleged cartel. Best Buy ("BB") Ex. 305/305E. The language cited by Best Buy is in fact a mistranslation. The version of this document admitted at the DPP trial indicates only that "[i]t's *possible* to cooperate with Japanese companies," not that such cooperation was expected to occur. DPP Trial Ex. 118 (Chung Reply Decl. Ex. W) (emphasis added). Moreover, Best Buy cites these unfulfilled aspirations, but ignores the fact that not a single Crystal Meeting attendee has admitted to notifying the Japanese suppliers of the cartel agreements reached at the Crystal Meetings (including the author of the minutes that Best Buy has identified). DPP Trial Ex. 3005 (Stanley Park (LG) Dep. at 174:7-12) (Chung Reply Decl. Ex. C) ("Q. To your knowledge, did anyone advise the Japanese about the results of these meetings? A. I don't know whether. Q. . . . Who was supposed to advise the Japanese companies? A. That was not decided.").

As one of its prime pieces of evidence, Best Buy discusses a document reflecting "a meeting of the highest executives of Toshiba and Sharp," at which Sharp "alerted Toshiba of the price increase" reached at a recent Crystal Meeting. Opp'n at 9-10 (citing BB Ex. 2539). Best Buy obscures the fact that the document on its face states that the meeting concerned sales of LCD panels from Sharp to its customer, Toshiba's PC division. BB Ex. 2539. Best Buy's reliance on a vertical customer meeting that is incapable of raising an inference of horizontal collusion underscores the weakness of Best Buy's opposition. *See Citric Acid*, 996 F. Supp. at 959 ("Other mentions of price were innocuous for different reasons. A letter from ADM to Cargill informing them of a price increase appears to relate to a particular sale from ADM to Cargill, not to the ADM's [*sic*] general list price.").

There is absolutely no evidence that the information discussed at this meeting was shared with anyone at Toshiba who was involved in LCD panel sales or marketing; indeed, Toshiba's PC division maintained an arms' length relationship with Toshiba's LCD panel manufacturing

division (later TMD).  Ishimura (Toshiba) Test., DPP Trial Tr. at 3036:23-3037:10 (Chung Reply Decl. Ex. D) ("Q. . . .  "[S]o, I take it from your testimony that the Toshiba PC group treated TMD just like any other supplier? . . .  A. Yes, that's correct.").   There is also no indication that Sharp's information came from a Crystal Meeting.   The comment about Taiwanese price increases is a vague statement about general market prices that had already been reported in the Japanese press.  Chung Reply Decl. Ex. E (English translation of Japanese news report from the Nihon Keizai Shimbun Morning Edition dated October 20, 2001 stating that the Taiwanese LCD manufacturers were increasing prices by 5.3%).   Best Buy's attempt to make this document appear sinister is illustrative of its broader pattern of portraying perfectly legal vertical supply relationships as somehow nefarious.  *See, e.g.,* BB Ex. 2647/2647E ████████████████

████████████████████████████████████████████ BB Ex. 2632.

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████ ██████████████████████████

████████████

    Other supposed "direct evidence" cited by Best Buy shows mere information exchanges, unilateral decision making and aggressive competition.  *See, e.g.*, ████████████████

███████████████████████████████ █████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

    Best Buy also cites to numerous documents revealing communications about products that were never discussed at the Crystal Meetings.  Exhibit 4019 concerns 15.4" WUXGA panels sold

to Dell.  It reflects exactly the kind of internal Toshiba discussions that were necessary under Toshiba's agreement with Dell that required Toshiba to meet certain competitors' prices.  *See* Mot. at 12-14.  Moreover, the 15.4" WUXGA was a specialized, high-end panel, and minutes from contemporary Crystal Meetings reveal that 15.4" WUXGA pricing was not discussed by the cartel.  *See* Barry Harris (Toshiba Expert) Test., DPP Trial Tr. at 3474:10-13 (Chung Reply Decl. Ex. H) ("Q. And, they were commodity panels.  Correct?  A.  I'm not sure if that's right.  There was the 15.4-inch W--WUXGA that was sold to Dell, and that was a highly-customized product."): ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████  Evidence of information exchanges related to this product are therefore insufficient to tie Toshiba to the overarching conspiracy that Best Buy has alleged.

Other documents refer to communications about small-sized panels, which also were never discussed at the Crystal Meetings, and many of these documents in fact demonstrate intense competition.  ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████  These documents cannot furnish a link to the Crystal Meetings because, as Brian Lee of CPT testified, the Crystal Meeting participants never reached agreements on, let alone discussed, small LCD panels.  *See* Mot. at 3-4.

Others reveal exactly the type of customer game-playing that led Toshiba employees to seek confirmation of the reports that it was receiving from its customers.  ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████

      Best Buy seizes upon Mr. Chiba's concerns about a three-company meeting and the possibility that such a meeting could be misinterpreted as bid-rigging. Opp'n at 8 (citing BB Ex. 2654/2654E). But an earlier email in the chain shows that the dinner was "to exchange information about Apple" and specifically "M25B," another small panel for Apple's iPods. As Mr. Amano explained at the DPP trial: "Epson had just gotten into the Apple business, from January; but because of demand fluctuations and because of Apple's methods, they were a little bit confused. TMD was a major supplier. And so they wanted to find out from us how we planned production, and they wanted to get advice from us. And that was why this dinner meeting was set up. And there was a general information exchange." Amano Test., DPP Trial Tr. at 1038:1-7 (Chung Reply Decl. Ex. K).

      Similarly, documents showing that Messrs. Chiba and Amano had contacts with other Japanese suppliers simply do not establish that Toshiba entered price-fixing agreements with those companies, or that there was any connection between the Japanese suppliers and the Crystal Meetings. For instance, Exhibit 2578 reveals nothing more than that Mr. Amano and Mr. Chiba were "communicating" and had "friend[s]" at Sharp and Hitachi. The document says nothing about any price-fixing agreement and simply reflects legal price verification to combat the "games that Dell [was] playing." BB Ex. 2578; ███████████████████████████
██████████████████████████████████████ *see also, In re Baby Food*, 166 F.3d at 133 (finding that opportunity to conspire and social relationships "should be accorded little, if any, weight") (citation and quotation omitted). ████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████. *Citric Acid*, 191 F.3d at 1102 ("A section 1 violation cannot . . . be inferred from parallel pricing alone, nor from an industry's follow-the-leader pricing strategy.") (internal citations omitted); ████████
█████████████████

Even where Best Buy has presented evidence that may relate to information exchanges concerning notebook panels, these documents reflect mistrust among Toshiba personnel and their competitor counterparts. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████

3.     **Best Buy's Circumstantial Evidence, Taken as a Whole, Does Not Tend to Exclude the Possibility that Toshiba Acted Independently from the Alleged Conspiracy**

The circumstantial evidence identified by Best Buy largely overlaps with the alleged "direct" evidence that Best Buy has mustered. Despite the quantity of materials that Best Buy has cited, even when taken as a whole, Best Buy's circumstantial evidence does not tend to exclude the possibility that Toshiba acted independently. *Citric Acid*, 191 F.3d at 1096 ("The requirement that a plaintiff who relies solely on circumstantial evidence of conspiracy . . . must produce evidence tending to exclude the possibility that defendants acted independently follows directly from the Supreme Court's opinion in *Matsushita* and is . . . well-established in both this circuit, as well as in our sister circuits.") (citations omitted).

For example, Best Buy attempts to link Toshiba to the Crystal Meetings through unwarranted inferences contradicted by the documentary and testimonial record. Best Buy misrepresents that the Crystal Meeting attendees "explicitly acknowledged[] the cartel needed to include the Japanese," ignoring the fact that not one Crystal Meeting attendee has testified to contacting or being asked to contact Toshiba. Opp'n at 18. Best Buy also erroneously characterizes an LG document purportedly indicating that Japan, Taiwan and China ████████

█████████████████████████████████████████████████ BB Ex. 1405/1405EE.  In actuality, the author of this document testified that it refers to ██████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Similarly, Best Buy cites an LG executive's speculation at a Crystal Meeting that "Japan TFT makers will follow and catch up on price," ignoring that the LG representative in attendance, Stanley Park, testified that he never contacted Toshiba regarding the Crystal Meetings.  BB Ex. 3285; DPP Trial Ex. 3005 (Stanley Park (LG) Dep. 594:5-8 (Chung Reply Decl. Ex. C)).  And of course, there is nothing nefarious about a competitor following market pricing.  █████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ BB Ex. 1971.

Best Buy also purports to identify evidence that Crystal Meeting minutes contained "regular discussions and consideration of *Toshiba's* pricing, production and market share." Opp'n at 21 & nn.23-25 (emphasis added).  In reality, the cited documents refer to opinions that Crystal Meeting attendees expressed about unspecified Japanese companies generally, BB. Exs. 308/308E, 311/311E, *estimated* information about Toshiba based on publicly available information, CMOCIV-1460532, GRN000836, BB Ex. 305/305E, or references to Toshiba as a *customer*.  As Brian Lee explained, the Crystal Meeting participants could not have discussed the Japanese companies' pricing and production in any greater detail and could only estimate them because they were not invited to the Crystal Meetings.  Mot. at 6; Lee Test., AUO Trial. Tr. at 1313:25-1314:11 (Chung Reply Decl. Ex. N).

Best Buy then misrepresents several documents in the hope of creating an inference that they relate to prices discussed at the Crystal Meetings, while providing no evidence to support that inference.  Opp'n at 19-22.  For example, although Toshiba's Kiri Shirai initially wrote that Toshiba was considering raising prices to Dell in January, she subsequently asked TAEC not to "change the quotation yet" because Toshiba wanted to "stay with this price little more and see what's gonna happen."  TSB-LCD-0331450 at -451.  Other misrepresentations are abundant.



*E.g.*, BB Ex. 3106/3106E ████████████████████████████

███████████████████████████████████████████████ BB Ex.

4007E █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

TSB_LCD1_00340499E ████████████████████████████

██████████████████████████████████████ *see* Makoto Kaneta

(CMO) Dep. 40:7-19 (Chung Reply Decl. Ex. L)).

Best Buy also cites documents involving Christina Caperton and Dominic Dorall as evidence of conspiratorial conduct. Opp'n at 15-16. However, these documents show nothing more than information exchanges or speculation about pricing trends and volume allocations that might be awarded to suppliers. *E.g.*, BB Ex. 3534; BB Ex. 3698; BB Ex. 1945. Although Dominic Dorall may have received some general information about forecasts that Toshiba's competitors anticipated, his best source of information for competitors' pricing was Dell itself, because he was located at Dell's supply hub. *See* TSB-LCD-0349114 (Chung Reply Decl. Ex. B) ("Below is the pricing which I received from my source in Dell today."); TSB-LCD-0482225 (Chung Reply Decl. Ex. O) (stating that Dell's Hoay Cheen provided him with pricing information); TSB-LCD-0243501 (Chung Reply Decl. Ex. P) (listing Dell part numbers and pricing for specific panels sold by Sharp and Samsung). Obtaining information on competitors' prices from a customer is "proper competitive behavior." *Citric Acid*, 996 F. Supp. at 960 ("The attempt to glean from customers market information about competitors is proper competitive behavior.") Best Buy cannot raise an inference of collusion based on information Toshiba received from its own *customers*.

As with Best Buy's purported "direct" evidence, many of the documents and meetings that Best Buy cites concerned unquestionably legitimate vertical relationships. *E.g.* AU-MDL-08012946E ████████████████████████████████████

███████████████ SCM00373979 ████████████████████████

██████████████████████████████████ BB Ex. 1058 █████████

██████████████████████████████████████████████████████████████████ *see*
*also* BB Ex. 759/759EE ██████████████████████████████████████████████

████████████████████████ For example, Toshiba's Makoto Chiba did meet with HannStar's David Joe on a couple of occasions, but those meetings concerned a technology alliance under which Toshiba provided its advanced technology to HannStar in exchange for obtaining a steady supply of cheaper panels. TSB_LCD1_00219002E; Makoto Chiba (Toshiba) Dep. 70:1-72:5 (Chung Reply Decl. Ex. Q). By definition, these customer-supplier communications cannot support an inference of conspiracy. They had nothing to do with the Crystal Meetings.

The handful of documents that remain have not been shown to have any connection to the Crystal Meetings and involved nothing more than "shop talk," which is insufficient to survive summary judgment. *In re Baby Food*, 166 F.3d at 125; *see* Opp'n at 12-22 (citing HITDOJCIV00590865E; BB Ex. 530/530E; BB Ex. 1405/1405EE; BB Ex. 1801; BB Ex. 2585; BB.Ex. 2586/2586E; BB Ex. 2595/2595E; BB Ex. 2667; BB Ex. 4016E; BB Ex. 4020E; BB. Ex. 4021; BB Ex. 4023). It is evident from the face of these documents that much if not all of the information concerned either general opinions about market trends or prices that the LCD suppliers had already offered to their customers for delivery in subsequent months, which contrary to Best Buy's assertions, is not "future pricing." And as explained previously, Toshiba's agreements with suppliers such as Dell and HP required it to base its pricing on the prices offered by its competitors. Mot. at 12-13. To verify these prices, Toshiba did indeed make use of a competitive intelligence "network," *see* BB Ex. 2584, but as Mr. Amano testified at trial, Toshiba's intelligence network was comprised of various sources including OEMs and Dell's own factory in Malaysia. Amano Test., DPP Trial Tr. at 956:1-6 (Chung Reply Decl. Ex. K). There is nothing nefarious about gathering competitive intelligence. As the documents cited by Best Buy show, the purpose of Toshiba's communications was "to verify the truth of this kind of information." BB Ex. 4009E; *see also* BB Ex. 3800 ████████████████████████
██████████████████████████████████████████████████████████████████████
████████████

**4.      The Evidence of Toshiba's Alleged Knowledge of Wrongdoing Does Not Tend to Exclude the Possibility that Toshiba Acted Independently from the Alleged Conspiracy**

Best Buy also argues that Toshiba's use of handling restrictions on emails demonstrates its awareness that competitor contacts were illegal.  Opp'n 22-24.  As the evidence shows, however, these documents were nothing more than efforts to comply with Toshiba's internal policies regarding handling confidential information.  Toshiba maintained information security guidelines that instructed its employees to designate sensitive corporate information with notations such as "Top Secret," "Secret," "Copying Prohibited," "Redistribution Prohibited," "*Destroy After Reading*," and others.  DPP Trial Ex. 1810-T at -443E (Chung Reply Decl. Ex. R) (emphasis added); *see also* Amano Test., DPP Trial Tr. at 1023:17-25 (Chung Reply Decl. Ex. K) ("[W]ithin the Toshiba group, there are very stringent guidelines having to do with information security.  And so if there is information about competitors or new products that has not become public, then in accordance with the idea or the thinking of the person who wrote the e-mail message, that person should write things such as 'Destroy After Reading' or 'Highly Confidential.'").  The guidelines broadly define "corporate information" to include all information except that which is widely disseminated, and instruct employees to exercise their discretion and use these notations to protect confidential information regardless of the source or author.  Toshiba's employees complied, placing notations such as "destroy after reading" on documents that involved discussions between Toshiba and its customers.  *E.g.*, TSB_LCD1_00832090 (Chung Reply Decl. Ex. S).  Best Buy's claim that these notations are proof of illegal conduct is wrong.

**5.      The Expert Testimony Is Insufficient to Create a Genuine Issue of Material Fact for Trial**

Best Buy relies on the expert reports of Dr. B. Douglas Bernheim and Dr. Kenneth Flamm to argue both that Toshiba had economic incentives to participate in the alleged cartel and that the Crystal Meeting participants had incentives to invite Toshiba to participate.  Best Buy contends that Toshiba was not a fringe player in the large panel TFT-LCD market because, █████████

REPLY MEMORANDUM IN SUPPORT OF TOSHIBA ENTITIES' MOTION FOR SUMMARY JUDGMENT
No. 3:12-cv-1441 SI, MDL No. 1827

███████████████████████████████████████████████████

███████████████████████████████      ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

For similar reasons, Best Buy's arguments regarding Toshiba's small share of LCD panel sales and capacity miss the mark.  Contrary to Best Buy's claims, ████████████████

███████████████████████████████████████████████████

████████████  Opp. at 25 (citing Third Bernheim Rebuttal ¶ 91).  But as Dr. Harris notes, Toshiba's minor share meant that it had little incentive to join in the Crystal Meetings, and that the Crystal Meeting participants had little incentive to invite Toshiba given the minor effect that Toshiba's participation would have on prices for large, mainstream panels.  Expert Report of Barry C. Harris, Ph.D. ¶¶ 39-43 (Feb. 22, 2013) (Chung Reply Decl. Ex. U) ("Harris Report").  Toshiba elected to focus on differentiated technology and manufacturing small, customized panels, which were not discussed at the Crystal Meetings.  Harris Report ¶¶ 30-38.  As Best Buy's expert Mr. Stowell has opined, █████████████████████████████████████████████████

████████████████████████████████████  Expert Report of David P. Stowell ¶ 26 (Dec. 15, 2011) (Chung Reply Decl. Ex. V); *see* Harris Report Table 1 (showing Toshiba's LCD monitor panel share dropping from 1.1% (2001) to 0.5% (2002), 0.1% (2003) and 0% thereafter; showing TV panel share of 0.9% (2004) and 0% thereafter).

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████  Opp'n at 25.  But as Dr. Harris explained, even if Dr. Bernheim were correct

regarding the pass-through rate — a point which remains in dispute — Toshiba had at most only a weak incentive to join an LCD conspiracy in light of the diminished sales and lost profits that Toshiba could expect to incur.  Harris Report ¶ 48.

Best Buy also improperly cites to expert opinions offered by Dr. Flamm in the DPP case. Opp'n at 25-26.  Dr. Flamm's opinions are inadmissible and may not be considered in the context of this motion.  Fed. R. Civ. P. 56(c).  Best Buy has not disclosed Dr. Flamm as an expert, and Dr. Flamm has not submitted a report in the *Best Buy* action or any other Track 1B case. Accordingly, Best Buy "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial."  Fed. R. Civ. P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  ██████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████

### D.    Best Buy Has Not Offered Proof Sufficient to Tie Together Disparate Instances of Anticompetitive Conduct into the Overarching Conspiracy it Has Alleged

Even if Best Buy could meet its burden under *Citric Acid* of offering evidence that tends to exclude the possibility that Toshiba acted independently, Best Buy still cannot establish the "one lengthy cartel" that it has alleged.  Opp'n at 29.  Best Buy mischaracterizes Toshiba's motion as an improper attempt to "dismember" the conspiracy it has alleged.  Opp'n at 4. Toshiba fully recognizes that Best Buy's evidence of the alleged conspiracy must be considered "as a whole."  *Citric Acid*, 191 F.3d at 1097.  This does not relieve Best Buy of its burden to prove the "essential elements" of the conspiracy it has alleged.  *Citric Acid*, 996 F. Supp. at 954 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) ("If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, 'the moving party is entitled to a judgment as a matter of law.'").  An essential element in any Section One conspiracy case is

proof of a "conscious commitment to a *common scheme*." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 768 (1984) (emphasis added). On this element Best Buy has failed twice. First, Best Buy fails to present evidence that would tie together the disparate instances of anticompetitive conduct into the lengthy cartel it alleges. Second, assuming Best Buy could do so, which it cannot, Best Buy presents no evidence to show that Toshiba made a conscious commitment to that scheme.

Best Buy has presented evidence of disparate conduct among LCD suppliers over an eight-year period. To prevail, Best Buy must offer direct or circumstantial evidence that this conduct was undertaken pursuant to "one overall agreement" to carry out the overarching conspiracy Best Buy has alleged. *Zemek*, 634 F.2d at 1167. Toshiba's alleged connection to such an agreement must be analyzed under the *Citric Acid* framework. *Citric Acid*, 996 F. Supp. at 955 ("defendant's connection to the conspiracy is precisely the issue here"). Best Buy has failed to offer direct evidence of Toshiba's participation in the agreements reached at the Crystal Meetings or circumstantial evidence tending to exclude the possibility that Toshiba acted independently. *Citric Acid*, 191 F.3d at 1093 ("The requirement that a plaintiff who relies solely on circumstantial evidence of conspiracy . . . must produce evidence tending to exclude the possibility that defendants acted independently follows directly from the Supreme Court's opinion in *Matsushita* and is . . . well-established in both this circuit, as well as our sister circuits.") (citation omitted).

Much of the evidence cited by Best Buy has nothing to do with the products discussed at the Crystal Meetings or the parties who participated in the Crystal Meetings, and the remaining evidence is entirely circumstantial and entirely inadequate to exclude the possibility that Toshiba acted independently of the Crystal Meeting conspiracy. In addition, Best Buy has failed to connect the pattern of *ad hoc*, mainly bilateral contacts among LCD suppliers in the pre-Crystal Meeting period to the subsequent Crystal Meeting conspiracy, again under the *Citric Acid* standard. Indeed, Best Buy simply does not address the significant evidence that disproves its theory of a single overarching conspiracy, such as the unrefuted testimony from the founders of the Crystal Meetings who explained, consistent with the guilty pleas of the Crystal Meeting

participants, that the cartel was conceived in 2001, solely among the six Korean and Taiwanese participants, with no relationship to the pattern of pre-2001 conduct that Best Buy has alleged. Mot. at 7-9; *see also Citric Acid*, 966 F. Supp. at 959 (finding that meetings with competitors, unrelated to formal cartel meetings, lacked probative value "in light of the way the conspiracy admittedly functioned").

### 1. It Is Best Buy's Burden to Demonstrate the Overarching Conspiracy it Alleges

Where (as here) there is compelling evidence of multiple, separate conspiracies, it is the plaintiff's burden to present evidence supporting its contention of a single overarching conspiracy. Numerous courts have confronted the question of whether a series of convictions or guilty pleas for participating in separate price-fixing conspiracies may be treated as one "overarching conspiracy," in both the civil and criminal contexts.

In *Precision Associates*, six international freight forwarders pleaded guilty "for their roles in several separate conspiracies" to fix fees and charges related to international freight forwarding services for air cargo — just as Epson, Hitachi and Sharp pleaded guilty to participating in separate, discrete LCD price-fixing conspiracies. 2011 WL 7053807 at *2. In a follow-on civil action, plaintiffs alleged 10 separate violations of the Sherman Act, along with a blanket claim "grouping all of the local conspiracies into a single overarching conspiracy." *Id.* at *3. The court granted the defendants' motion to dismiss the overarching conspiracy claim because the complaint was "silent as to how, when, or where these sixty-five defendants or the conduct identified in the 10 local conspiracy claims became connected to each other into one global conspiracy connected by common actors, methods and goals." *Id.* at *27. The court further found that "the individual conspiracies themselves do not evidence parallel conduct because they involve different defendants acting at different times." *Id.* at *28.

In *Iowa Ready-Mix Concrete*, a group of defendants had previously pleaded guilty to participating in three separate price-fixing conspiracies involving bid-rigging for concrete deliveries in certain local markets. 768 F. Supp. 2d at 964-66, 971-72. There was significant overlap in the membership of the separate conspiracies (two of the defendants were involved in

all three of the conspiracies), along with a temporal overlap when all three of the conspiracies were ongoing, parallel to one another, at the same time (from June 2008 until March 2009). *Id*. at 972. The civil plaintiffs alleged a four-year, overarching price-fixing conspiracy covering the entire "Iowa region." *Id*. at 971. The plaintiffs, however, had "fail[ed] to allege any facts that could tie together the specific, discrete incidents of admitted misconduct and the overarching all-defendant four-plus-year conspiracy that the plaintiffs wish to prosecute." *Id*. at 972. The court dismissed the complaint because there was "no allegation of facts supporting the existence of an overall plan to fix prices or that each defendant had knowledge that others were involved in the conspiracy." *Id*. at 974; *see also id*. at 979 ("While it is entirely possible that the plaintiffs have pleaded sufficient factual basis for claims against subsets of defendants for separate antitrust conspiracies, they have expressly relied on an 'overarching' conspiracy among all of them that simply is not supported by any factual allegations . . . .").

In *In re Optical Disk Drive*, plaintiffs alleged that defendants engaged in "three specifically-identified occasions" of bid-rigging on sales of optical disk drives to Dell and HP. 2011 WL 3894376 at *9. The court found that those allegations might suffice to "support the existence of a conspiracy with respect to at least those particular auctions." *Id*. The allegations concerning these separate instances of bid-rigging were not sufficient to support the plaintiffs' allegation of "a broad six year continuing agreement among all defendants to fix the prices of all ODDs sold through innumerable other channels," as the plaintiffs had alleged, and the court dismissed the complaint. *Id*.

Criminal antitrust cases similarly require a showing that there was one overall agreement when a party seeks to recast several separate conspiracies as elements of a single overarching conspiracy. In *United States v. Sargent Electric*, certain defendant electrical contractors were convicted of bid-rigging. They argued that their convictions were a violation of double jeopardy because they had previously pleaded guilty to various bid-rigging schemes, which (defendants claimed) were part of a single overarching conspiracy. 785 F.2d at 1125. Similar to Epson, Hitachi and Sharp in this case, the defendants' initial bid-rigging convictions were related to specific projects at specific customer facilities. *Id*. To determine whether a single or multiple

conspiracies took place, the Third Circuit began by noting that "[a]n agreement 'to rig bids wherever and whenever possible'" — the same allegation that Best Buy has brought forward — "is meaningless for Sherman Act purposes unless there are in the real world of the marketplace some 'whens' and 'wheres.'" *Id*. at 1127. Because certain defendants were not qualified to submit bids at certain of the facilities, the Third Circuit found that there was no possibility of market-wide competition for those bids, and therefore, the defendants could have participated only in separate bid-rigging conspiracies on a project-by-project basis — thus precluding the possibility of a single overarching conspiracy. *Id*. at 1129-30 (""There is no potential competition between a party not on an approved list of vendors and a party on such a list."). Likewise, many major LCD panel purchasers, including Apple, Dell and Motorola, qualified only certain manufacturers to supply LCD panels, and those qualifications were made on a project-by-project basis. *See, e.g*., SCm00364659 (Sharp document discussing a Motorola project: "At present, . . . our company and Samsung have been certified but for this time, TMD has been certified as a 3rd company."). The Third Circuit therefore reversed the district court's finding that there was a single overarching conspiracy.

In *Wilshire Oil Co*., a defendant was convicted for participating in a conspiracy to rig bids for liquid asphalt deliveries within the state of Kansas. 427 F.2d at 971-72. As in *Sargent Electric*, the defendant argued that the conviction violated double jeopardy, because the defendant had previously been convicted for rigging bids on liquid asphalt deliveries in Missouri, and (the defendant argued) the Kansas and Missouri bid-rigging schemes were part of the same overarching conspiracy. *Id.* at 975. The Tenth Circuit disagreed and found that there was no overarching conspiracy, despite significant overlap among the membership, timing and aims of both the Kansas and Missouri conspiracies. *Id.* In determining whether one or multiple conspiracies had taken place, the court noted that the "pertinent inquiry" was "whether the record . . . is sufficient to establish that [defendant] and all other oil companies indicted in Missouri and Kansas had a single, common and continuing objective of fixing, maintaining and establishing prices to suppress and eliminate competition in the sale of liquid asphalt to Kansas and Missouri." *Id*. at 976. In making this determination, the court focused on testimony from the conspirators

establishing that they "knew of no connecting link between the two [conspiracies]" and that there was never any discussion of one conspiracy during meetings related to the other conspiracy. *Id.* at 977. Based on this testimony, the court found that the evidence established that the defendant participated in separate, parallel conspiracies rather than a single overarching conspiracy. Similarly, there were no discussions in the Crystal Meetings concerning the small panels for mobile applications that formed the basis of Epson's guilty plea and certain counts in Sharp's guilty plea. *See* Mot. at 3-4.

The law in the Ninth Circuit is no different. Although not an antitrust case, *United States v. Nye*, 220 Fed. Appx. 482 (9th Cir. 2007), is controlling. There, the Ninth Circuit reversed a conspiracy conviction on the ground that there was no evidence of "one overall agreement" among the defendant and the other alleged conspirators to "perform various functions to achieve the objectives of the conspiracy." *Id.* at 483 (quoting *Zemek*, 634 F.2d at 1167); *see also Citric Acid*, 996 F. Supp. at 955 ("The requirements for a civil conspiracy are the same as for a criminal conspiracy."). In *Nye*, the defendant had acted as a supplier of small quantities of methamphetamine to one Herrara, an alleged conspirator. 220 Fed. Appx. at 438. The government attempted to tie the defendant to a larger, overarching conspiracy based on a phone call in which the defendant discussed purchasing a large quantity of drugs from Herrara. *Id.* There was no evidence that the defendant ever actually agreed to go through with the purchase. Accordingly, there were no grounds for implicating the defendant in an overarching conspiracy involving the larger drug transaction. *Id.* ("Nye's knowledge . . . that Herrera was apparently going to obtain a large quantity of drugs from someone else does not make Nye a participant in a conspiracy with all past, present, and future suppliers of drugs to Herrera.").

### 2. Best Buy Has Offered No Rebuttal to the Unrefuted Evidence Limiting the Scope of the Alleged Conspiracy

Rather than addressing the aforementioned cases in its opposition, Best Buy wrongly criticizes Toshiba for "fail[ing] to acknowledge" that antitrust conspiracies entail joint and several liability. Opp'n at 30. Best Buy also argues, for no readily discernible reason, that a latecomer to a conspiracy "may be charged with preceding acts committed in furtherance of the conspiracy."

*Id*. Given Best Buy's position that the Japanese LCD suppliers founded the alleged overarching conspiracy, First Amended Complaint ¶ 2, Dkt. No. 7163 (Nov. 15, 2012), it is difficult to see how case law concerning latecomers could be relevant to Best Buy's opposition, unless Best Buy is now conceding that the cartel began in 2001 with the Crystal Meetings and that Toshiba and the other Japanese suppliers joined at a later time. Whatever the significance of the generic conspiracy cases cited by Best Buy, it has failed to identify any evidence that could tie the disparate activity in the LCD industry, including the separate conspiracies identified in the various guilty pleas entered in the related criminal cases, into the single overarching conspiracy that Best Buy has alleged.

Best Buy also fails to address the uncontroverted testimony of Brian Lee and C.C. Liu concerning the origins of the Crystal Meetings. Mr. Lee and Mr. Liu explained that the Korean and Taiwanese suppliers organized the Crystal Meetings in 2001, in response to cutthroat competition in the LCD industry. Mot. at 7-8. This testimony is fatal to Best Buy's theory that the Crystal Meetings simply "evolved" seamlessly out of sporadic bilateral contacts among LCD suppliers that began with the Japanese suppliers in the 1990s. Moreover, the period of oversupply and declining prices that prompted the formation of the Crystal Meetings undermines Best Buy's allegation that there was a single overarching conspiracy in the LCD industry from 1996 through 2006. Best Buy provides no response to this highly probative testimony.

**III.    <u>CONCLUSION</u>**

For the foregoing reasons, Best Buy has failed to proffer direct evidence or circumstantial evidence tending to exclude the possibility of Toshiba's participation in the conduct alleged. Accordingly, Toshiba's motion for summary judgment should be granted, and Best Buy's claims should be dismissed.

//

//

//

//

Respectfully submitted,

**WHITE & CASE** LLP

DATED: June 28, 2013

By: /s/ Christopher M. Curran

Christopher M. Curran (*pro hac vice*)
Email: ccurran@whitecase.com
Martin M. Toto (*pro hac vice*)
Email: mtoto@whitecase.com
John H. Chung (*pro hac vice*)
Email: jchung@whitecase.com
**WHITE & CASE** LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

*Attorneys for Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc.*