Volume 9

Pages 1284 - 1458

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

IN RE: TFT-LCD (FLAT-PANEL)          )
ANTITRUST LITIGATION.                )     NO. C 07-MDL-1827 SI


San Francisco, California            Individual Cases:
Monday                               CASE NO. 10-CV-4572
August 5, 2013                       CASE NO. 12-CV-4114
10:12 a.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Best Buy Plaintiffs:
                    ROBINS, KAPLAN, MILLER & CIRESI LLP
                    2049 Century Park East
                    Suite 3400
                    Los Angeles, California  90067
              BY:   ROMAN M. SILBERFELD, ESQ.
                    DAVID MARTINEZ, ESQ.
                    LAURA E. NELSON, ESQ.
                    BERNICE CONN, ESQ.
                    MICHAEL A. GEIBELSON, ESQ.


For Defendant HannStar Display Corporation:
                    FREITAS TSENG & KAUFMAN, LLP
                    100 Marine Parkway
                    Suite 200
                    Redwood Shores, California  94065
              BY:   ROBERT E. FREITAS, ESQ.
                    JASON SHEFFIELD ANGELL, ESQ.
                    JESSICA NICOLE LEAL, ESQ.


(Appearances continued, next page)

APPEARANCES, CONTINUED:

For Toshiba Defendants:
                          WHITE & CASE LLP
                          701 Thirteenth Street, N.W.
                          Washington, D.C.  20005
                     BY:  CHRISTOPHER M. CURRAN, ESQ.
                          JOHN H. CHUNG, ESQ.
                          J. MARK GIDLEY, ESQ.
                          AGATHA KOPROWSKI, ESQ.
                          HEATHER BURKE, ESQ.
                          MARTIN TOTO, ESQ.


Also Present:             Naomi Kusakabe
                          Alex Tsai
                          Paul Chiu
                          Julius Christensen



Reported by:    BELLE BALL, CSR #8785, CRR, RDR
                CONNIE KUHL, CSR #13173, RMR, CRR
                Official Reporters, U.S. District Court

PROCEEDINGS

```
 1    MONDAY, AUGUST 5, 2013                    10:12 A.M.

 2                    P R O C E E D I N G S

 3         (The following proceedings were held in open court,

 4    outside the presence and hearing of the jury)

 5         THE COURT:  Good morning.

 6         MR. SILBERFELD:  Good morning, your Honor.

 7         MR. CURRAN:  Good morning.

 8         MR. FREITAS:  Good morning.

 9         THE COURT:  Are we ready?

10         MR. SILBERFELD:  We have some housekeeping matters,

11    we'd like to not necessarily resolve or just bring --

12         THE COURT:  All right, that's fine.  But you know

13    I've been here for an hour and we could have done this before

14    the jury was ready.  But what would you like to talk about?

15         MR. SILBERFELD:  Well, there are two matters that

16    affect the witness for tomorrow.

17         THE COURT:  Okay.

18         MR. SILBERFELD:  Dr. Bernheim.

19         THE COURT:  Yes.  This is all the stuff that just got

20    filed.

21         MR. SILBERFELD:  Right.

22         THE COURT:  Okay.

23         MR. SILBERFELD:  One has to do with whether he can

24    appear out of order or whether all the liability proof has to

25    come in first.  The second has to do with two of his slides,
```

PROCEEDINGS

1    about which there's objection.  And we just kind of want to

2    see if, by the end of the day, perhaps, we could get that

3    resolved so that we know what we're doing tomorrow.

4        Those are two of the -- one of them can wait.  And the

5    other one is there's a witness coming Wednesday on the

6    indirect purchaser claims that involves the jury instruction

7    that both sides have proposed.  There are competing

8    instructions on what down-stream pass-on means.  I've actually

9    just excerpted not only the instructions but the argument

10   associated with them from the 500 pages.  If we could actually

11   just hand those up and have you consider those at some point

12   between now and Wednesday.

13             THE COURT:  All right.  That will be fine.

14             MR. SILBERFELD:  That's all.

15             MR. CURRAN:  Your Honor, I think the trial brief

16   issues can be addressed after we excuse the jury for the day

17   or something like that.  But obviously it's up to your Honor.

18   We're ready to proceed with the witness.

19             THE COURT:  Well, the trial brief issues will have to

20   be addressed later because I haven't read the trial briefs.

21             DEPUTY CLERK:  You want to retake the stand?

22             THE COURT:  So who is on the stand and who is

23   examining?

24             MR. SILBERFELD:  Ms. Fritz.  Mr. Curran.

25             THE COURT:  Okay.

1       Good morning.

2               **THE WITNESS:**  Good morning.

3               **DEPUTY CLERK:**  All rise.

4       (The jury enters the courtroom)

5               (The following proceedings were held in the presence

6               of the Jury:

7               **THE COURT:**  Welcome back, ladies and gentlemen.  You

8       may all be seated.

9       I think our way will be clear, at least for a week, given

10      what we hear of our transportation issues, so we can hope for

11      good luck thereafter.

12      (General laughter)

13              **THE COURT:**  Mr. Curran, you may proceed.

14      And, Tracy, why don't you swear Miss Fritz again?

15          **WENDY LIANN FRITZ, PLAINTIFF'S WITNESS, SWORN**

16              **DEPUTY CLERK:**  You want to pull that mic closer to

17      you?  You can kind angle it.  There.

18              **THE WITNESS:**  All right.

19                  **CROSS EXAMINATION RESUMED**

20      BY MR. CURRAN:

21      Q.  Good morning, Miss Fritz.

22      A.  Good morning.

23      Q.  First I'd like to orient ourselves to where we left off on

24      Thursday, and then we'll take it from there.

25          Miss Fritz, do you recall on Thursday we discussed the

1    Asia News Flash for a bit?

2    A.  I do.

3    Q.  And that was a document relating to a team gathering up

4    competitive intelligence in Asia and reporting it back to

5    folks at Best Buy in the United States, right?

6    A.  Yes, that's my recollection.

7    Q.  I think we also reviewed some documents relating to

8    competitive intelligence surrounding Black Friday.  Do you

9    recall that?

10   A.  I do.

11   Q.  And that was information about competitor's plans about

12   the Thanksgiving holiday?

13   A.  I believe so, yes.

14   Q.  And some of the competitive intelligence gathered there

15   dealt with price and quantity forecasting, right?

16   A.  Correct.

17   Q.  And then I think, Miss Fritz, we also discussed for awhile

18   Mr. -- the competitive field team headed by Mike Ray and

19   Phillip Britton, correct?

20   A.  Correct.

21   Q.  And we talked about the staff members of that team and

22   their stores visited and other activities, correct?

23   A.  Correct.

24   Q.  And those other activities included not only gathering

25   pricing information at stores but also from time to time

1   interacting with floor personnel at the competitor's stores,

2   correct?

3   A.  Yes, and primarily their activities were gathering other

4   information as well, product information, promotional

5   information, etc.

6   Q.  Okay.  So product information, promotional information,

7   warranty information, and some pricing information, correct?

8   A.  Yes.

9   Q.  And then, Miss Fritz, did we also touch briefly on Best

10  Buy's price match policy?  Do you recall that?

11  A.  I do.

12  Q.  And as to that one, I would like to ask you to look at the

13  price match policy, or at least certain aspects of it.

14          **MR. CURRAN:**  May I approach the witness, your Honor?

15          **THE COURT:**  Yes.

16  **BY MR. CURRAN:**

17  Q.  Miss Fritz, is this a Frequently Asked Questions document

18  about Best Buy's price match policy?

19  A.  It appears that way, although I can't tell if this is a

20  recent version or an old version.  I can't see the date.

21  Q.  I'm not aware of a date being on it.  This was produced to

22  us from Best Buy.  But does it appear to be the price match

23  policy, at least at some point in time?

24  A.  It does.

25          **MR. CURRAN:**  Your Honor, I move for the admission

```
 1    into evidence of Exhibit 8224.
 2              THE COURT:  Any objection?
 3              MR. SILBERFELD:  Just the timeframe issue, your
 4    Honor.  I notice that it has a Spanish version on the back.
 5    Perhaps that will allow Miss Fritz to tell us roughly the
 6    vintage of it.  But I have no objection other than, does it
 7    relate to the time period we're here about.
 8              MR. FREITAS:  We have no objection, your Honor.
 9              THE COURT:  Well, I'll allow it.  But with the
10    notation that we don't know exactly when this was used or
11    produced.
12         (Trial Exhibit 8224 received in evidence)
13    BY MR. CURRAN:
14    Q.  Following up on Mr. Silberfeld's comment, Miss Fritz:
15    Does the inclusion of the Spanish language version on the back
16    side, does that help you determine the point in time when this
17    was Best Buy's policy?
18    A.  Not a specific date.  But I know we didn't introduce
19    everything being translated into Spanish until several years
20    ago.
21    Q.  Okay.  Miss Fritz, I'd like to direct your attention
22    specifically to the Q-and-A in the first column, left side at
23    the bottom, where the heading is, What is considered proof of
24    price.  Do you see that?
25    A.  I do.
```

FRITZ - CROSS EXAMINATION/CURRAN

1    Q.  And the print is small.  So feel free to look at the

2    screen if that helps.  Okay.  And Miss Fritz, does it say

3    there that, "If you have already purchased the item, the best

4    way to show proof of price is to bring in your original Best

5    Buy receipt, plus the competitor's current ad.  We reserve the

6    right to call the competitor's store to verify the lower price

7    and availability of the item"?

8    A.  Yes, it does.

9    Q.  And is that statement consistent with your understanding

10   of Best Buy's price match policy during the period 1998 to

11   2006?

12   A.  Again, I don't know the specific timeframe of this

13   document or exactly what our policy was during that time

14   frame.  In terms of is this reflective of our price match

15   policy and what I can say today, yes.

16   Q.  And so, Miss Fritz, do you understand this policy to

17   contemplate that the Best Buy store personnel may call the

18   competitor's store to confirm the lower price and the

19   availability of the item?

20   A.  Yes.

21   Q.  Okay.  And by the availability of the item, that refers to

22   whether the item is this stock, correct?

23   A.  Correct.

24   Q.  So in other words, Best Buy's obligation to match the

25   price under this policy is dependent on not only the price at

FRITZ - CROSS EXAMINATION/CURRAN

1    the other store but also the availability in stock?

2    A.  In general, yes.

3    Q.  So Miss Fritz, even when a customer has an ad or a

4    receipt, it may be appropriate for the Best Buy store manager,

5    or personnel, to contact the competitor's store to verify that

6    the items in stock, correct?

7    A.  It's rare.  If they had the ad and/or the online example

8    of it, that's usually sufficient.

9    Q.  Okay.  Have you worked in Best Buy stores yourself?

10   A.  I have actually -- I oversee retail now.  So I've worked

11   in the stores.

12   Q.  Do you personally know how often every store manager or

13   store clerk calls a competitor to verify price or verify that

14   an item is in stock?

15   A.  Specifically, no.  But I do know it's pretty rare.

16   Q.  And how do you know that it's pretty rare?

17   A.  Just based on my observations, and also what I've seen in

18   terms of being in the store on a pretty frequent basis, being

19   in many stores on a pretty frequent basis.  It's usually the

20   ad that is referenced, or the website.

21   Q.  And you've taken over responsibilities for store

22   management in the last few years, correct?

23   A.  The last 18 months.

24   Q.  Last 18 months.  Okay.  Now, Miss Fritz, another thing

25   that we touched upon on Thursday was margin information, and I

FRITZ - CROSS EXAMINATION/CURRAN

1    think we discussed a particular document showing

2    Mr. Winneroski sharing margin information of Toshiba and other

3    vendors with HP personnel, correct?

4          **MR. SILBERFELD:**  Objection, your Honor.  I think that

5    misstates the document and the testimony.

6          **MR. CURRAN:**  It's a question, your Honor, that the

7    witness can feel free to correct me if I've made a

8    misstatement.

9          **THE COURT:**  Well, you're just summarizing the

10   testimony, right?  And the purpose of that is to orient her to

11   what you're going to ask her next.  So I'm going to sustain

12   the objection, and why don't you just ask her what you're

13   going to ask her next.

14         **MR. CURRAN:**  Okay.

15   **BY MR. CURRAN:**

16   Q.  Miss Fritz, do you recall at the beginning of my

17   examination on Thursday we looked at the current Best Buy code

18   of ethics?

19   A.  I do.

20   Q.  I'd like to take you to that again.  Can you find that in

21   the stack of papers you have there?

22   A.  I'm sure I can.  Just a moment.

23   Q.  It's been designated and entered into evidence as Exhibit

24   8206?

25   A.  Yes.  I have it.

FRITZ - CROSS EXAMINATION/CURRAN

1    Q.  And I'd like to take you back to Page 16 of it, and the

2    top half of the page there.  Beginning with the section under,

3    "Responsibility to our business partners".  And in particular

4    the final sentence there.  Please feel free to read the whole

5    thing, but the final sentence states, "We trust that these

6    third parties" -- and that's referring back to vendors and

7    others -- "will behave ethically in all their business

8    dealings, and we pledge to do the same in return."

9        Miss Fritz, is that part of Best Buy's code of ethics?

10   A.  It is.

11   Q.  And do you understand that provision to be like a golden

12   rule, we will do the same as our business partners?  Is that

13   what's being conveyed here?

14   A.  Can you be more specific about it being a golden rule?

15   Q.  By this passage in the code of ethics, is Best Buy

16   communicating that it commits to engaging in similar ethical

17   behavior as its vendors and other business partners?

18   A.  Yes.

19   Q.  And then the section below that is the competitive

20   intelligence gathering, and I think we've already reviewed the

21   first paragraph there.  Do you remember doing that on

22   Thursday?

23   A.  I do.

24   Q.  And we refer to -- specifically to the sentence, "All

25   companies who wish to remain successful gather competitive

1    intelligence in some way and Best Buy is no different."  Do

2    you see that?

3    A.  I do.

4    Q.  And Miss Fritz, the materials we went through on Thursday

5    dealing with competitive intelligence and information

6    gathering and so forth, that reflects that Best Buy does

7    indeed gather competitive intelligence in some ways, correct?

8    A.  I can't speak to the document specifically, but we do

9    gather competitive intelligence, yes.

10   Q.  All the time, right?

11   A.  Frequently, yes.

12   Q.  And now I'd like to skip down to the same section.

13   There's a paragraph that begins with the word, "Because".  Do

14   you see that?

15   A.  I do.

16   Q.  Now, I want to review that and see how the terms here

17   square about some of the conduct that we've discussed.

18   "Because the gathering of competitive intelligence can occur

19   in almost any circumstance, there is no set of rules that can

20   specifically address every conceivable circumstance.  However,

21   Best Buy expect that each and every employee follow not only

22   the letter but also the spirit of these guidelines."

23       And then you see there are two bullet points there,

24   Miss Fritz?

25   A.  I do.

FRITZ - CROSS EXAMINATION/CURRAN

1    Q.  And the first one, "We always respect the right of other

2    companies to protect their proprietary information."

3        Now, Miss Fritz, we've seen some instances where Best Buy,

4    in fact, was not respecting the right of other companies to

5    protect their proprietary information, haven't we?

6    A.  I wouldn't say that consistently, no.

7    Q.  Well, let's take Mr. Winneroski's sharing of margin

8    information with HP.  Wasn't that a -- an act that was not

9    respectful of the proprietary information of Toshiba and other

10   companies?

11   A.  I would say it was inappropriate to share that

12   information, yes.

13   Q.  And a violation of Best Buy's own code of ethics?

14   A.  I'm not sure I'd see it as a violation.  But again,

15   because I wasn't involved in it, from my perspective, it's

16   inappropriate.

17   Q.  Now, when you say you weren't involved in it, you were

18   copied on Mr. Winneroski's communication to the folks at HP,

19   right?

20   A.  I was copied on it, but I don't recall it, nor did I send

21   the information.

22   Q.  And Mr. Winneroski reported to you at that time, correct?

23   A.  I believe so, yes.

24   Q.  And then this policy continues, "Never encourage or

25   pressure others to violate their obligations to protect the

1   confidentiality of their current or former employer's

2   proprietary information."

3       Do you see that, Miss Fritz?

4   A.  I do.

5   Q.  Now, for example, the gathering of competitive information

6   about Black Friday and the pricing and the forecast

7   information of Best Buy competitors, that's not consistent

8   with Best Buy's code of ethics, either, is it?

9   A.  I would say it's not inconsistent because we were

10  gathering competitive information that was available to us.

11  Q.  Do you know the source of that information, the

12  competitive forecasting and the competitive price information?

13  A.  I do not.

14  Q.  So you don't know whether that came from employees of

15  Wal-Mart or Comp USA or Circuit City, right?

16  A.  I do not.

17  Q.  All right.  The next sentence, "Likewise, you should never

18  take another company's proprietary information without the

19  company's authorization, nor obtain another company's

20  proprietary information as a result of deception,

21  misrepresentation, promises or threats."

22      Now, Miss Fritz, are you aware of whether or not Mr. --

23  the competitive intelligence field team headed by Mr. Ray and

24  Mr. Britton, whether or not they disguised themselves or

25  misrepresented their identity when they were doing mystery

FRITZ - CROSS EXAMINATION/CURRAN

```
1    shops and other activities?

2    A.  I am not, no.

3    Q.  Now, we saw in that Asian News Flash a fair number of

4    items of competitive intelligence that Best Buy people had

5    gathered up in Asia, correct?

6    A.  It appeared that way, yes.

7    Q.  Including information about specific activities and

8    transactions of Best Buy competitors like Circuit City and

9    Wal-Mart, correct?

10   A.  I don't recall all the specifics of the document.

11   Q.  Well, we can go back to the document, but do you recall

12   that there were items in there about Wal-Mart and Circuit City

13   and Dell and others?

14   A.  I recall Wal-Mart and Dell.  I don't recall Circuit City.

15   Q.  Let's limit it to Wal-Mart and Dell.  There was

16   information there, competitive intelligence information about

17   their transactions, including supply information, right?  The

18   relationship between those competitors of yours and their

19   vendors, right?

20   A.  That's what the document had, yes.

21   Q.  And do you view the gathering up of that information as

22   consistent with Best Buy's code of ethics?

23   A.  Again, I don't view gathering competitive information a

24   violation of our code of business ethics.

25   Q.  Is that true?  Does your view hold even when the
```

1  information is gathering directly from employees of the

2  competitor?

3  A.  If that information is available -- what I talked about on

4  Thursday, from my perspective, which I think is a little more

5  strict than our code of business ethics, I don't think it's

6  appropriate to talk with other people.  But there's nothing in

7  our code of business ethics that says we cannot.

8  Q.  And that includes as to information such as warranties,

9  pricing, and other terms of sale?

10  A.  It doesn't list that specifically.

11  Q.  But it doesn't exclude that either, right?

12  A.  I don't believe so.

13  Q.  Okay.  So you don't see a problem in general with Best Buy

14  activities that gather up that type of information?

15  A.  I don't see an issue in gathering competitive information,

16  no.

17  Q.  Now, continuing to the second bullet point, "It is every

18  Best Buy employee's personal responsibility to know and

19  understand all applicable company policies and procedures

20  before seeking any competitive information.  Whenever you are

21  uncertain about how to proceed about Best Buy competing in the

22  marketplace, contact your manager or the competitive

23  intelligence team, legal department, or ethics office, to help

24  think through the issues and make a decision."

25      My question, Miss Fritz:  The reference there to the

FRITZ - CROSS EXAMINATION/CURRAN

1   competitive intelligent team, that's the Mike Ray and -- I

2   forget Mr. Britton's first name now -- do you remember?

3   A.   Phil.

4   Q.   Phil.  And that's the team headed by Mike Ray and Phil

5   Britton, correct?

6   A.   Headed by Mike Ray, yes.

7   Q.   Okay.  Oh.  Headed by Mike Ray; managed by Phil Britton?

8   A.   Yeah, in this specific paragraph, I don't know if that

9   means exactly that team, because I'm not sure of the

10  timeframes.  But it does say competitive intelligence team.

11  I'm -- just can't say if it's referring to those two

12  individuals.

13  Q.   But Phil Britton has been part of the competitive

14  intelligence team for many years, correct?

15  A.   Correct.  I don't know how long.

16  Q.   And is still managing the competitive intelligence team to

17  this day, correct?

18  A.   To my knowledge.

19  Q.   And we heard Mr. Britton and saw Mr. Britton on Thursday

20  saying that in his view, having a network or contacts with a

21  competitor was an acceptable activity in competitive

22  intelligence gathering, right?

23  A.   That's what he said, yes.

24  Q.   Now, Miss Fritz, I'd like to take you to Page 6 of the

25  same exhibit, 8206-6.  And the very bottom of that page,

FRITZ - CROSS EXAMINATION/CURRAN

1    there's a section on partnering to stop misconduct.  Are you

2    with me there, Miss Fritz?

3    A.   I am.  I'm just reading it quick.

4    Q.   I want to direct you to the section right in the middle of

5    this paragraph.  There's a sentence that begins, "This means

6    you should always report any illegal conduct or violations of

7    the code of business ethics."

8         Let me stop right there, Miss Fritz.  Miss Fritz, do you

9    understand the Best Buy code of ethics to be a statement of

10   what's legal and what's illegal?

11   A.   I understand it to be our guidelines and policies of how

12   we conduct ourselves, which sometimes includes things legal or

13   illegal.  But sometimes it's also just a values-based

14   approach.

15   Q.   So is it your understanding that there are certain

16   policies that Best Buy has that are more restrictive than the

17   law?

18   A.   Not necessarily.  I think some of them are more statements

19   about our values than they are about the law.  But they

20   coexist.

21   Q.   In your understanding, are there some things that might

22   violate Best Buy's codes of ethics but wouldn't violate the

23   law?

24   A.   It could be outside of the guidelines that we've said,

25   yes.

FRITZ - CROSS EXAMINATION/CURRAN

1    Q.   Do you have any understanding as to why Best Buy would set

2    guidelines that aren't on the same line as the law?

3    A.   My interpretation would be that we have a reputation and a

4    values base that we operate off of that we want to move on as

5    part of our brand.

6    Q.   And then kind of continuing with this, so let me start

7    this sentence again.  "This means you should always report any

8    illegal conduct or violations of the code of business ethics

9    to an appropriate Best Buy representative.  Immediately.

10   Every time.  No exceptions.  If you manage other people, your

11   role in maintaining our ethical culture is especially

12   critical.  Managers who receive reports of possible illegal

13   conduct or violations of the Best Buy code of business ethics

14   are required to take immediate action.  That means it's up to

15   you to help stop it.  If at any time you are unsure how to do

16   that or where to turn for help, reach out to any of the

17   following resources...."

18        Do you see that, Miss Fritz?

19   A.   I do.

20   Q.   Miss Fritz, have you personally ever reported illegal

21   conduct or violations of the business code of ethics within

22   Best Buy?

23   A.   Not to my recollection, no.

24        (High-pitched sound interruption)

25        **MR. CURRAN:**  May I look, your Honor?

1          **THE COURT:**  Sure.  Very often turning things off and

2     back on will fix them.

3          **DEPUTY CLERK:**  It's the clock.

4          **THE COURT:**  It's the clock?

5      (Pause in proceedings)

6    **BY MR. CURRAN:**

7    Q.  So, Miss Fritz?

8    A.  Continuing, yes.

9    Q.  I think on the stand on Thursday you stated that you

10   considered Mr. Winneroski's dissemination of margin

11   information to HP to be a violation of the code.

12   A.  I considered it to be overstepping those bounds, but

13   again, I don't have a recollection of reading that information

14   at the time.

15   Q.  Did you report Mr. Winneroski's dissemination of the

16   margin information under the code?

17   A.  Not to my recollection.

18   Q.  Are you aware of whether anyone in Best Buy has ever

19   reported a violation of the code by the competitive field team

20   or any of its employees?

21   A.  I am not aware.

22   Q.  Miss Fritz, I think another subject we covered on Thursday

23   that I'd like to continue with was MDF.  Do you recall our

24   discussion of that?

25   A.  I do.

1    Q.  And MDF stands for Market Development Funds?

2    A.  It does.

3    Q.  And I think you testified under Mr. Silberfeld's

4    questioning that, generally, MDF is spent on promotional

5    activities, correct?

6    A.  A variety of promotional activities, yes.

7    Q.  And I think you acknowledged as well that -- let me just

8    ask the question:  MDF funds, sometimes, are used just to

9    increase Best Buy's margins, correct?

10   A.  I wouldn't say that they're used to increase margins.  We

11   negotiate market development funds with a vendor.  And

12   generally we use all of those.  But if we don't, it would go

13   to margin, which is also pretty industry common practice.

14   Q.  Are there ever any times -- let's focus on the relevant

15   period here, 1998 to 2006 -- do you recall any times during

16   that period when Best Buy sought to gather MDF for margin

17   development purposes?

18   A.  I don't, specifically.  But it certainly could have

19   happened.

20   Q.  And when you say it could have happened, does that include

21   having a team at Best Buy contact vendors and others,

22   including Intel, ADM, Microsoft, to seek MDF to increase Best

23   Buy's margins?

24   A.  I don't -- I'm not sure what you're speaking to in terms

25   of a team to contact these vendors.  Can you be more specific?

1    Q.  Yeah, a group of Best Buy employees or officers, including

2    Mehrdad Akbar?

3    A.  Yeah, I'm not familiar with any specific instance.

4         **MR. CURRAN:**  Your Honor, I'd like to hand out a

5    document, if I may.  This will be Exhibit 8215.

6         May I approach the witness?

7         **THE COURT:**  You may.

8         And, ladies and gentlemen, we are calling in the experts

9    to consult on this matter, but it will probably happen over

10   the lunch break because they need to get a rig in here to get

11   up.  So, we should just soldier on (referring to high-pitched

12   sound).

13   **BY MR. CURRAN:**

14   Q.  Miss Fritz, do you have Exhibit 8215 in front of you?

15   A.  I do.

16   Q.  Please take a moment to consider it.

17   A.  Okay.

18   Q.  Miss Fritz, does Exhibit 8215 include two emails, both of

19   which you are a recipient of?

20   A.  It appears to, yes.

21   Q.  And the top email is dated July 20th 2005, correct?

22   A.  It looks that way, yes.

23   Q.  And the subject line says, re:  GM brainstorm?

24   A.  Regarding GM brainstorm.

25         **MR. CURRAN:**  Your Honor, I move for admission into

1    evidence 8215.

2              **MR. SILBERFELD:**  No objection.

3              **MR. FREITAS:**  No objection, your Honor.

4              **THE COURT:**  Thank you.  It will be received.

5         (Trial Exhibit 8215 received in evidence)

6    **BY MR. CURRAN:**

7    Q.  Miss Fritz, I'd like to begin with a consideration of the

8    first-in-time email, so that would be the one beginning there.

9    A.  Uh-huh.

10   Q.  And Miss Fritz, Mehrdad Akbar was a colleague of yours at

11   Best Buy?

12   A.  Correct.

13   Q.  And this email is one sent by him to you and various of

14   your colleagues at Best Buy, correct?

15   A.  It appears that way, yes.

16   Q.  And what's your understanding of -- in the subject line,

17   it says GM Brainstorm -- the "GM" stands for gross margin,

18   correct?

19   A.  Correct.

20   Q.  What's your understanding of GM Brainstorm?

21   A.  I don't recall this specific instance, but it was pretty

22   common, based on what our margins were, if sell-through was

23   coming in at a lower gross margin than you thought, we were

24   always looking at ways to make sure that we could collect on

25   the obligations that were out there, and the previous

1    commitments, and then make sure that -- when we booked

2    anything, in order to hit our product targets.

3    Q.  By GM brainstorm, doesn't that also include, Ma'am, an

4    effort to just drum up additional MDF even when there's not a

5    prior obligation?

6    A.  No.  In general, it was more around prior obligations, and

7    we need to make sure we collect on them and we get every

8    dollar booked in that particular month or quarter that's

9    available.

10   Q.  Let's see what Mr. Akbar says in his email here.

11       So it's addressed to you.  When the -- "Steph and I met

12   with the team and have so far identified the following in

13   terms of additional margin opportunities."

14       And then the first category is "most probable", correct?

15   A.  Correct.

16   Q.  And there's a reference there, Monitors will have 500K

17   from Samsung to be booked in July, right?

18   A.  That's what it says, yes.

19   Q.  So again, this is an effort to the gather up MDF?

20   A.  No, it's an effort to gather up additional gross margin.

21   Q.  The next line, "Additional 750 in MDF in DT's that we will

22   go after for July" -- do you see that, Miss Fritz?

23   A.  I do.

24   Q.  So that line is discussing MDF, right?

25   A.  Yes.

FRITZ - CROSS EXAMINATION/CURRAN

1  Q.  Or desktops?

2  A.  Appears that way, yes.

3  Q.  And the 750, is that 750,000?

4  A.  I don't know for sure.

5  Q.  Is that your understanding as recipient of this email?

6  A.  I would imagine, yes.

7  Q.  What's your understanding of that, "we will go after for

8  July"?

9  A.  Based on the timeframe, I would assume it would be

10  additional dollars that would be potential that would be up to

11  the desktop vendors to either put promotions together or do

12  some additional placements to make sure that we can realize

13  that money in the month of July and spend it.

14  Q.  The next line, "Additional 125 to 200K funding from ATI to

15  promote their logo in desktops."

16      Miss Fritz, what's ATI?

17  A.  I don't know specifically what it stands for, but it is a

18  graphics card company.

19  Q.  And a graphics card -- do Best Buy sell graphics cards?

20  A.  We do, yes.

21  Q.  So ATI was a vendor to Best Buy?

22  A.  Correct.

23  Q.  Were ATI's graphics cards also in products that were sold

24  to Best Buy?

25  A.  Yes.

FRITZ - CROSS EXAMINATION/CURRAN

1    Q.   So ATI was also a component maker?

2    A.   Correct.

3    Q.   And this refers to the collection of money for ATI, right?

4    A.   Yes.

5    Q.   Then the next section deals with probables, correct?

6    A.   Yes.

7    Q.   Let's breeze through this.  You see the reference to AMD

8    in there, correct?

9    A.   I do.

10   Q.   And Steph working on -- working with AMD for additional

11   funding?

12   A.   Correct.

13   Q.   And then farther down there's reference to MS funding,

14   correct?

15   A.   Correct.

16   Q.   A couple of those.  Is "MS" Microsoft?

17   A.   I don't know for sure, but I would imagine it is, yes.

18   Q.   And did Best Buy collect MDF and other funding from

19   Microsoft?

20   A.   Yeah, a variety of different funds.  They were a vendor of

21   ours as well as a supplier.

22   Q.   I don't think I have any other questions -- well, actually

23   I do.

24        On the back side, Miss Fritz, there's a section, Other

25   things that are being worked on.  And then in the third

FRITZ - CROSS EXAMINATION/CURRAN

1  paragraph there, there's a line, "We need to get to the bottom

2  of how we get Westinghouse funding better forecast", and then

3  there's a parenthetical, "Some confusion around DFI vs. MDF."

4      Do you see that?

5  A.  I do.

6  Q.  DFI is deduct off of invoice?

7  A.  Yes.

8  Q.  And that's when MDF or other funding is deducted off of

9  the invoice that the sender sends to Best Buy, correct?

10 A.  Actually, it stood -- yes.  The invoice we send back to

11 them.

12 Q.  Okay.  All right.  So -- the invoice you send back to

13 them, so it's Best Buy placing the reduction on the invoice?

14 A.  Correct.  So if we're ordering monitors from Westinghouse,

15 we're going to pay them.  If there's MDF that's going to be

16 deducted, we would deduct that from that particular invoice

17 before we paid them.

18 Q.  That's where the DFI comes from?

19 A.  Correct.

20 Q.  And if MDF or other funding is not deducted from the

21 invoice, it's paid at another time, correct?

22 A.  Yes, typically.

23 Q.  And sometimes that's called back-end funding?

24 A.  Some people refer to it as back-end funding, yes.

25 Q.  And MDF is sometimes back-end funding, correct?

FRITZ - CROSS EXAMINATION/CURRAN

1    A.  Correct.

2    Q.  And it's sometimes based on the amount of product sold by

3    the vendor, correct?

4    A.  I refer to that, or we refer to that more as a

5    sell-through credit.

6    Q.  Is MDF a sell-through credit, sometimes?

7    A.  I equate those things differently.

8    Q.  Well, Miss Fritz, can you identify for me the

9    circumstances in which vendors pay Best Buy as opposed to the

10   other way around?  Okay?  So in other words, in what

11   circumstances is money flowing from vendors to Best Buy?

12   A.  There could be a number of instances.  But I think we

13   already talked about MDF, right, could be money that goes back

14   to Best Buy for different promotions that we've done.

15   Sell-through credits.  And different allowances based on

16   freight and those kind of programs.

17       Or just based on terms.  Terms -- benefits of paying vs.

18   paying late.

19   Q.  What does the word "co-op" mean to you in this context?

20   A.  Just means cooperative or co-op advertising.

21   Q.  And does Best Buy collect cooperative advertising dollars

22   from its vendors?

23   A.  We do, yes.

24   Q.  Does Best Buy collect payments when there's a new store

25   opening?

FRITZ - CROSS EXAMINATION CURRAN

```
1    A.  We do.

2    Q.  Does Best Buy collect payments for end caps?

3    A.  Yes, but it's typically used out of that MDF fund, so it's

4    not usually above and beyond the MDF.

5    Q.  I think you covered this with Mr. Silberfeld on Thursday,

6    but end caps, that's the end of the aisle where a product on a

7    self is more conspicuous, right?

8    A.  Yes.  It's prominent placement.

9    Q.  So vendors pay for that placement?

10   A.  They do.

11   Q.  On Best Buy's shelves?

12   A.  They do.

13   Q.  And end-of-life funds, that's another type of money flow

14   from a vendor to Best Buy, correct?

15   A.  Yeah.  Not as common.  Those are more on a case-by-case

16   basis, yes.

17   Q.  And that's to help compensate Best Buy for when a product

18   is getting older and stale on the Best Buy shelves and the

19   price has to be reduced?

20   A.  Yeah.  If we need to move through a product, there will

21   sometimes be additional funding to help us move the product --

22   or move the price.

23   Q.  And price protection, is that something that Best Buy

24   attains from its vendors?

25   A.  Yes.
```

FRITZ - CROSS EXAMINATION/CURRAN

1    Q.  And price protection protects Best Buy's margins when the

2    street price of a product has to be reduced, right?

3    A.  Yeah, basically by protecting our inventories and moving

4    the costs down on the inventories that we own.

5    Q.  That you own?

6    A.  Correct.

7    Q.  Miss Fritz, ordinarily does Best Buy pay for the products

8    it buys before or after it sells them?

9    A.  It varies by category.

10   Q.  But it's common, or it's not uncommon, anyway, Miss Fritz,

11   right, for Best Buy to sell a product to a consumer, customer,

12   prior to Best Buy having paid for the product being supplied

13   by the vendor, correct?

14   A.  It can happen.  But again, it varies by category.  There's

15   certain categories that turn at a much slower rate.

16   Q.  Notebook computers turn pretty quickly, correct?

17   A.  Notebooks turn very quickly.

18   Q.  So ordinarily, with respect to notebook computers, Best

19   Buy has sold the product before it bought it, correct?

20   A.  I wouldn't say ordinarily.

21   Q.  Frequently?

22   A.  I would say in some cases.

23   Q.  Frequently?

24   A.  I'd say in some cases.

25   Q.  Not frequently?

```
 1    A.   I'd say in some cases.

 2    Q.   And Best Buy also collects money from vendors for signs in

 3    the store, correct?

 4    A.   Yes.  As we talked about with our MDF, signage, end cap

 5    placement, advertising placement, is all part of kind of the

 6    MDF allowance.

 7    Q.   And I think we've already established that Best Buy

 8    collects money also from not only vendors, but also from

 9    component sellers who have sold to the vendors, correct?

10    A.   Yeah.  In the case of computers, that is more common than

11    in other categories.

12    Q.   Okay.  And I think we've already established:  Intel, AMD,

13    Microsoft are three companies that provide money to Best Buy

14    for products containing their components, right?

15    A.   Yeah.  It's primarily Intel and AMD.  On occasion,

16    Microsoft would participate.  But it's primarily AMD and

17    Intel.  Or it was.

18    Q.   Miss Fritz, I think we touched upon this on Thursday, but

19    Best Buy has over the years on a number of occasions looked

20    into making its own computer products, correct?

21    A.   We have.

22    Q.   I think we used the term on Thursday, "Private label",

23    correct?

24    A.   Correct.

25    Q.   Can you explain what that term means, "private label"?
```

FRITZ - CROSS EXAMINATION/CURRAN

1    A.  Private label essentially means we're making our own

2    product under a Best Buy brand.  So you may be familiar with

3    Insignia, which is a private label brand for us in the TV

4    space.

5    Q.  Okay.  And in the cases where Best Buy has developed

6    private label product, it puts that on its shelves and tries

7    to sell them, right?

8    A.  Correct.

9    Q.  Okay.  In competition with the products that Best Buy has

10   obtained from vendors, correct?

11   A.  Correct.

12   Q.  Like Insignia, were there Insignia notebook, computers?

13   A.  Not to my recollection, no.

14   Q.  Televisions?

15   A.  Televisions.

16   Q.  So in the case of Insignia televisions, that's a product

17   that Best Buy would make or has made and then put on the

18   shelves and sold in competition with the televisions that Best

19   Buy has obtained from its vendors?

20   A.  Correct.

21   Q.  So in those circumstances, Best Buy is competing with its

22   vendors, correct?

23   A.  You could say that, yes.

24   Q.  And Best Buy also has a website where it sells product,

25   correct?

FRITZ - CROSS EXAMINATION/CURRAN

1   A.  We do.

2   Q.  Bestbuy.com?

3   A.  Correct.

4   Q.  And bestbuy.com sells a variety of computer products, and

5   has, during the whole relevant period, correct?

6   A.  Bestbuy.com sells a variety of all consumer electronic

7   products.

8   Q.  Including computer products, correct?

9   A.  Including computer products, yes.

10  Q.  And suppliers of computer products to Best Buy, like --

11  take HP, for example.  HP also has a website through which it

12  sells HP computer products, correct?

13  A.  They do, yes.

14  Q.  So in that sense, also, Best Buy is a competitor of HP,

15  correct?

16  A.  Correct.

17  Q.  So your suppliers or vendors, if you use that term, are in

18  perhaps multiple respects at times competing with Best Buy,

19  right?

20  A.  You could say that.  Yeah.  I think again it's pretty

21  common in the industry.  Best Buy is not the only one.  Many

22  retailers are in that same situation.

23  Q.  But now when Best Buy is negotiating to purchase product

24  from a company like HP, of course, price is part of the

25  discussion, right?

FRITZ - CROSS EXAMINATION/CURRAN

1    A.   Cost is part of the discussion.  And general

2    manufacturer's MSRP is part of the discussion.

3    Q.   Can you explain what MSRP is?

4    A.   Manufacturer's suggested retail price.

5    Q.   So when a supplier like HP is negotiating with Best Buy,

6    the discussion is not only about the cost or price at which

7    Best Buy will obtain the product, but it also discusses the

8    street price or MSRP, right?

9    A.   Well, there's a couple of things.  One, we talk about the

10   cost, we talk about the profit margins, and they give us their

11   suggested retail price.  And we, most especially in notebooks,

12   we most commonly discuss it in the context of what price band

13   it would fit into as opposed to the specific price.

14   Q.   And the vendors like HP know what Best Buy's price targets

15   are during those discussions, right?

16   A.   They should, yes.

17   Q.   Because you tell them, right?

18   A.   Correct.

19   Q.   So going into these negotiations, the margin that Best Buy

20   is seeking is known to both sides, right?

21   A.   It should be, yes.

22   Q.   Okay.  And Best Buy has this value equation that helps it

23   determine what the street price ought to be, right?

24   A.   Not necessarily.

25   Q.   No?

1    A.   No.   The value equation is to help us understand consumer

2    values, to help us determine what price it would be, but also

3    how it's going to sell.   And how it's going to perform based

4    on past history.

5    Q.   Okay.   But the value equation is used by Best Buy to help

6    it determine at what price product should be sold to its

7    customers, correct?

8    A.   It's one input.

9    Q.   Okay.   But in any event, when Best Buy is negotiating with

10   a supplier like HP, Best Buy is always doing its best to

11   preserve its target margin, correct?

12   A.   We do our best to preserve our margin, yes.

13   Q.   Back to private label.   I'd like to show you a document

14   and ask you about it, Miss Fritz.

15       Your Honor, this will be Exhibit 8146.

16       **MR. CURRAN:**   May I approach the stand, your Honor?

17       **THE COURT:**   You may.

18   **BY MR. CURRAN:**

19   Q.   Miss Fritz, please take a moment to familiarize yourself

20   or refamiliarize yourself with 8146.

21   A.   Okay.

22   Q.   Thank you, Miss Fritz.

23       Miss Fritz, Exhibit 8146 is an email from you to Michael

24   Scharff and copying other colleagues of yours at Best Buy from

25   June 5th, 2001, correct?

FRITZ - CROSS EXAMINATION/CURRAN

1   A.  It appears that way, yes.

2           **MR. CURRAN:**  I move for admission of Exhibit 8146.

3           **MR. SILBERFELD:**  No objection.

4           **MR. FREITAS:**  No objection, your Honor.

5           **THE COURT:**  Thank you.  It will be received.

6       (Trial Exhibit 8146 received in evidence)

7   **BY MR. CURRAN:**

8   Q.  Miss Fritz, only a few questions about this document.  But

9   this document relates to a private label initiative or

10  consideration of a private label initiative at Best Buy,

11  correct?

12  A.  Correct.  I don't recall the specific timing or

13  initiative, but from reading through it, that's what it says,

14  yes.

15  Q.  Okay.  First, I want to call your attention to the second

16  page of the document, toward the bottom.  The second to last

17  sentence there, where it says, "This project is highly

18  confidential and should not be shared with anyone else, inside

19  or outside the company."

20      Do you see that?

21  A.  I do.

22  Q.  Was that kind of a restriction on dissemination unusual to

23  see in Best Buy correspondence?

24  A.  I can't speak to this specific instance.  This was

25  actually from Michael.  But I think the nature was or the

1    intent was probably to keep it confidential until we

2    understood if it was a viable solution that we were going to

3    go after.

4        But again, I can't speak to this instance.  This is from

5    him.

6    Q.  Okay.  And then this email chain, if you will, begins with

7    an email from David Morrish, who I think you've identified as

8    a boss of yours, at least at certain times, correct?

9    A.  He was a boss of mine, yes.

10   Q.  At this point in time as well, 2001?

11   A.  I believe so.

12   Q.  And in the subject line there it says, "Own branded

13   opportunity – urgent."  That's a reference to a possibility of

14   a private label product, correct?

15   A.  That's what it says.

16   Q.  "Own branded" is synonymous with "private label", correct?

17   A.  That's how I interpreted it.

18   Q.  The first item, two, "Develop product in the mid price

19   bands where there is more profit opportunity but also more

20   competition with Dell, Gateway, Compaq and HP."

21       Do you see that?

22   A.  I do that.

23   Q.  So that confirms that the development of a private label

24   or own branded computer product would put Best Buy in more

25   competition with companies, including Compaq and HP, correct?

```
 1    A.  I don't interpret that from the sentence.  Because I don't

 2    recall it.  But it does say there will be more profit

 3    opportunity and more competition.

 4    Q.  But is that more competition with Dell, Gateway, Compaq

 5    and HP, correct?

 6    A.  That's what it says, yes.

 7    Q.  That seems to at least be acknowledging that Best Buy's

 8    development of a private label product would put it in more

 9    competition with those companies, correct?

10    A.  I think anytime you develop a private label product, as we

11    discussed, you are competing with your current providers.

12    Q.  Okay.  One other document on private label.

13          MR. CURRAN:  Your Honor, this will be Exhibit 8159.

14    May I approach the witness, your Honor?

15          THE COURT:  You may.

16    BY MR. CURRAN:

17    Q.  Miss Fritz, you can take a moment to review 8159.  As with

18    the last one, I'll only have a couple of questions on it.

19    A.  Okay.

20    Q.  Miss Fritz, is this Exhibit 8159 an email from Oliver

21    Soellner to you and various others dated on or about October

22    14th, 2004?

23    A.  It appears that way, yes.

24          MR. CURRAN:  Your Honor, I move for the admission of

25    Exhibit 8159.
```

FRITZ - CROSS EXAMINATION/CURRAN

1    **MR. SILBERFELD:**  No objection.

2    **MR. FREITAS:**  No objection, your Honor.

3    **THE COURT:**  Thank you.  It will be received.

4    (Trial Exhibit 8159 received in evidence)

5    **BY MR. CURRAN:**

6    Q.  Miss Fritz, this exhibit deals with a possible private

7    label opportunity of Best Buy's, correct?

8    A.  I believe so, yes.

9    Q.  And specifically, in some sort of cooperation with a

10   company named Medion?

11   A.  Medion.

12   Q.  Medion.  First, do you see the top email on the first

13   page -- well, first of all, it's addressed to you, correct?

14   As well as others?

15   A.  It appears so, yes.

16   Q.  And at the bottom, just before the best regards, "All the

17   provided information are highly confidential, so please do not

18   copy or distribute it."

19       Do you see that?

20   A.  I do.

21   Q.  So, as with the last one, this is a closely held

22   discussion, correct?

23   A.  Yes, which is not uncommon.

24   Q.  And then jumping ahead a couple of pages to 8159-3, that

25   appears to be a memorandum discussing a meeting between folks

1    at Best Buy and folks at Medion, correct?

2    A.  It does.

3    Q.  And it identifies you as a participant and perhaps of the

4    meeting, correct?

5    A.  It does.

6    Q.  And at the top of this document in the status it says, Top

7    Secret for Authorized Personnel Only, No Distribution.  Do you

8    see that?

9    A.  I do.

10   Q.  Again, that's not an unusual legend to see on a closely

11   guarded initiative?

12   A.  I wouldn't say top secret is common.  But again,

13   confidential information was typically how we marked a lot of

14   our documents.

15   Q.  And then other people on the description list here,

16   besides yourself, there's Dave Morrish, who was your boss, and

17   Stephanie, who was one of your subordinates, correct?

18   A.  Correct.

19   Q.  As well as Mr. Akbar, who we touched upon a little earlier

20   today, right?

21   A.  Correct.

22   Q.  Then the next page, which is Page 4 of this exhibit,

23   there's a section dealing with components.  Section 6.  Do you

24   see that, Miss Fritz?

25   A.  I do.

FRITZ - CROSS EXAMINATION/CURRAN

1    Q.   So now, when Best Buy is considering private label

2    products, that would put Best Buy in a situation of a

3    manufacturer of the products, right?

4    A.   It would, yes.

5    Q.   So Best Buy in that situation would have to consider

6    things such as the acquisition of components?

7    A.   Yes.

8    Q.   That's necessary to make the product, right?

9    A.   Correct.

10   Q.   Okay.  And this discussion here is talking about how

11   Medion and Best Buy could work together to make sure they

12   acquire components at an appropriate price, correct?

13   A.   It says that -- it states, really, that it would be buying

14   commodity components.  That's the way I read it.

15   Q.   But gaining synergies from doing it together, right?

16   A.   Correct.

17   Q.   So -- and this is 2004, correct?

18   A.   Correct.

19   Q.   And the prior document we looked at dealing with private

20   label, that was the one that started with David Morrish,

21   Exhibit 8146.  That was 2001, correct?

22   A.   Yes.

23   Q.   So is it fair, Miss Fritz, to say that Best Buy was

24   considering private label initiatives in the -- in various --

25   as to various products at various times throughout the period

1    we're focused on, 1998 to 2006?

2    A.  We considered it a number of times, yes.

3    Q.  Okay.  And as part of the consideration or evaluation of

4    private label products, the cost of components was relevant,

5    correct?

6    A.  It was relevant, but it was only one part of the equation.

7    Q.  Okay.  But it was one part of the equation?

8    A.  Yeah, absolutely.

9    Q.  Miss Fritz I'd like to take you to one of the documents

10   that Mr. Silberfeld showed you and asked you questions about,

11   and this is in the binder that Mr. Silberfeld gave you.  And

12   specifically, it's the first one, tab 1132.

13   A.  Found it.

14        **MR. CURRAN:**  This is already in evidence, your Honor.

15   **BY MR. CURRAN:**

16   Q.  All right.  So to reset the context here, Miss Fritz, this

17   is an email to you and others from Mr. Winneroski who at the

18   time was reporting to you, correct?

19   A.  It appears that way, yes.

20   Q.  Okay.  And he is recapping a meeting he had at TAIS,

21   correct?

22   A.  It doesn't say TAIS.  It says Toshiba.

23   Q.  But you know the meeting was at TAIS, correct?

24   A.  I don't know specifically, no.

25   Q.  Well, you deal with TAIS, correct?

FRITZ - CROSS EXAMINATION/CURRAN

1   A.   I've dealt with TAIS.  I've also dealt with the other

2   functions of Toshiba as well, including their consumer

3   electronics group.

4   Q.   Okay.  But you buy your laptops from TAIS, right?

5   A.   We buy our laptops from TAIS, yes.

6   Q.   And you interact with TAIS on a regular basis, right?

7   A.   Well, I used to, but I don't anymore.

8   Q.   Okay.  During the relevant time period here you interacted

9   with TAIS on a pretty regular basis, I guess, depending on

10  your specific position?

11  A.   I did interact with them on a regular basis, yes.

12  Q.   And basically, every notebook computer that Best Buy sold

13  that was Toshiba brand, it came from TAIS, correct?

14  A.   I believe so.

15  Q.   And you've been to TAIS's offices in Irvine, California,

16  right?

17  A.   I have, yes.

18  Q.   And you deal with their president, Mark Simons, on a

19  pretty regular basis, right?

20  A.   I did, yes.

21  Q.   Do you still see him occasionally?

22  A.   Occasionally, although it's been a couple of months.

23  Q.   So when Mr. Winneroski is dealing with Toshiba as a

24  supplier of notebook computers, he's dealing with TAIS, right?

25  A.   Again, generally.  I don't know specifically, in this

1    instance.

2    Q.  Okay.  Now, you're a recipient of this email, correct?

3    A.  Correct.

4    Q.  From your subordinate, Mr. Winneroski.  And he's

5    describing a meeting at Toshiba, at least, correct?

6    A.  It appears that way, yes.

7    Q.  Okay.  And you know some of the Toshiba folks that are

8    listed here, right?  I think you talked about Matt Weiss and

9    Terry Cronin when Mr. Silberfeld was asking you questions,

10   right?

11   A.  Yes, I am aware of those individuals.

12   Q.  And you know they were at TAIS, right?

13   A.  Matt Weiss, yes.  Terry, I'm not sure.

14   Q.  I want to refer your attention to the -- first, the date

15   May 15th, 2003, correct?

16   A.  Correct.

17   Q.  And then down to full four on the email cover note.

18   There's a reference there to Kurt Skilling.  Now, you know

19   that's supposed to be Kurt Skillman, right?

20   A.  I heard Kevin mention that.  But I don't actually recall

21   Kurt specifically.

22   Q.  In fact, in this email there are two Kurts.

23       Sorry to take you back up, Noel.

24       But there are actually two Kurts in the cc line, correct?

25   A.  It appears that way, yes.

1   Q.  One Kurt is Kurt Rasmussen who is a colleague of yours,

2   right?

3   A.  I believe so.  At the time.

4   Q.  And the other one is Kurt Skillman, who was at TAIS,

5   correct?

6   A.  Again, I don't recall Kurt specifically, but that's my

7   understanding from Kevin.

8   Q.  So, back down to four.  "Kurt Skillman had some key

9   insights into component issues in the industry that were very

10  helpful in triangulating some of the feedback that we have

11  heard in the past few weeks from Toshiba and others."

12      Do you see that sentence, Miss Fritz?

13  A.  I do.

14  Q.  Miss Fritz, what do you understand Mr. Winneroski to be

15  meaning when he says, "triangulating some of the feedback"?

16  A.  I would understand -- and again, I don't recall this

17  specific meeting -- but I would understand it to mean

18  validating or connecting some of the dots.

19  Q.  Connecting some of the dots.  Okay.  So, did you

20  understand Mr. Winneroski to be saying here that something

21  Mr. Skillman said helped Mr. Winneroski connect the dots about

22  certain component issues?

23  A.  I don't recall this specific instance, but it would appear

24  that he's saying that he got some additional information.

25  Q.  That helped him connect the dots?

FRITZ - CROSS EXAMINATION/CURRAN

1    A.  Yes.

2    Q.  Do you know who the "and others" is at the end of that --

3    A.  I do not.

4    Q.  At this time, 2001, other vendors of notebook computers to

5    Best Buy included HP and Sony, right?

6         MR. SILBERFELD:  Your Honor, I think counsel

7    misspoke.  He said '01.  It's '03.

8         MR. CURRAN:  I'm sorry.  Thank you, Mr. Silberfeld.

9    Let me reset the question.

10   BY MR. CURRAN:

11   Q.  Miss Fritz, in May of 2003, other vendors of notebooks

12   to -- and other computing products -- to Best Buy included HP

13   and Sony, correct?

14   A.  I believe so, but I couldn't say that for sure.  I know we

15   dealt heavily with HP.  Sony was inconsistent.

16   Q.  But certainly HP has been a consistent vendor of computing

17   products to Best Buy, correct?

18   A.  They have been a consistent vendor for a number of years,

19   yes.

20   Q.  And at this point in time, 2003, Best Buy had also been

21   engaged in private label product exploration, at least,

22   correct?

23   A.  I'm not -- I am not sure if we were in 2003.  These two

24   documents I think are 2001 and 2004.  So I couldn't say

25   specifically around 2003.

1    Q.   But sometime in that timeframe in the early 2000s, Best

2    Buy certainly was investigating private label activities,

3    correct?

4    A.   It was a common exploration, yes.

5    Q.   Okay.  But you don't know the specific sources other than

6    Toshiba for the dots that Mr. Winneroski was connecting?

7    A.   I do not.

8    Q.   I'd like to refer you to the next page.  This is the first

9    page.  If we can turn that -- thank you.

10       This is the first page of this vendor meeting recap,

11   right?

12   A.   Correct.

13   Q.   And I think you've testified on direct on Thursday that

14   this is a form that Best Buy uses to report on certain

15   meetings, correct?

16   A.   Yeah, we used to.  I don't actually think we use it

17   anymore.  But this was a standard form at that time.

18   Q.   Okay.  So Mr. Winneroski, your subordinate, was filling in

19   the information here to memorialize what took place at the

20   meeting, correct?

21   A.   Yeah, he was recapping the meeting.

22   Q.   And then -- I don't want to spend much time on this first

23   page, but the first item seems to be something about urgent

24   need to lock down date for supply chain meeting.

25       Do you see that?

FRITZ - CROSS EXAMINATION/CURRAN

1    A.  I do.

2    Q.  And then the owner of the action steps there are Kevin

3    Winneroski, Diane Sherwood and Kurt Rasmussen, correct?

4    A.  Correct.

5    Q.  And I think we've established that's the Kurt Rasmussen on

6    the Best Buy side, right?

7    A.  Yeah, it is.  Although I don't remember what his role was.

8    Q.  Okay.  But again, Rasmussen, Best Buy; and Skillman was

9    TAIS, right?

10   A.  I believe so, yes.

11   Q.  And the next item below that deals with some ideal model

12   for our supply chain, and again, the owner of action steps,

13   same three, Winneroski, Sherman(sic) and Rasmussen, correct?

14   A.  It looks that way, yes.

15   Q.  Let's go to the next page now.  The last item.  Key issues

16   discussed, there's component risks in notebooks.  And then

17   there's a, under decisions reached -- and I think this is

18   something Mr. Silberfeld focused on.  "Panels are a spotty

19   issue, not necessarily any real shortages, likely more of an

20   issue of the panel cartel conspiring to keep supply down to

21   drive prices up.  Real issue is hard drives.  IBM exited the

22   business two months ago selling out to Hitachi leaving Hitachi

23   and Toshiba as main suppliers.  Hitachi has been unable to

24   ramp up demand -- serious ongoing issue."

25       That's what Mr. Winneroski was reporting as to decisions

FRITZ - CROSS EXAMINATION/CURRAN

1    reached at that meeting?

2    A.   That appears to be one of the recap items, yes.

3    Q.   Then under, Owner of action steps, here only first names

4    are listed, right?

5    A.   Correct.

6    Q.   Kevin, Diane and Kurt.  So those the same three first

7    names, at least, of the Best Buy people in prior action steps,

8    but I guess we don't know which Kurt's being referred to

9    there, do we?

10   A.   We do not.

11   Q.   And then there's also a reference to Howard and Matt, and

12   those are the couple of the TAIS people, correct?

13   A.   Howard and Matt are both with Toshiba, yes.

14   Q.   Okay.

15           MR. CURRAN:   Your Honor, I would like to show a video

16   clip from Miss Fritz's deposition on this subject and then ask

17   her questions about that.  Miss Fritz is an officer of Best

18   Buy, so I invoke Rule 32 of Federal Rules of Civil Procedure

19   on that basis.

20           THE COURT:   Any objection?

21           MR. SILBERFELD:   No objection.

22           THE COURT:   Okay.  You may proceed.

23           (Excerpt of deposition testimony, dated January 20th,

24   2012, played, not reported)

25           MR. CURRAN:   Your Honor, I think it's clear from the

FRITZ - CROSS EXAMINATION/CURRAN

1   clip that Exhibit 80 being referred to there was a deposition

2   exhibit, which is the same as Exhibit 1132 in front of us.

3           DEPUTY CLERK:  It was clip 10001?  Was it already

4   used?

5           MR. CURRAN:  I think it was not already used.  We'll

6   give you a clip.

7           DEPUTY CLERK:  So we'll number this 10002?

8           MR. CURRAN:  Does that sound okay?  Yes, that's

9   correct.

10          DEPUTY CLERK:  Okay.

11  BY MR. CURRAN:

12  Q.  So Miss Fritz, that was your testimony at your deposition,

13  correct?

14  A.  It was, yes.

15  Q.  And do I understand it that this report from

16  Mr. Winneroski referring to "a panel cartel conspiring to keep

17  supply down to drive prices up", was not an immediate concern

18  of yours when you read this?

19  A.  I don't recall reading it or this document, but if I would

20  have in the conversation been concerned, I'm sure I would have

21  escalated it.

22  Q.  Did you escalate it?

23  A.  Not to my recollection, no.

24  Q.  Did you discuss this panel cartel conspiracy with anyone?

25  A.  No.

FRITZ - CROSS EXAMINATION/CURRAN

1          MR. CURRAN:  Your Honor, I'd like to hand out another

2     exhibit.  This one will be 5711.

3        May I approach the witness, your Honor?

4          THE COURT:  You may.

5     BY MR. CURRAN:

6     Q.  Miss Fritz, of course, take a moment to familiarize

7     yourself with 5711.

8     A.  Yeah, I've seen this document before, in -- I think in the

9     deposition.

10    Q.  Okay.

11       Your Honor, I move for the admission into evidence of

12    Exhibit 5711.

13          MR. SILBERFELD:  No objection.

14          MR. FREITAS:  No objection, your Honor.

15          THE COURT:  Thank you.  It will be received.

16       (Trial Exhibit 5711 received in evidence)

17          THE COURT:  All right now.

18    BY MR. CURRAN:

19    Q.  Miss Fritz, this is an email from a Scott Bachinski to you

20    and others at Best Buy, on or about May 27, 2003, correct?

21    A.  It appears that way, yes.

22    Q.  So this is 12 days after Mr. Winneroski's report to you,

23    right?

24    A.  I believe that's correct, yes.

25    Q.  And the subject line here is, "RVP Chicago presentation",

FRITZ - CROSS EXAMINATION/CURRAN

1  right?

2  A.  Yes.

3  Q.  And can you tell us what RVP means in this context?

4  A.  I believe it means regional vice-presidents.

5  Q.  So you and certain colleagues from Minneapolis were

6  heading down to Chicago for a presentation to these regional

7  vice-presidents, correct?

8  A.  I don't recall actually being at the meeting.  But it does

9  suggest that this is a presentation that we gave -- that was

10 given to them, yes.

11 Q.  And the text of this email from Mr. Bachinski says,

12 "Hello, all.  Attached is the final rendition of the

13 presentation for tomorrow in Chicago.  I recommend we discuss

14 presentation points tomorrow at the airport.  Please let me

15 know if you have any questions."

16     Right?

17 A.  Correct.

18 Q.  And that was Mr. Bachinski's message to you and your

19 colleagues, right?

20 A.  Correct.

21 Q.  I'd like to refer you to the second page of this exhibit.

22 A.  Okay.

23 Q.  And this appears to be a PowerPoint slide and then some

24 commentary on it, correct?

25 A.  It does, yes.

FRITZ - CROSS EXAMINATION/CURRAN

1   Q.  And the PowerPoint slide is kind of in the nature of an

2   agenda, right?

3   A.  Yeah.

4   Q.  And then, looking at the bottom part, the kind of

5   narrative on the PowerPoint, it indicates that you and Diane

6   Sherwood would be providing a presentation on notebook

7   inventory update, correct?

8   A.  It does appear that way, yes.

9   Q.  All right.  And now, the next page, 5711-3, there's a

10  reference here to "the team", and "the team" includes you as

11  the business general manager for notebooks; is that right?

12  A.  Correct.

13  Q.  And Diane Sherwood, your colleague, is listed there as

14  well, correct?

15  A.  Yes, she is.

16  Q.  And what is IM?

17  A.  I believe in this case it stood for inventory manager.

18  Q.  Did she report to you?

19  A.  At this point in time, I don't think so.  I think she

20  reported in to the inventory team.

21  Q.  But you were superior to her in the corporate structure?

22  A.  I was, yes.

23  Q.  And now I'd like to jump to the next page.  Notebook

24  inventory update.  And this is the title page of the

25  presentation that you and Miss Sherwood were giving, right?

1    A.   This is the title page?  I don't know if -- again, I don't

2    recall the presentation, so I don't know if her and I gave it

3    collectively or not.

4    Q.   And then the next page, page 5711-05, you see that in

5    front of you, Miss Fritz?

6    A.   5711-05?  Yes.

7    Q.   Now, this is a page from the presentation that's

8    attributed to you and Miss Sherwood, correct?

9    A.   It is a page in the presentation, yes.

10   Q.   I'd like to refer your attention to the section on

11   components.  In the middle of the PowerPoint and the second

12   bullet point, it says, "Panels, dash, cartel holding supply

13   down to drive pricing", correct?

14   A.   I see that, yes.

15   Q.   So the information that Mr. Winneroski was able to connect

16   the dots with was discussed at this discussion among regional

17   vice-presidents, correct?

18   A.   Yeah, I don't know if I'd say the connecting the dots part

19   was part and parcel to this.  But it was -- it looks like it

20   was referenced on this slide, yes.

21   Q.   But we saw, from Mr. Winneroski's email and recap, he was

22   triangulating or connecting the dots to conclude that there

23   was some panel cartel holding down the supply to increase

24   prices, right?

25   A.   That's what his notes said.  But I think in his testimony

FRITZ - CROSS EXAMINATION/CURRAN

1    he talked about it being a hard drive issue.

2    Q.  But 12 days later, you and Miss Sherwood are giving a

3    presentation in Chicago to regional vice-presidents and you're

4    repeating Mr. Winneroski's conclusion, correct?

5    A.  I don't recall being at the meeting.  So I don't know if

6    we teed it up.  Typically I would tee up a topic and then

7    someone else would go through it, but I don't recall this

8    specific meeting, so I can't say that for sure.

9    Q.  And the comment directly above the panel cartel comment,

10   "hard drives, IBM exited business, sold to Hitachi," that's

11   another component issue that Mr. Winneroski had reported on in

12   his recap, right?

13   A.  Yes, but I believe he said that he believed that they were

14   connected.

15   Q.  All right.  And then at the bottom of this PowerPoint

16   there's a statement, "Best Buy confidential", correct?

17   A.  Correct.

18   Q.  I gets that's just a standard legend indicating that this

19   is confidential information belonging to Best Buy, correct?

20   A.  Typically, yes.

21   Q.  In the commentary below the PowerPoint presentation, it

22   says, There is a lot to be happy about, but at the same time,

23   some challenges.  There are hard drive, panel and chassis

24   shortages.  Each are playing our vendors and SKUs in a

25   different way."

FRITZ - CROSS EXAMINATION/CURRAN

1        Do you see that?

2   A.  I do.

3   Q.  And the vendors being referred to there are the suppliers

4   of computing products, correct?

5   A.  I believe so.  I can't say for certain, but that's how I

6   would read it.

7   Q.  Vendors such as TAIS, right?

8   A.  Again, can't say specifically who the vendors would be.

9   But they were in that at that time.

10  Q.  Now I'd like to go back.  There was another document

11  Mr. Silberfeld showed you, and this is the second tab in the

12  black book.

13  A.  1133?

14  Q.  That's right.  1133, Page 1.  And I don't know if you need

15  a moment to familiarize yourself.

16  A.  No, I remember this one from the other day.

17  Q.  Okay.  So I think Mr. Silberfeld directed your attention

18  to the middle part where there is a statement about, "We are

19  not hearing about component related issues from Toshiba at

20  this time."

21       This document's already in evidence.  1133.

22       So there's that reference to Toshiba.  Do you see that?

23  A.  I do see that, yes.

24  Q.  I'd also like to refer your attention -- two paragraphs

25  above that where there's a point about HP.  And at the end of

FRITZ - CROSS EXAMINATION/CURRAN

1    that HP reference, it says, "Panels are supply constrained."

2        I should read that whole sentence.

3        "HP is signaling that they may raise prices and delay

4    shipping SKUs in the next rev slated for late September/early

5    October delivery.  60G hard drives are supply constrained,

6    panels are supply constrained, memory prices are increasing."

7        Do you see that, Miss Fritz?

8    A.  I do.

9    Q.  So this document is also from '03, just like the last two

10   documents we've looked at, correct?

11   A.  Yes, it appears it's from August 25th.

12   Q.  So this is August.  So first we had Mr. Winneroski

13   connecting the dots in May of '03, correct?

14   A.  His vendor recap was from May of '03, yes.

15   Q.  Then we had, 12 days later, a discussion of panel cartel

16   at the meeting with the regional vice-presidents, correct?

17   A.  There was a meeting with the RVPs, yes.

18   Q.  And then in August of '03, here's a reference to HP

19   stating to Best Buy that panels are supply constrained,

20   correct?

21   A.  That's what this memo says, yes.

22        **MR. CURRAN:**  Your Honor, I have another document to

23   hand out.  Even though I only have a few questions, it's a

24   thick document.  This will be Exhibit 8223.

25        May I approach the witness, your Honor?

FRITZ - CROSS EXAMINATION/CURRAN

```
 1          THE COURT:  You may.

 2   BY MR. CURRAN:

 3   Q.  As I said, Miss Fritz, this is a very thick document, but

 4   I only have a very few questions about it.  But feel free to

 5   familiarize yourself with it.

 6   A.  I won't walk through the whole thing, but....

 7       Go ahead.

 8   Q.  Miss Fritz, the email cover note is a -- an email from

 9   Patrick LeCombe to you and various others at Best Buy dated

10   November 26, 2003, correct?

11   A.  It appears that way, yes.

12          MR. CURRAN:  Your Honor, I move into evidence Exhibit

13   8223.

14          MR. SILBERFELD:  I may or may not have an objection.

15   It's 242 pages.  I have not had a chance to look at it.  I'd

16   like that opportunity.  Perhaps counsel can go on to something

17   else.

18          THE COURT:  You can ask your questions, but I'm not

19   going to admit it until he's had a chance to look at it.

20          MR. CURRAN:  Thank you, your Honor.  May we display

21   it on the screen?

22          MR. SILBERFELD:  I'd object to that until we get to

23   the page.

24          THE COURT:  You'd better tell us what pages you're

25   talking about.
```

1          MR. CURRAN:  I intend to ask Miss Fritz about Pages

2    1, 2, 24, 25 and 26.  And 236.

3          THE COURT:  236.

4          MR. CURRAN:  Yeah.

5       235, 236.

6       And, your Honor, this exhibit was on Best Buy's exhibit

7    list for this trial.

8          THE COURT:  As to the first pages you want to show,

9    Exhibit -- Page 2, is there any objection to that?

10         MR. SILBERFELD:  Foundation to see what the

11   document's about.  I do have an objection.

12         THE COURT:  Can you lay a foundation?  She hasn't

13   really told us what this is.

14         MR. CURRAN:  Okay, your Honor.

15   BY MR. CURRAN:

16   Q.  Miss Fritz, I'd like to direct your attention to the

17   second page.  And you see the title there?

18   A.  I do, yes.

19   Q.  What's -- well, do you remember specifically what Yucatan

20   referred to?

21   A.  I believe it was -- we had internal names for projects,

22   and I believe this was a name for Dell.

23   Q.  Miss Fritz, this appendix is a big multipage document that

24   a project team focusing on competition with Dell created,

25   correct?

1    A.  Well, I haven't looked through the whole document, but it

2    looks like it's an appendix about Dell.

3    Q.  And it's an appendix -- well, let me refer specifically to

4    the next page, which I don't intend to ask questions about.

5    But the next page has a list of contributors to this project,

6    correct?

7    A.  It looks that way, yes.

8    Q.  And you are one of the contributors, correct?

9    A.  Correct.

10   Q.  And, Miss Fritz, this document was created by you and your

11   colleagues in the ordinary course of business at Best Buy,

12   correct?

13   A.  I don't actually know what the document is that's in here.

14   So I would need to look at it first.

15       (Pause in proceedings)

16       **THE COURT:**  She doesn't believe there's a question

17   pending.

18       **MR. CURRAN:**  There's not.  I was giving

19   Mr. Silberfeld a little longer to voice objections.

20       **MR. SILBERFELD:**  As to the seven pages, I've looked

21   at those, and subject to a motion to strike, I have no

22   objection at the moment to displaying those.

23       **THE COURT:**  You may display them then.

24       **MR. CURRAN:**  Thank you, your Honor.

25   **BY MR. CURRAN:**

1    Q.  So, Exhibit 8223, email cover first, please.  All right.

2        So, Miss Fritz, just to confirm again, Patrick LeCombe was

3    a colleague of yours at Best Buy, correct?

4    A.  He was, yes.

5    Q.  And this is an email to you and various other folks at

6    Best Buy, correct?

7    A.  It appears that way, yes.

8    Q.  And we see some familiar names in there, including David

9    Morrish, correct?

10   A.  Yes.

11   Q.  And then Ron Boyer?

12   A.  Boyer.

13   Q.  I'm sorry, I know you corrected me on Thursday.  Ron

14   Boyer.  His name's there as well, correct?

15   A.  Correct.

16   Q.  And this is November of '03, so we're still in the same

17   calendar year as Mr. Winneroski's recap, correct?

18   A.  It appears that way, yes.

19   Q.  And I think you've already stated that the reference to

20   Yucatan means Dell, correct?

21   A.  I believe so.

22   Q.  The next page, Page 2 of this exhibit, that's just a cover

23   page, correct?

24   A.  It looks that way, yes.

25   Q.  And it states:  Draft, not for distribution beyond project

FRITZ - CROSS EXAMINATION/CURRAN

1    team.  Again, that's a fairly typical restrictive legend on

2    this particular project, correct?

3    A.  Yeah, I would say it that way.

4    Q.  And next I'd like to direct your attention to Page 24.

5    And here there's a reference explicitly to Dell, not using the

6    Yucatan code name, and it states, "Locking up flat panel and

7    glass manufacturing with Samsung.  Impact:  Notebooks and

8    monitors."

9          MR. SILBERFELD:  This was not one of the pages

10   counsel told me about.  He said 24.  This is 23, I think.

11         THE COURT:  This says 24.  The --

12         MR. CURRAN:  Can you show the page --

13         THE COURT:  It's the Bates number.

14         MR. SILBERFELD:  Oh, he wants to look at the Bates

15   number, not the original.

16         MR. CURRAN:  The exhibit --

17         MR. SILBERFELD:  Two sets of numbers.  May I have

18   just one second?

19         THE COURT:  Yes.

20      (Pause in proceedings)

21         MR. SILBERFELD:  That's fine.

22         THE COURT:  You may proceed.

23         MR. CURRAN:  Thank you, your Honor.

24   BY MR. CURRAN:

25   Q.  All right.  So, Miss Fritz, we're on Exhibit 8223, Page

1   024, right?  Are you there?

2   A.  That's where I am, yes.

3   Q.  And do you see the -- in the first line of text, "Dell.

4   Locking up flat panel and glass manufacturing with Samsung.

5   Impact:  Notebooks and monitors."

6        Do you see that?

7   A.  I see that.

8   Q.  And then above that there's some diagram showing, among

9   other things, LCD panel vendors being impacted by Dell and

10  others, correct?

11  A.  Yes.

12  Q.  I'd like to direct your attention to the -- if

13  Mr. Silberfeld's okay -- to the next two pages, which are the

14  exhibit Pages 25 and 26.

15          **MR. SILBERFELD:**  Subject to a motion, that's fine.

16          **THE COURT:**  All right.

17  **BY MR. CURRAN:**

18  Q.  So if we can look at Page 25.  And the PowerPoint slide

19  here, Miss Fritz, at the top, it talks about control point

20  definition.  Do you see that?

21  A.  I see that.

22  Q.  And then "control point" is defined as the business

23  element that controls product supply and protects a profit

24  model.

25        Do you see that?

FRITZ - CROSS EXAMINATION/CURRAN

1    A.  I do.

2    Q.  Okay.  And then going to the next page, Page 26 of the

3    exhibit, there's a chart that's identifying industry control

4    points and ownership.  Do you see that?

5    A.  I do.

6    Q.  And then there's a reference in the middle of that chart

7    under Computer to LCD panels.  Do you see that?

8    A.  I do.

9    Q.  And there's a reference there to Samsung, LG and AU,

10   correct?

11   A.  Correct, along with Acer.

12   Q.  Miss Fritz, that's a reference to the crystal meetings,

13   isn't it?

14   A.  I could not say that, no.

15   Q.  And that chart that we're looking at is indicating that

16   someone at Best Buy has concluded that the control point for

17   LCD panels is Samsung, LG and AUO, correct?

18   A.  It looks like it is a summary from Patrick, and his point

19   of view.

20   Q.  And this is November of '03, so approximately six months

21   after Mr. Winneroski's recap, correct?

22   A.  I believe so, yes.

23   Q.  I'd like to jump ahead to exhibit, Pages 235 and 236.

24           **THE COURT:**  Can we go --

25           **MR. SILBERFELD:**  Yes, that's fine.

FRITZ - CROSS EXAMINATION/CURRAN

1   **BY MR. CURRAN:**

2   Q.  So, Miss Fritz, looking first at Page 235, the third

3   bullet point on this page refers to typical branded

4   manufacturers.  Do you see that?

5   A.  I do.

6   Q.  And it goes on to say, "Toshiba, HP/Compaq, IBM, Sony, CE

7   vendors."  Do you see that?

8   A.  I do.

9   Q.  And "CE" in this context means consumer electronics?

10  A.  I would assume that's what it means, but I'm not for sure.

11  Q.  Including notebook computers?

12  A.  Consumer electronics typically refers more to TVs, digital

13  cameras.  Other consumer electronic products.

14  Q.  But it often includes notebook computers, doesn't it,

15  consumer electronics?

16  A.  In our definition, consumer electronics was slightly

17  different than computing.

18  Q.  Isn't Best Buy a consumer electronics store?

19  A.  We are.  But again, in terms of how we refer to different

20  products in different categories, I would interpret it to be

21  consumer electronics, which would be noncomputing.  But that's

22  just my interpretation.

23  Q.  What was -- well, Dell made computer products, correct?

24  A.  Correct.

25  Q.  And this whole presentation is about computing products,

FRITZ - CROSS EXAMINATION/CURRAN

```
 1    correct?
 2    A.  I believe so.  But they also sold -- Dell also sold
 3    televisions.
 4    Q.  And then here's -- below the reference to Toshiba and
 5    these other vendors it says, "Limited ability to cause any
 6    impact due to...."
 7        Then it says, "Inefficient supply chain, latent liability
 8    with 13 weeks of inventory."
 9        And then the third bullet point:  "Fall victim to
10    component shortages."
11        Do you see that?
12    A.  I do.
13    Q.  So this is stating that those branded manufacturers are
14    victims of component shortages, correct?
15    A.  I'm not sure if that's what it means or not, if I've not
16    seen this document.
17    Q.  You don't remember the document?
18    A.  I don't.
19    Q.  On the next page, exhibit Page 236, I want to refer your
20    attention to the bit about Samsung.  Do you see the reference
21    to Samsung?
22    A.  I do.
23    Q.  And then it says, "Samsung dangerous to Best Buy and Dell,
24    operating profit of 15 percent creates war chest, strong
25    desire to build own brand."  And then, "Number 1 share,
```

1    strangehold LCD, memory, DRAM and flash."

2         Do you see that, Miss Fritz?

3    A.   I do.

4    Q.   This is reporting that Samsung has the Number 1 share in

5    LCDs, among other components, correct?

6    A.   It appears that way, yes.

7    Q.   And that Samsung has or could have a stranglehold on

8    components such as LCD, correct?

9    A.   That's what it says.

10   Q.   All right.  Continuing, Miss Fritz, with our -- the

11   timeline, I'd like to jump ahead now to 2005.

12        Your Honor, I'd like to hand out an exhibit, 5522.

13   **BY MR. CURRAN:**

14   Q.   Please take a moment to familiarize yourself with this

15   document, Miss Fritz.

16   A.   Okay.

17        Okay.

18   Q.   All right, Miss Fritz.  This document is an email from

19   Steve Fuechtmann of Best Buy to you copying various of your

20   colleagues and dated March 8th, 2005.  Correct?

21   A.   It looks that way, yes.

22        **MR. CURRAN:**  Your Honor, I'd move into Exhibit 5522?

23        **MR. SILBERFELD:**  No objection.

24        **MR. FREITAS:**  No objection, your Honor.

25        **THE COURT:**  Thank you.  It will be received.

1        (Trial Exhibit 5522 received in evidence)

2    **BY MR. CURRAN:**

3    Q.  Miss Fritz, starting at the top, just to confirm, Steve

4    Fuechtmann is a colleague of yours at Best Buy, correct?  Or

5    was at the time?

6    A.  He was, yes.

7    Q.  And this email is addressed solely to you but copying

8    various others including a number of people I've already

9    identified in this -- in your examination, correct?

10   A.  That's correct.

11   Q.  And it's dated March 8th of '05, which is nearly two years

12   after Mr. Winneroski's recap memo, correct?

13   A.  That sounds right, yeah.

14   Q.  And then scrolling down to the embedded email, dated

15   March 7, 2005, do you see that, Miss Fritz?

16   A.  I do.

17   Q.  And that's an email from Jason McClain who was also at

18   Best Buy at the time, correct?

19   A.  He was.

20   Q.  And on this email, you're cc'd, correct?

21   A.  It appears that way, yes.

22   Q.  And the first sentence of the email from Mr. McClain after

23   it says "team", it says, "Steve, Butch and I presented the

24   following to Wendy this afternoon as a framework to take to

25   the BT and SOS leaders," correct?

1    A.   Correct.

2    Q.   And what does BT and SOS mean?

3    A.   BT means business teams.  SOS, I'm actually not sure.

4    Q.   In any event, this is reporting that Steve, who I guess is

5    Steve Nelson, and Butch, who I guess is Butch Cavello, and

6    Mr. McClain had presented the following information to you,

7    correct?

8    A.   I believe it's actually Steve Fuechtmann.

9    Q.   Okay.

10   A.   But yes.

11   Q.   Looking at the next page, which is 5522-02, I want to

12   direct your attention to the section entitled, "Inventory

13   comparison, fiscal year '04 to fiscal year '05."  And, in

14   particular, there's a part of a sentence in the middle of the

15   middle paragraph where it says, "The industry was low on hard

16   drives.  IBM exited and sold to Hitachi.  Panels, cartel

17   holding supply down to drive pricing."

18        And then, "and chassis delay for HP."

19        Do you see that, Miss Fritz?

20   A.   I do.

21   Q.   So this email, which you were copied on and which purports

22   to summarize a presentation to you, has reference to the panel

23   cartel holding supply down to drive pricing, correct?

24   A.   I don't recall it specifically, but that's what it says,

25   yes.

FRITZ - CROSS EXAMINATION/CURRAN

1    Q.  Okay.

2    A.  As a summary.

3    Q.  Now, Miss Fritz, the notion that there was a panel cartel

4    driving supply down to increase pricing was common knowledge

5    at Best Buy between 2003 and 2005, correct?

6    A.  I wouldn't say that, no.

7    Q.  The idea that there was a panel cartel was reflected in a

8    number of emails and presentations during that time period,

9    correct?

10   A.  It was in a few documents that I'd seen, yes.

11   Q.  But you and your colleagues were not concerned about that

12   cartel, correct?

13   A.  I was not concerned.

14   Q.  Okay.  Because you knew that you would get your profit

15   margins no matter what as long as you had the inventory and

16   supply, correct?

17   A.  No, I wasn't concerned, because if there would have been a

18   substantial issue, Kevin would have raised it to me or someone

19   else would have raised it to me.  So I interpreted it as an

20   excuse for the very reasons that we were not getting product.

21   Q.  So, you believed that a supplier of yours was making an

22   excuse of a cartel because that supplier couldn't deliver

23   product?

24   A.  I believed that was what Kevin testified to, and that was

25   what was in his recap.  I don't recall that issue being

1   escalated to me.  But again, looking at it now, I would

2   interpret it as one of many reasons that we could or couldn't

3   get the supply, which was a common occurrence.

4   Q.  You're the corporate representative of Best Buy in this

5   trial, correct?

6   A.  Correct.

7   Q.  And that designation entitles you to be present for the

8   whole trial, even though you're a witness, right?

9   A.  That's my understanding, yes.

10  Q.  And you know that in this lawsuit Best Buy is suing

11  Toshiba for allegedly being part of the cartel, right?

12  A.  That's my understanding, yes.

13  Q.  So is it your understanding that Toshiba, and TAIS folks

14  in particular, gave Mr. Winneroski information about a panel

15  cartel that Toshiba was a part of?

16  A.  That's not my understanding.

17  Q.  Is it your understanding that Toshiba folks at TAIS gave

18  Mr. Winneroski information that allowed him to connect the

19  dots as to a cartel that Toshiba was a part of?

20  A.  No.

21  Q.  As an excuse?

22  A.  No.  It's my understanding that there was a vendor recap

23  of a Toshiba meeting and there was a number of things

24  discussed and followed up on.  One of them being the reason

25  for Toshiba not supplying product.

1    Q.  Now, Miss Fritz, are you aware of whether or not Best Buy

2    sued Samsung in connection with this trial, this lawsuit?

3    A.  I don't know specifically.  I know that they were

4    involved, but I don't know who did specifically sue them.

5    Q.  They're not here at trial, correct?

6    A.  Not to my knowledge, no.

7    Q.  Are you aware of a settlement agreement between Samsung

8    and Best Buy in connection with this lawsuit?

9    A.  I'm not privy to the details, but I do remember hearing

10   that there was some sort of settlement.

11   Q.  And are you aware of certain commercial aspects of that

12   settlement agreement between Samsung and Best Buy?

13   A.  Can you be more specific what you mean by "commercial"?

14   Q.  Miss Fritz, you're now in charge of, what, hundreds of

15   stores in the midwest for Best Buy, correct?

16   A.  Correct.

17   Q.  Do some of those stores have the Samsung Experience in the

18   store?

19          **MR. SILBERFELD:**  Objection, your Honor.  403 at this

20   point.  With regard to the settlement agreement, specifically.

21          **THE COURT:**  Tell you what, we'll take our lunch break

22   at this time, ladies and gentlemen.  Don't trust the clock on

23   the wall.  Not only does it sing to us, but it doesn't tell us

24   the time.

25       If you'd be ready to come back, please, at quarter till

PROCEEDINGS

1:00.

    And, in the meantime, please do not discuss this matter
with each other or anyone else or make up your minds; you have
not heard all the evidence yet.

    (The jury exits the courtroom)

        (The following proceedings were held in open court,
outside the presence and hearing of the jury)

        **THE COURT:**  Now, I don't know if you want the witness
here or not here.  But --

        **MR. SILBERFELD:**  She should actually be excused, I
think.

        **THE COURT:**  Okay.  Will you step outside?

        **THE WITNESS:**  Okay.

        **THE COURT:**  You may all sit down out there.

    So, what is happening here?

        **MR. SILBERFELD:**  Let me state more fully, out of the
presence, the objection.

    My understanding of the ground rules is references to the
fact of settlement can be made but not the settlement terms.
The settlement terms Mr. Curran is asking about with regard to
the Samsung Experience relates to a venture whereby Samsung
and Best Buy have developed stores within a store,
effectively, at Best Buy.  Large stores.  That is part of the
settlement agreement with Samsung.  Mr. Curran knows it,
because the settlement agreement was produced to him and to

PROCEEDINGS

1    other counsel.  And so this now crosses that line.

2           THE COURT:  And what is the point of your

3    questioning?  What are you trying to get from this witness?

4           MR. CURRAN:  There are a number of points that I

5    intend to elicit, your Honor.

6      Okay.  First of all, I think the witness said under direct

7    examination by Mr. Silberfeld that Best Buy only wants to do

8    business with ethical suppliers.  And it turns out Samsung is

9    now their Number 1 relationship.  The fact of the

10   settlement -- I don't intend to get into financial terms, the

11   settlement amount paid or the value of the Samsung experience.

12   But the fact that Best Buy has settled with Samsung and has

13   cooperation terms requiring Samsung to cooperate with Best Buy

14   in this litigation, including through the witnesses that we've

15   already heard live in this courtroom, and that Best Buy got

16   these -- the Samsung Experience, which is now a huge

17   partnership between the companies, I think that's all relevant

18   to the credibility of this witness and other witnesses in the

19   case.

20          THE COURT:  Doing business with bad guys?  Is that

21   your point?

22          MR. CURRAN:  Yeah, that's part of it.

23     I also see that as inconsistent with the Best Buy code of

24   ethics that has been a centerpiece of my examination.

25          MR. FREITAS:  I have two points to add, your Honor.

PROCEEDINGS

```
1   One has to do with the credibility of the Samsung witnesses.

2   And the arrangement by which they've been brought into court.

3       The other has to do with the amount that's in the

4   agreement.  I'd like to get into the amount.

5           THE COURT:  Well, that, I believe, has been ruled on.

6           MR. FREITAS:  I understand, your Honor.  I'm raising

7   it.  I recognize the Court has made a prior order.

8           THE COURT:  But it seems to me that if they're

9   walking hand in hand into the future with Samsung stores

10  within stores and all of that, that's relevant to the

11  witness's testimony, isn't it?  To credibility?

12          MR. SILBERFELD:  It arises from the settlement

13  agreement.

14          THE COURT:  Yeah, well, the fact that there was a

15  settlement agreement is allowed in.  The only reason we're

16  keeping out the money is because you don't want to tell them

17  about the money because of the way it's going to work out in

18  terms of requesting damages from this jury.  And I have agreed

19  with you, fully everybody has, that that's how we'll do it.

20      But the fact that the settlement has occurred is relevant

21  to witness bias, and the only part of that that I was

22  excluding, and it was based on the fact you're going to make a

23  damage argument, was the dollar figure.  But the fact that

24  they're doing business together it seems to me is a relevant

25  fact, and that's the point you're trying to make, right?
```

PROCEEDINGS

1           MR. CURRAN:  Yes, your Honor.

2           MR. SILBERFELD:  The point's been made with the

3    Samsung witnesses that -- they're here pursuant to a

4    cooperation agreement of the settlement.

5           MR. CURRAN:  They didn't know.  They didn't know why

6    they were here.

7           MR. SILBERFELD:  This witness certainly can't testify

8    to that.  I know she doesn't know that.  The fact that Samsung

9    stores are within Best Buy stores.

10          THE COURT:  She doesn't know that that was a piece of

11   the settlement agreement?

12          MR. SILBERFELD:  I don't believe she does.  She's

13   never seen it.  I don't think she can say that there's a

14   cooperation term in the settlement agreement that causes

15   Samsung people to testify here.  She can't do that.  That's my

16   belief.  She can certainly say there's a business relationship

17   with Samsung today.  But that springs completely from the

18   settlement agreement itself.  And it's just a backdoor way of

19   getting at the value of the settlement.

20          MR. CURRAN:  I don't understand -- that's not valid.

21          THE COURT:  It seems to me it's a relevant fact that

22   can be explored without getting into the value of the

23   settlement.  If you're representing to me as a member of the

24   Court, as an officer of the Court, that she doesn't know it

25   was a piece of a settlement agreement, then that's fine and it

PROCEEDINGS

1    doesn't matter why it's there.  It still would affect the fact

2    that they're big deal business partners.  You can explore

3    that, because it would affect her point of view about Samsung.

4        And then there's the corporate citizen issue that he's

5    going to evidently argue about, which I guess that's what he's

6    going to do.

7            MR. SILBERFELD:  Okay.

8            THE COURT:  Okay.

9        Incidentally, I have reviewed the materials that you've

10   filed.  Vis-a-vis the instructions, those instructions you

11   gave me still have Target and Kodak and all those guys in it.

12   So I need to see what it is you really want me to say, and

13   then I'll be happy to look at it.

14           MR. SILBERFELD:  We'll do that this afternoon.

15           THE COURT:  Okay.  The expert, the business about the

16   charts that are different, now, you haven't had a chance to

17   respond to that.  But the rule is that the expert can testify

18   to things that the expert has talked about in his deposition,

19   and he can't change what he talked about in his deposition.

20           MR. SILBERFELD:  All of the information is in his

21   backup materials.

22           THE COURT:  Did he give a different damage number at

23   his depo than he's going to give here?

24           MR. SILBERFELD:  He did.

25           THE COURT:  Well, that's not right.

PROCEEDINGS

1    **MR. SILBERFELD:**  He gave an explanation as to how

2    that number can be derived from his backup materials.

3          **THE COURT:**  And now he derives it differently?

4          **MR. SILBERFELD:**  No, no.  Exactly the same way.

5    Exactly the same way.

6          **THE COURT:**  Then why are the numbers different?

7          **MR. SILBERFELD:**  It has to do with whether you use

8    his conspiracy period model or his plea period model.

9          **THE COURT:**  And he did...?

10         **MR. SILBERFELD:**  Both.

11         **THE COURT:**  The one at his depo and not the other?

12   Is that right?

13         **MR. SILBERFELD:**  He presented one at his depo and he

14   presented both in his reports, and both are in his backup

15   materials.

16         **THE COURT:**  He presented both of those numbers in his

17   report?

18         **MR. SILBERFELD:**  Yes.  And in the backup materials

19   where all the calculations that support it, yes.

20         **THE COURT:**  So the number that he wants to testify to

21   here is a number that was in his report?

22         **MR. SILBERFELD:**  It was in the backup materials to

23   his report.

24         **THE COURT:**  I don't know what that means.

25         **MR. SILBERFELD:**  Well, he gave a preferred number,

PROCEEDINGS

```
1   which was --
2            THE COURT:  Now he's going to prefer a different
3   number?
4            MR. SILBERFELD:  A lower number.  Based upon the
5   narrower plea period.
6        What this is all about is:  We want to present two numbers
7   to the jury.  One for the conspiracy period from '98 to '06;
8   and another, in case they want to find only a crystal meeting
9   conspiracy, from '01 to '06.  There's no apparent objection to
10  the $289 million number Dr. Bernheim is going to testify
11  about.
12           THE COURT:  That's the larger period.
13           MR. SILBERFELD:  The smaller period is $283 million.
14  And he'll explain the difference.  The issue arises because he
15  did a separate plea period only model that gives a number of
16  200 and -- I think it's $40 million, $46 million.  A
17  difference of about $30 million.  That's the issue.
18           THE COURT:  Yes, I understood that was the issue.
19           MR. SILBERFELD:  But you can derive --
20           THE COURT:  $30 million is still a lot of money.
21           MR. SILBERFELD:  It is, indeed.  But the number and
22  the calculation and how to get there is in the materials that
23  was produced.  It was.  There's no dispute about that, I don't
24  believe.
25           MR. CURRAN:  Your Honor, Mr. Gidley is handling this
```

PROCEEDINGS

1    issue for us.

2         **MR. GIDLEY:**  Yes, your Honor.  There is quite a

3    dispute.  The number was 246 million as of May 2nd, 2013.

4         **THE COURT:**  That's what you said in your papers.

5    That's what you said in your papers.

6         **MR. GIDLEY:**  So he's down to -- if you take the

7    backup of the conspiracy period model, you can stop it short

8    or start it, you know, later, at 2001.  Well, that's a

9    calculation never presented before this Saturday.  And we

10   don't even have the backup for that.  We have to go and get

11   our own economist to try to reverse engineer what he's done.

12   It's a new number.  He's never been subject to

13   cross-examination on the plea period, 2001 to 2006, using the

14   conspiracy period model, and, you know, rejigger for that

15   different time period.  That's the $40 million difference, and

16   that's brand-new.

17        **MR. FREITAS:**  And there are methodological

18   implications to that change as well, your Honor.

19        **THE COURT:**  Is that correct, Mr. Silberman --

20   Mr. Silberfeld?

21        **MR. SILBERFELD:**  That's all right.  I've been called

22   worse.

23        **THE COURT:**  Is what he just said accurate?

24        **MR. SILBERFELD:**  What he just said is accurate for

25   the plea period model, yes.  What we're presenting is the

PROCEEDINGS

1    conspiracy period model, which they've always had, cut for the

2    plea period.

3           **THE COURT:**  But it's a calculation that he had not

4    previously prepared a chart on and had not previously

5    testified about?

6           **MR. SILBERFELD:**  Correct.

7           **THE COURT:**  Well then, he can't talk about it here.

8           **MR. SILBERFELD:**  So we'll revise to reflect that.

9           **THE COURT:**  Yes.

10          **MR. SILBERFELD:**  The second issue with Dr. Bernheim

11   is he's supposed to testify tomorrow and the --

12          **THE COURT:**  If it's a matter of in order or out of

13   order in terms of the proof, I'm inclined to let you put him

14   on when you're going to put him on.  And, if you ultimately

15   are not able to get the foundational evidence into the record,

16   then he'll be stricken.

17          **MR. SILBERFELD:**  Very good.

18          **MR. CURRAN:**  Then what will be stricken?

19          **THE COURT:**  His testimony.

20          **MR. CURRAN:**  Thank you.

21          **MR. GIDLEY:**  Thank you, your Honor.

22          **MR. FREITAS:**  Thank you, your Honor.

23          **THE COURT:**  But on the Instructions, I would like to

24   look at what you really want, not what you wanted before.

25          **MR. SILBERFELD:**  We'll do that.

PROCEEDINGS

1    **THE COURT:**  All right.

2      (Recess taken from 12:16 to 1:00 p.m.)

3      (The following proceedings were held outside of the

4    presence of the Jury)

5    **THE CLERK:**  Come to order.

6    **THE COURT:**  You may be seated.

7      Before we get started, I wanted to mention, you have been

8    leaving various depo transcripts with me to review.  And one

9    of them, Mr. Chiba, has a dispute about a translation.

10     Now, I don't know quite what you want me to do about that.

11   And I don't know if later in time, anybody asked him about

12   what he meant.

13     Does anybody know what I'm talking about?  It relates to

14   the deposition of Mr. Chiba on February 10th, 2011 and it's at

15   Page 141 of his --

16   **MS. BURKE:**  Your Honor, I believe that there was a

17   check interpretation that was only two pages later, where she

18   states one sentence.

19   **THE COURT:**  Yes.  They disagree.

20   **MS. BURKE:**  Yes.  And I guess all --

21   **THE COURT:**  What I'm saying:  What would you want me

22   to do about that?

23   **MS. BURKE:**  That's all we ask, is that that one

24   sentence gets played, to show a prior --

25   **THE COURT:**  To show that the parties don't agree on

PROCEEDINGS

```
 1    what he actually said.  Now, what good does that do to this

 2    jury?  They don't speak --

 3         MS. BURKE:  We are fine with withdrawing the

 4    objection, Your Honor.  We just raised it for the Court in

 5    terms of showing that there was a disputed translation

 6    throughout the testimony.

 7         THE COURT:  Because it would have been very simple to

 8    go back and say, "Mr. Chiba, did you mean this or did you mean

 9    that?"

10       And so, I didn't know if that was done in some later page

11    of his deposition.

12         MS. BURKE:  It wasn't, Your Honor.

13         THE COURT:  If not, then I'll overrule the objection.

14    Thank you.

15         MS. BURKE:  Thank you.

16         THE COURT:  Okay.  Are we now ready?

17         MR. CURRAN:  Yes, Your Honor.

18       (The following proceedings were held in the presence of

19    the Jury)

20         THE COURT:  Welcome back, ladies and gentlemen.  You

21    may all be seated.

22       All right, you may proceed, Mr. Curran.

23       And you are still under oath, ma'am.

24

25
```

1

## CROSS-EXAMINATION RESUMED

2    **BY MR. CURRAN:**

3    **Q**   Ms. Fritz, I was almost finished with my questioning when

4    we broke for lunch, so this won't take much longer.

5        But, can you tell us what the Samsung Experience is?

6    **A**   The Samsung Experience is a -- um, we refer to it as a

7    store within a store.  It's an area in our Best Buy stores

8    that showcases Samsung products.

9    **Q**   And, is that being rolled out in a number of Best Buy

10   stores across the country?

11   **A**   Yes.

12   **Q**   Do you know how many?

13   **A**   Um, I believe it's actually in all of the stores.  But I

14   don't know for sure.

15   **Q**   Okay.  And, please remind me, how many Best Buy stores are

16   there in the country?

17   **A**   Well, there are over 1,000 big-box stores.  There's 1,500,

18   total, including the Best Buy mobile standalone stores.  So,

19   the Best Buy mobile standalone stores would not be getting an

20   experience.

21   **Q**   Okay, but all of the Best Buy big-box stores would be

22   getting it?

23   **A**   I don't know, for sure but I do think it is all stores.

24   But I'm not positive.

25   **Q**   Okay.  And do I understand correctly that the Samsung

1   Experience is roughly the equivalent of a small Apple store,

2   but for Samsung, within the Best Buy stores?

3   **A**   Sort of.  A little different, but it's a -- it's a

4   brand-focused place in the store, yes.

5   **Q**   Okay.  And, is the Samsung Experience a partnership of

6   sorts between Best Buy and Samsung?

7   **A**   Yeah.  Part of our traditional vendor relationships,

8   right.  One of them is a -- one of the things that we talk

9   about with our vendors a lot is they want more prominence in

10  the store, i.e. end caps, or stand-alone, or a

11  store-within-a-store environment.

12  **Q**   Okay.  Is the Samsung Experience the only computer store

13  within a store that Best Buy has rolled out, nationwide?

14  **A**   No.

15  **Q**   Who are some of the other suppliers of those?

16  **A**   Well, Apple, as you've mentioned, we've had that for a

17  number of years.  Samsung.  And then, we are just in the

18  process of also rolling out a Microsoft store-in-store.  And

19  it's not just computing-focused.  There are some other gaming

20  products, et cetera.

21  **Q**   Now, the Samsung Experience is something that's just been

22  rolled out over the last two years.  Right?

23  **A**   Actually it's just been rolled out within the course of

24  this year.

25  **Q**   Okay.  So, that shows an escalation, if you will, in the

1   relationship between Best Buy and Samsung in that respect,

2   correct?

3   **A**   I wouldn't term it as an escalation, no.

4   **Q**   It's a further step in the relationship between the two

5   companies.  Right?

6   **A**   No.  I would say it's an opportunity for Samsung to get

7   more presence in our stores.

8   **Q**   And perhaps for Best Buy to draw in more customers who

9   want Samsung products.  Right?

10  **A**   Hopefully to generate more traffic into our stores as

11  well.

12  **Q**   So it's an attempt for a mutual benefit -- beneficial

13  solution?

14  **A**   I don't know it's an attempt.  I think it's a -- it's a

15  collective agreement, right, to drive their brand, and drive

16  more customers into our store.

17  **Q**   Okay.  And, Ms. Fritz, do you know whether or not the

18  Samsung Experience rollout at Best Buy was an aspect of the

19  settlement agreement between Best Buy and Samsung of this

20  litigation?

21  **A**   I do not.

22  **Q**   You don't know, one way or the other?

23  **A**   I do not.

24  **Q**   But you say that the Samsung Experience has just been

25  rolled out in the last year.

1   **A**   Yeah.  It actually just started rolling out in -- I want

2   to say the May-June time frame.

3   **Q**   Do you know when Samsung settled this litigation with

4   Best Buy?

5   **A**   I do not.

6   **Q**   Are you aware of whether or not Samsung's settlement

7   agreement with Best Buy requires Samsung to cooperate with

8   Best Buy in its suit against Toshiba?

9   **A**   Can you repeat that?  Sorry.

10  **Q**   Yeah.  So, Best Buy has settled with Samsung.  Right?

11  **A**   That's my understanding.

12  **Q**   But Best Buy is still suing Toshiba, right?

13  **A**   That's my understanding.

14  **Q**   And HannStar as well, right?

15  **A**   Yes.

16  **Q**   Do you know whether or not Samsung is cooperating with

17  Best Buy in Best Buy's litigation here?

18  **A**   I do not.

19  **Q**   Do you have any understanding as to why Samsung witnesses

20  have come to this courtroom from Korea, and Texas, to appear

21  in Best Buy's case in chief?

22  **A**   I do not.

23          **MR. CURRAN:**  No further questions, Your Honor.

24          **THE COURT:**  Okay.  Mr. Fitzgerald?

25          **MR. FREITAS:**  Thank you, Your Honor.

FRITZ - CROSS EXAMINATION / FREITAS

1     Your Honor, we have a binder for the witness, with some

2     exhibits (Indicating).

3     May I proceed, Your Honor?

4     **THE COURT:**  You may.

5     <u>**CROSS EXAMINATION**</u>

6     BY MR. FREITAS:

7     **Q**   Good afternoon, Ms. Fritz.

8     **A**   Good afternoon.

9     **Q**   Ms. Fritz, you would agree with me, wouldn't you, that the

10    computer retail business is highly competitive?

11    **A**   I would say it's the -- the computer business is very

12    dynamic.

13    **Q**   How about highly competitive?

14    **A**   Um, I would say competitive.

15    **MR. FREITAS:**  Your Honor, we have a deposition clip,

16    Page 97, Lines 17 to 19.

17    **THE CLERK:**  Are we going to mark this?  We need to

18    mark it, because --

19    **THE COURT:**  You know, it would be easier for these

20    little ones just to -- it would be easier for these little

21    ones, just to transcribe it.  Did you want to play this as

22    independent evidence or do you want --

23    **MR. FREITAS:**  I think it's both, Your Honor.  As

24    Mr. Curran pointed out, she is a managing agent, so I think we

25    can use it for any purpose.  But I do think it is --

1          **THE COURT:**  All right, then we have to mark it.  It

2     will have to be marked as an exhibit.

3          **THE CLERK:**  So, is it going to be 10003?

4     (Counsel indicate in the affirmative)

5          **THE CLERK:**  Okay.

6     (Trial Exhibit 10003 received in evidence)

7     (Deposition excerpt of the Witness played in open court,

8     not reported)

9     **BY MR. FREITAS:**

10    **Q**    And Ms. Fritz --

11         **MR. FREITAS:**  That's all.

12    **BY MR. FREITAS:**

13    **Q**    Ms. Fritz, generally speaking, you also agree, don't you,

14    that the overall retail environment in which Best Buy competes

15    is highly competitive?

16    **A**    I would say, generally speaking, it is -- it is

17    competitive.

18    **Q**    Now, Mr. Curran mentioned some of your competitors who

19    haven't survived or haven't done so well, but despite that,

20    you face significant competition from Wal-Mart and from other

21    brick-and-mortar retailers, right?

22    **A**    Yeah, that's correct.

23    **Q**    And you also face significant competition online, right?

24    **A**    We do.

25         **MR. SILBERFELD:**  Can we have a time frame for these

1    questions, Your Honor?

2            **THE COURT:**  That's a good point  can we put a time

3    frame on it, please?

4            **MR. FREITAS:**  Can I begin with today, and then move

5    back?

6            **THE COURT:**  Yes.  But I don't know how long you plan

7    to be.

8            **MR. FREITAS:**  It will just be two questions,

9    Your Honor.

10           **THE COURT:**  All right.

11   **BY MR. FREITAS:**

12   **Q**    Today, you agree, don't you, significant online

13   competition?

14   **A**    Today there is significant online competition.

15   **Q**    And it was different back in the time we are concerned

16   about now, but you still faced online competition, didn't you?

17   **A**    During the time period, I -- I don't recall.  I know the

18   original online business was -- was very small, and was not

19   considered a huge competitive issue.

20   **Q**    As late as 2006?

21   **A**    I don't recall a specific time frame.

22   **Q**    Now, during your earlier testimony, you mentioned Dell as

23   one of your competitors during the time in question.  Right?

24   **A**    I did.

25   **Q**    And, at that time, you also competed with various of your

1375

FRITZ - CROSS EXAMINATION / FREITAS

1   vendors.  Right?

2   **A**   Can you be more specific?

3   **Q**   Apple?

4   **A**   Correct.

5   **Q**   Okay.  And, I think Mr. Curran mentioned HP as another

6   example of a vendor with which you competed during the time in

7   question?

8   **A**   Correct.

9   **Q**   Okay.  During your prior testimony, you've made mention to

10  efforts by Best Buy to achieve target margins.  Right?

11  **A**   Yes.

12  **Q**   And when Best Buy's costs increase, Best Buy tries to

13  maintain its margins, doesn't it?

14  **A**   I don't believe that I talked about that specifically.

15  **Q**   I'm not saying that you did, but it's true, isn't it?

16  When your costs increase, you try to increase your -- to meet

17  your margins, right?

18  **A**   In general, we are obligated to deliver on our

19  profit-margin targets, yes.

20  **Q**   So when the prices that you pay go up, you try to meet

21  your margins.  Right?  You do what you need to do to meet

22  those margins.

23  **A**   I wouldn't say that.

24  **Q**   You raise your prices to meet your margins when your costs

25  go up, don't you?

1376

1   **A**    In the notebook space, actually, not very often, no.

2   Because raising your prices would actually mean you would slow

3   down your sell-through.  So, very rare.

4   **Q**    You haven't made any effort to make a determination of how

5   Best Buy was harmed as a result of what brings us here, have

6   you?

7   **A**    No, only to understand the amount of dollars that were

8   impacted over that time period.

9   **Q**    And, you haven't -- you haven't talked with Dr. Alan

10  Frankel, have you?

11  **A**    No.

12  **Q**    You haven't talked with Dr. Douglas Bernheim?

13  **A**    No.

14  **Q**    You mentioned in your prior testimony, the idea that there

15  were -- you said, I think, $32 billion worth of LCD

16  products --

17  **A**    Yes.

18  **Q**    -- that were purchased by Best Buy, during which period of

19  time?

20  **A**    That was -- as I mentioned, that was during the period of

21  time from '98 to 2006, I believe.

22  **Q**    And that's the total -- what you calculated for LCD

23  products, not for panels.  Right?

24  **A**    That was for the actual products, the cost of the goods

25  sold.

FRITZ - CROSS EXAMINATION / FREITAS

1    **Q**    And you included in that calculation all of the LCD

2    products that you could identify.  Right?

3    **A**    Yeah, it was a -- it was a general look at the total

4    dollars.

5    **Q**    That total included LCD products that weren't bought,

6    weren't purchased from anyone that Best Buy claims is a

7    conspirator, right?

8    **A**    I -- I didn't look at it at that detailed of a level,

9    absolutely.

10   **Q**    So yours was -- your number was all products, not the

11   products that came from conspirators, correct?

12   **A**    It was just a general number of our size of our business

13   during that time, again, in a cost-to-goods-sold perspective.

14   **Q**    And you made no effort to determine where the panels in

15   those products came from, whether they came from companies

16   accused of being conspirators or otherwise.  Right?

17   **A**    No.

18   **Q**    Okay.  You mentioned that Best Buy's a public company.

19   Right?

20   **A**    We are, yes.

21   **Q**    And that means that Best Buy has public shareholders in

22   addition to the Best Buy employees, officers, directors, who

23   hold shares in the company.  Right?

24   **A**    Correct.

25   **Q**    And you mentioned specifically Richard Schulze as one of

FRITZ - CROSS EXAMINATION / FREITAS

1   the shareholders?

2   **A**   Yes.

3   **Q**   He is the founder, you said, I think; right?

4   **A**   He is the founder, and currently the chairman emeritus.

5   **Q**   He owns 20 percent of Best Buy, doesn't he?

6   **A**   I don't know the exact amount, but he does own a

7   substantial portion.

8   **Q**   And, about 70 percent of Best Buy is owned by in

9   institutional shareholders, as opposed to individuals.

10  Correct?

11  **A**   I actually don't know the breakout.

12          **MR. FREITAS:**   Can we see Exhibit 1132, please.

13      (Document displayed)

14  **BY MR. FREITAS:**

15  **Q**   You have already answered some questions about this

16  exhibit.  I'm not going to go over what you have testified

17  about before, but I want to follow up on a couple of issue.

18      Exhibit 1132 begins with an email from Kevin Winneroski,

19  right?

20  **A**   Yes.

21  **Q**   Now, he was reporting to you in May of 2003, wasn't he?

22  **A**   I believe so, yes.

23  **Q**   And your title at the time was what?

24  **A**   My --

25  **Q**   Your title at the time?

FRITZ - CROSS EXAMINATION / FREITAS

1   **A**   2003, I don't recall specifically, but I think I was a VP

2   of the computing hardware group at that time.

3   **Q**   VP?

4   **A**   I believe so.  I got promoted to vice-president some time

5   in 2003.

6   **Q**   Okay.  About that time, how many people were reporting to

7   you?

8   **A**   Directly or indirectly?

9   **Q**   Directly.

10  **A**   Directly, I'm giving an estimate, but probably 12 to 15.

11  **Q**   Okay.  And what exactly was Mr. Winneroski's job in May,

12  2003?

13  **A**   I believe at this time that he was the director of

14  notebooks.

15          **MR. FREITAS:**  Could we see the next page, please.

16  (Document displayed)

17  **BY MR. FREITAS:**

18  **Q**   There's a heading, Vendor Meeting Recap.  And you

19  testified about this before.

20  **A**   Yes.

21  **Q**   But I want to direct your attention to the language that

22  appears at the top, near the top, right below the title

23  (Indicating).

24      Do you see there where it says "Meeting organizer provides

25  participants with a record of the meeting within 24 hours"?

FRITZ - CROSS EXAMINATION / FREITAS

1   **A**   I see that, yes.

2   **Q**   That was the regular practice that was being followed at

3   Best Buy in May of 2003, that everyone who was at the vendor

4   meeting would get a copy of the recap.  Correct?

5   **A**   That was the guideline, yes, I believe so.

6           **MR. FREITAS:**  Can we see the first page of Exhibit

7   1132 again.

8       (Document displayed)

9   **BY MR. FREITAS:**

10  **Q**   Let's look at the first line there.  It says (As read):

11  "Attached is a recap and action items from the meeting I had

12  at Toshiba this morning."

13      Do you see that?

14  **A**   No.  Can you -- tell me where you are looking.

15  **Q**   Up near the top, the first line.

16  **A**   Oh, you're back on the email, sorry.

17  **Q**   That's right.  Sorry.

18      (Witness examines document)

19  **A**   Yes.

20  **Q**   All right.  So it says he, Mr. Winneroski, is sending his

21  recap the very day of the meeting.  Right?

22  **A**   It looks that way, yes.

23  **Q**   So the guideline was within 24 hours, and it looks like on

24  this occasion he sent his recap the very same day.

25  **A**   It looks that way, yes.

FRITZ - CROSS EXAMINATION / FREITAS

1  **Q**   When Mr. Winneroski was testifying, did you hear him

2  mention NPD?

3  **A**   I -- I don't recall him mentioning NPD.

4  **Q**   I think you mentioned NPD in your testimony, right?

5  **A**   I did.

6  **Q**   So you are familiar with NPD as a source of competitive

7  intelligence for Best Buy?

8  **A**   Correct.  And we commonly use it for market share

9  information.

10  **Q**   When you refer to NPD, are you referring to any specific

11  NPD companies?

12  **A**   No.

13  **Q**   Are you familiar with their corporate structure?

14  **A**   I am not.

15  **Q**   Have you heard that NPD has owned DisplaySearch since

16  2005?

17  **A**   I -- I have heard the name DisplaySearch.  I did not know

18  that NPD owned them.

19       **MR. FREITAS:**  Can we go to the second-to-last page of

20  Exhibit 32, please.

21     (Document displayed)

22       **MR. FREITAS:**  And the box, the next-to-the-left box,

23  the last one, just over from there.

24     (Document displayed)

25       **MR. FREITAS:**  That one, right there.

1    BY MR. FREITAS:

2    Q    In this box --

3                THE WITNESS:  Sorry, this monitor is not on.

4                THE COURT:  Tracy, her monitor isn't turned on.

5                THE CLERK:  There could be just a power button; hold

6    on.

7         (Off-the-Record discussion)

8                THE WITNESS:  Okay.

9    BY MR. FREITAS:

10   Q    All right.  You see there, there's a reference to, it says

11   (As read):

12   "...selling out to Hitachi, leaving Hitachi and Toshiba as

13   main suppliers."

14   A    I see that, yes.

15   Q    Okay.  Those weren't the only hard drives suppliers in

16   May, 2003, right?

17   A    I don't recall.  But I know they were the substantial

18   ones.

19               MR. FREITAS:  Can we see Exhibit 8223, Page 24,

20   please.

21        (Document displayed)

22   BY MR. FREITAS:

23   Q    So you see right here (Indicating), there is also a

24   reference to a couple of other hard drive makers, including

25   Seagate.  Do you see that?

FRITZ - CROSS EXAMINATION / FREITAS

1    **A**    I see that, yes.

2    **Q**    Seagate was a major hard drive supplier in May, 2003,

3    wasn't it?

4    **A**    I don't know -- I don't recall if they were.  And I'm not

5    sure if they were in notebooks, which I believe is the other

6    document.  This might be computing, wholistic.

7    **Q**    Seagate certainly has been a major hard drive supplier

8    over the years, right?

9    **A**    Yes.

10   **Q**    Ms. Fritz, as a part of the training you received at

11   Best Buy, you were taught that if you think a vendor is

12   violating the antitrust laws, that you should escalate that to

13   your supervisor.  Correct?

14   **A**    Correct.  That was part of our antitrust training.

15   **Q**    And you were also taught that if you believed a vendor was

16   violating antitrust law, that you should escalate it to

17   someone in the legal department.  Right?

18   **A**    That was part of our training as well, yes.

19   **Q**    And in May, 2003, you were reporting to Dave Morrish?

20   **A**    I believe so.

21       **MR. FREITAS:**  Can we see Exhibit 5711, please.

22       (Document displayed)

23   **BY MR. FREITAS:**

24   **Q**    Mr. Curran asked you about Exhibit 5711.  And, that begins

25   with an email dated May 27, 2003.  Do you see that?

FRITZ - CROSS EXAMINATION / FREITAS

1    **A**    I do.

2              **MR. FREITAS:**   Can we see the next page, please.

3         (Document displayed)

4    **BY MR. FREITAS:**

5    **Q**    And, Mr. Curran also pointed out that there was a

6    reference to an RVP, regional vice-president monthly meeting.

7    Right?

8    **A**    Correct.

9              **MR. FREITAS:**   Back to the first page, please.

10        (Document displayed)

11   **BY MR. FREITAS:**

12   **Q**    And it is indicated on the first page of Exhibit 5711 that

13   the meeting -- a meeting would take place in Chicago the next

14   day.  Right?

15   **A**    That's what it says.

16   **Q**    I know your memory wasn't perfectly clear about this, but

17   apparently you attended the regional vice-president -- or you

18   and Ms. Sherwood attended the regional vice-president meeting

19   in Chicago in late May, 2003.

20   **A**    We were listed as participants.  Again, I don't remember

21   the specific meeting.

22   **Q**    And the listing, does indicate that you were definitely

23   there?

24   **A**    The listing does indicate?  Not -- not always.

25   **Q**    Well, let's look at the third page of the exhibit, please.

FRITZ - CROSS EXAMINATION / FREITAS

1       (Document displayed)

2           **MR. FREITAS:**  I'm sorry, the second page.

3       (Document displayed)

4    **BY MR. FREITAS:**

5    **Q**   There's an agenda there?

6    **A**   Yes.

7    **Q**   And it is indicated on the agenda that you were to be a

8    presenter, isn't it?

9    **A**   It is.

10   **Q**   That would indicate that you were present, wouldn't it?

11   **A**   It would indicate it.  It still doesn't tell me if I have

12   was there or not.  I don't recall.

13   **Q**   All right.  But the way things worked with these meetings,

14   the fact that you are listed as a presenter, in all

15   likelihood, that means you were there.

16   **A**   It's likely, yes.

17   **Q**   All right.  And in that agenda, there are time limits for

18   the proposed topics that were ongoing to be discussed.  Right?

19   **A**   It appears that way, yes.

20   **Q**   And, your presentation is indicated as the second-longest,

21   isn't it?

22       (Witness examines document)

23   **A**   Hmm, yeah it looks that way.  It's actually mine and

24   Diane's, yes.

25   **Q**   The presentation from you and/or Ms. Sherwood is indicated

1    to be the second-longest.

2    **A**    Correct.

3           **MR. FREITAS:**  Now, can we see Exhibit 5710, please.

4       (Document displayed)

5           **MR. FREITAS:**  I'm sorry, this is not in evidence yet.

6    Take that down, please.

7       (Document taken off display)

8           **MR. FREITAS:**  Oh, I'm sorry, it is.  Put it back up.

9       (Document displayed)

10   **BY MR. FREITAS:**

11   **Q**   All right.  Exhibit --

12          **THE COURT:**  6710?

13          **MR. FREITAS:**  5710, Your Honor.

14   **BY MR. FREITAS:**

15   **Q**   Now, 5710 begins with an email from Scott Bachinski to

16   Josh Will, dated November 24, 2003.  Do you see that?

17   **A**   I do.

18   **Q**   And Josh Will, he's still at Best Buy, isn't he?

19   **A**   He is.

20   **Q**   Can you remember what his job was in November of 2003?

21   **A**   I do not.  We changed jobs frequently.

22   **Q**   All right.  If you look at the next page --

23      (Document displayed)

24   **Q**   -- you will see that your presentation or the presentation

25   that you apparently participated in at the regional

FRITZ - CROSS EXAMINATION / FREITAS

1   vice-presidents' meeting in Chicago in May is being forwarded

2   by Mr. Bachinski in November of 2003 to Mr. Will.  Right?

3   **A**   It looks that way, yes.

4   **Q**   What was it about Mr. Will's job that would have made him

5   an appropriate recipient for those slides a few months after

6   the meeting had taken place?

7   **A**   I don't know.

8          **MR. FREITAS:**  Can we see Exhibit 8223, please,

9   Page 2.

10      (Document displayed)

11  **BY MR. FREITAS:**

12  **Q**   Exhibit 8223 is the Yucatan document, Ms. Fritz?

13  **A**   Yes.

14  **Q**   Do you see the date, November 17, 2003?

15  **A**   I do.

16  **Q**   Do you recall that the Yucatan meeting took place on or

17  about that date?

18  **A**   I don't.

19         **MR. FREITAS:**  Can we see the first page of Exhibit

20  8223, please.

21      (Document displayed)

22  **BY MR. FREITAS:**

23  **Q**   Now, that's an email by Mr. LeCombe to various people,

24  forwarding the Yucatan appendix, November 26th.  Do you see

25  that?

FRITZ - CROSS EXAMINATION / FREITAS

1    **A**    I do.

2    **Q**    About ten days after the November 17th date.  Do you see

3    that?

4    **A**    I see the 26th, that date --

5    **Q**    Now, was that common, that after project meetings like the

6    Yucatan meeting, that the detailed appendix would be forwarded

7    to the participants, and possibly others?

8           **MR. SILBERFELD:**  Pardon me, Your Honor.  Could the

9    witness be allowed to finish her answers?  We're getting a lot

10   of clipped answers, which I don't think is fair to the

11   witness.

12          **THE COURT:**  Make sure she's finished before --

13          **MR. FREITAS:**  Yes, Your Honor.

14          **THE WITNESS:**  Can you repeat the question?

15   **BY MR. FREITAS:**

16   **Q**    Sure.  The date on the Yucatan slides is November 17.

17   Right?

18   **A**    I believe so.  I have to look back at it, but --

19   **Q**    The date of the email is November 26th.

20   **A**    Yes.

21   **Q**    Okay.  Was it common after a project meeting like the

22   Yucatan meeting, for the detailed appendix to be sent around

23   to the participants?

24   **A**    I wouldn't say common, but it did happen, yes.  To make

25   sure that everybody was updated.

FRITZ - CROSS EXAMINATION / FREITAS

1    Q    Were the regional vice-presidents' meetings, as of May of

2    2003, consistently monthly events?

3    A    Not to my recollection, no.

4    Q    It was called "monthly recap" or "monthly briefing," but

5    they didn't literally happen every month?

6    A    Not to my recollection, no.

7    Q    They were typically in person, though, weren't they?

8    A    Um, I believe so, yes.  And they were typically in

9    Minneapolis.

10   Q    Pardon me?

11   A    And typically in Minneapolis.

12   Q    This one (Indicating) was apparently in Chicago, though?

13   A    Apparently.

14   Q    Did that happen, from time to time, that you would travel

15   to the regional vice-president meetings?

16   A    Occasionally.

17   Q    And were you a consistent attendee at the regional

18   vice-president meetings during this time in 2003?

19   A    I don't remember during this specific time, but I know I

20   would go into those meetings, on a pretty common basis.  So

21   whenever they were in town and we met, I was usually there.

22   Q    Okay.

23        MR. FREITAS:  Can we look at Exhibit 5710, please.

24        (Document displayed)

25        MR. FREITAS:  And Page 5, please.

1  **BY MR. FREITAS:**

2  **Q**   I would like you to take a look at, Ms. Fritz, at the part

3  that appears right below the slide here (Indicating).  Do you

4  see that?

5  **A**   I do.

6  **Q**   Is that part of what the attendees were shown?  Or are

7  those the notes that were used by you and/or Ms. Sherwood in

8  presenting?

9  **A**   I actually don't know.  I don't recall the specific

10  meeting.

11  **Q**   Okay.  Well, in any event, at that point, you are

12  reporting that your sales were over-budget more than

13  $20 million.  Right?

14  **A**   That's what it's saying, yes.

15  **Q**   And you said that your U.S. market -- your market share

16  was planned to be 39 percent.  Is that 39 percent of the total

17  U.S. market for computers sold at retail?

18  **A**   I don't know specifically, but it looks like it is a

19  statement about market share, yes.

20  **Q**   And that makes sense in terms of what your objectives in

21  2003 were, doesn't it?  Shooting for about 40 percent of the

22  total U.S. market for computers sold at retail, that is?

23  **A**   I would say our goals and objectives were to continue to

24  increase our market share, yes.

25  **Q**   And aiming in that range that makes sense in terms of what

1    you recall that you were aiming at during that time, doesn't

2    it?

3    A   I don't recall our specific market share goals at that

4    time.

5    Q   All right.  Later in the same paragraph, when you say that

6    you had achieved more than 52 percent of the market and two

7    weeks were over 60 percent, again, we're talking about the

8    entire U.S. market for computers sold at retail.  Right?

9    A   Well, first, to clarify, I don't think this was me saying

10   this, because I'm not sure who wrote the document.  So, I'm

11   just interpreting what I see on the screen.

12   Q   Based on your knowledge, what you knew at the time, what's

13   being discussed there is 52 percent and more than 60 percent

14   of the U.S. retail market for computers.  Right?

15   A   Well, it doesn't say that.  It says "52 percent with two

16   weeks hitting 61 percent and 58 percent."

17   Q   But you don't know whether it is referring to U.S. retail

18   market --

19   A   I don't.

20   Q   -- for computers or something else.

21   A   I don't.

22       MR. FREITAS:  Can we take a look at Exhibit 5522,

23   please.

24       (Document displayed)

25

1    **BY MR. FREITAS:**

2    **Q**   Mr. Curran asked you about this, but I'm going to ask you

3    about some different aspects of this exhibit.

4    **A**   Okay.

5    **Q**   Exhibit 5522, at the top, has an email from Steve -- is it

6    "Fuechtmann"?  Is that how you say it?

7    **A**   "Fuechtmann."

8    **Q**   Okay, Fuechtmann, to you.  Right?

9    **A**   Yes.  It appears that way.

10   **Q**   Okay.  And then there's another email down below.

11         (Document displayed)

12   **Q**   And that one is from Jason McClain to various people.

13   You're one of the people who received a copy.  Right?

14   **A**   Yes.

15   **Q**   Now, there's a reference in -- I think it is in the top

16   email from Mr. Fuechtmann.

17         (Document displayed)

18   **Q**   Do you see "GMA"?  What does "GMA" mean?

19   **A**   I believe it means "gross margin adjustments."  But, I'm

20   not positive.  I think it's "gross margin adjustments."

21   **Q**   Okay.  The subject line says:

22   "Computing EOL Status Update."

23         Do you see that?

24   **A**   I do.

25   **Q**   "EOL" means "end of life," right?

FRITZ - CROSS EXAMINATION / FREITAS

1    A    Typically, yes.

2    Q    And "EOL" specifically is used to refer to the end of the

3    life of a given SKU, a given product.  Right?

4    A    Typically, yes.

5    Q    A given product will reach a point at which it won't be

6    sold any more, and as that point approaches, you call that

7    "the EOL process."  Right?

8    A    I don't know if I would state it that way.

9    Q    How do you use EOL with reference to SKUs, Ms. Fritz?

10   A    So, we talk about SKUs that are transitioning.  And then

11   we look at end of life as any of the inventory that is left

12   after its transition date.  And, product that we actually need

13   to make sure we move through and/or move sideways, which for

14   us, means move to a different channel to sell through it.

15   Q    All right.  So you have -- let's say it's a notebook, it's

16   being sold.  Is EOL the transition phase?

17   A    We refer to it kind of generally as "end of life."  But

18   the transition phase is -- is the transition phase.  That's --

19   we know when it's actually going to transition.

20        "End of life" typically refers to the product date has

21   ended, and therefore we either need to do something with it

22   from a logistics perspective, from a price perspective,

23   et cetera.

24   Q    So you might -- you might drop the price, you might use

25   aggressive liquidation techniques, or you might move it, did

FRITZ - CROSS EXAMINATION / FREITAS

1    you say "sideways," to another channel?

2    **A**    Yes.

3    **Q**    And another channel, what would be an example of that?

4    **A**    We might move it -- we call it "sideways," but it

5    essentially means moving it to a -- another reseller like a

6    clearance or a close-out person or website, someone that

7    actually deals with close-out merchandise.

8              **MR. FREITAS:**   Okay.  Can we see Mr. McClain's email,

9    please.

10        (Document displayed)

11   **BY MR. FREITAS:**

12   **Q**   Mr. McClain makes reference in the second sentence to

13   something that you had apparently asked about.  Do you see

14   that?

15        (Document displayed)

16   **A**   I do.

17   **Q**   It says (As read):

18   "Wendy has asked for the detail behind both notebooks and

19   desktops version EOL and would like to see your respective

20   versions for Q1."

21        Do you see that?

22   **A**   I do.

23   **Q**   What did you ask him?

24   **A**   I asked them to -- we -- we version or forecast every

25   month, in terms of what our sales are going to be.  And also

1  any gross margin impacts, which, end of life write-off of

2  obsolete inventory would be one of them.

3      So, it looks like what I was asking for was the version

4  end of life, and what would the next forecast for Q1 look like

5  in terms of end of life.

6  **Q**  All right.  Now, in this time, in March of 2005, your job

7  included managing product life cycles, didn't it?

8  **A**  It did.

9  **Q**  And that included trying to be -- to avoid being stuck

10  with SKUs that weren't selling or that couldn't be sold.

11  Right?

12  **A**  It -- it -- the job entailed making sure that we were

13  addressing all components of the life cycle, from introduction

14  to exit.

15  **Q**  And pricing varies over the course of the life cycle in

16  many cases, doesn't it?

17  **A**  In notebooks, typically there was one price move.

18  **Q**  And when would that price move take place?

19  **A**  It wasn't always constant or consistent.  It would depend

20  on the sales.

21  **Q**  And it would take place as a result of developments in the

22  product life cycle, wouldn't it?

23  **A**  Not always, no.

24  **Q**  Commonly, the prices would start out high, and as the life

25  of the product grew -- that is, as it got older -- the price

1    would drop, wouldn't it?

2    **A**    It would depend.  Later on, in -- well, I don't know, I

3    would say maybe the last five or seven years, it wasn't very

4    common at all for a price move to happen.  So it depended upon

5    what was going on in the industry, what was going in the

6    environment, and how much product we had.  And when the

7    transition date was.

8    **Q**    In your prior testimony, you made reference to the

9    situation that is presented when you are offering a product,

10   and another product comes -- is launched in the same space.

11   Right?

12   **A**    I believe I talked about that, yes.

13   **Q**    It could be a newer product; it could be a product that's

14   more advanced.  Right?

15   **A**    Well, it would typically be a new product.

16   **Q**    Well, it would be simply a newer product in one sense, but

17   it could also be something that might not be new (Indicating

18   quotation marks) in one sense, but would have some different

19   features.  Right?

20   **A**    I'm not sure I'm understanding your question.

21   **Q**    All right, then I'll move on to another one.

22        When another product moves in to the same space, this

23   creates problems for selling the original product in many

24   situations, doesn't it?

25   **A**    Well, our job is to -- we -- we have a fixed amount of

FRITZ - CROSS EXAMINATION / FREITAS

1    space on the floor, right, for a specific amount of products.

2    So, our job is to make sure that we are exiting those products

3    before new products enter.

4    **Q**   And, the new products typically have an effect on the

5    price at which you can sell the existing products, don't they?

6    **A**   Typically, because they're usually fuller-featured.

7    **Q**   Pardon me?

8    **A**   Typically, because they are fuller-featured, or there's

9    more advanced technology in them.

10   **Q**   And it's common, isn't it, for the products that you were

11   responsible for in and about 2005, for the pricing to start

12   out high, and then to drop over the life of the -- the

13   saleable life of the product, as new products were being added

14   at your stores and added by competitors.  Right?

15   **A**   During the time period, I -- I believe I just said, I

16   don't think it was incredibly common.  Price moves did happen,

17   but during this period of time, I couldn't say specifically.

18   **Q**   You don't recall specifically for the 2005 period of time?

19   **A**   I don't.  That was almost five years ago.  No.  Longer

20   than that.

21   **Q**   Okay.  Fine.

22   **A**   Eight years ago, sorry.

23   **Q**   Sure.  One of the things you observe is that when new

24   products are launched, there are those who -- the early

25   adopters, who feel they have to have it.  Right?

1    **A**    Right.  There's always a group of early adopters that are

2    looking for latest technology.

3    **Q**    And often those people are willing to pay more for the new

4    products, aren't they?

5    **A**    I can't speak on behalf of those people, but I know that

6    when new products are launched, usually our early adopters are

7    the first people -- first people in.

8    **Q**    You testified on your direct examination about the

9    agreements you called "VMAs," vendor master agreements?

10   **A**    Yeah.  By "direct examination," do you mean here, here?

11   Or does that mean my deposition?

12   **Q**    I mean Mr. Silberfeld's questions here.

13   **A**    Okay, thank you.

14   **Q**    You remember that?

15   **A**    I do.

16   **Q**    And you said that the agreements are entered into in

17   Minneapolis.

18   **A**    Yes.

19   **Q**    Are you responsible for any vendor master agreements,

20   today?

21   **A**    Today?  No, I am not.

22   **Q**    Were you responsible for vendor master agreements during

23   the years before 2006?

24   **A**    Yes, I was responsible for negotiating some of those.

25   Again, a lot of them were wholistic across the company, so

FRITZ - CROSS EXAMINATION / FREITAS

1    they were representative of Best Buy, not necessarily just of

2    my area.

3    Q    And the vendors that you worked with, those were the

4    companies that sold finished goods that were resold by

5    Best Buy.  Correct?

6    A    Typically.

7    Q    And, typically, they wouldn't be companies like Intel or

8    AMD or ATI, right?

9    A    Yeah, I don't -- I don't recall if we had an -- a broader

10   agreement with Intel or AMD.  We obviously had a substantial

11   relationship with them, because the microprocessor business

12   was really important.  So, I don't recall if we had a larger

13   umbrella agreement with them or not.

14   Q    Regardless of whether you can specifically recall an

15   agreement with Intel, the VMAs you are describing, those were

16   agreements with finished-goods companies for the most part,

17   right?

18   A    Typically.

19   Q    You mentioned so-called "MDF" during your prior testimony.

20        MR. FREITAS:  Could we see Exhibit 1281, please.

21   (Document displayed)

22   BY MR. FREITAS:

23   Q    Now, in this advertisement there is information about

24   rebates, right?

25   A    There is, yes.

FRITZ - CROSS EXAMINATION / FREITAS

1  **Q**   And there's also information about sale prices.  Correct?

2  **A**   Yes, it looks that way.

3  **Q**   Sale prices, reduced prices, as opposed to regular prices

4  at which goods are sold.  Right?

5  **A**   Yeah.  I wouldn't be able to say that all of them are

6  specific sale prices, because it was a number of years ago.

7  But typically, there is a sale savings associated with them.

8  **Q**   I think you said you weren't sure if the sale prices or

9  the rebates involve MDF money that was received by Best Buy.

10  Did I hear that correctly?

11  **A**   Yeah, I -- I'm not sure.  And, because most of these

12  categories were not in my area.  But also, the funding of

13  rebates would vary dramatically.

14  **Q**   The funding of rebates would vary dramatically?

15  **A**   Yes.

16  **Q**   Well, sometimes rebates were paid with MDF, correct?

17  **A**   Sometimes.

18  **Q**   What are the other sources of payments of rebates?

19  **A**   Sell-through credits.

20  **Q**   What is a sell-through credit?

21  **A**   A sell-through credit is a -- is a payment after the --

22  the actual individual-unit sale has taken place.

23  **Q**   That's support that Best Buy receives from its vendor,

24  right?

25  **A**   Correct.

FRITZ - CROSS EXAMINATION / FREITAS

1   Q    So the vendor might pay MDF money that you would use to

2   pay a rebate, or the vendor might provide a sell-through

3   credit that you would use to pay a rebate, correct?

4   A    Correct, to help them sell through their product.

5   Q    How about mail-in rebates?  Are those typically paid by

6   the vendor?

7   A    Well, we -- I believe it was in 2006, but I'm not specific

8   on the date, but we -- we actually -- Best Buy eliminated

9   mail-in rebates.  So, depends on what time you're asking

10  about.

11  Q    Well, during the period when you were using them, they

12  were typically funded by vendors, weren't they?

13  A    Typically, yes.

14  Q    If you want to know how much Best Buy actually paid for a

15  product, you would have to know how much Best Buy received in

16  MDF and other vendor support, wouldn't you?

17  A    Well, if you wanted to know how much we paid for the

18  product, you would look at the product cost.

19       If you wanted to understand other MDF and other back-end

20  funding, you would look at those.  But we wouldn't consider

21  that a margin against the cost of the product, because in a

22  lot of cases, it was to the product category, not to a

23  specific SKU.

24  Q    Well, the fact of the matter is you did receive MDF that

25  was used to reduce your cost for giving SKUs.  Isn't that

1 | right?

2 | **A**   On occasion, yes.

3 | **Q**   Pardon me?

4 | **A**   On occasion we did receive MDF.  But it was usually at a

5 | category level, not a SKU level.

6 | **Q**   Well, if you looked at --

7 |        **MR. FREITAS:**  Let me withdraw that, Your Honor.

8 | **BY MR. FREITAS:**

9 | **Q**   What do you mean by "category," Ms. Fritz?

10 | **A**   "Category," like a category of products.  So the notebook

11 | category, the desktop category, the television category.

12 | **Q**   You don't mean LCD products as a whole.  You mean

13 | individual --

14 | **A**   I mean individual product categories.

15 | **Q**   And you would receive MDF money from vendors for, say,

16 | notebooks.

17 | **A**   Correct.

18 | **Q**   And when you mentioned that number, you mentioned before

19 | about $32 billion worth of purchases.  That was not the MDF

20 | for the vendor support, was it?

21 | **A**   No.  It was cost of goods sold.

22 | **Q**   Could you look, please, at Exhibit 7891.  It should be in

23 | the binder that is in front of you.

24 |        **MR. FREITAS:**  It's not -- this is not in evidence.

25 |        **THE WITNESS:**  Yes.

1    **BY MR. FREITAS:**

2    **Q**   You were not able -- well, withdraw that.

3        Best Buy is not able to say how much it has received in

4    MDF for any given product, is it?

5    **A**   Is there something specific you wanted me to look at?

6    **Q**   It's a reference there, there is some information about

7    the questions I'm going to ask.  You can -- you can read it or

8    not.  But if you could answer my question now, that would

9    be --

10   **A**   Can you repeat the question?

11   **Q**   Sure.

12   **A**   I thought you were referring to something in the document.

13   **Q**   I will, eventually.

14       Best Buy is not able to determine how much it receives in

15   MDF for a given product.  Correct?

16   **A**   Correct.  That is my understanding.

17   **Q**   Best Buy doesn't track MDF at the SKU or individual

18   product level.  Right?

19   **A**   No.  No, because typically it's associated with a

20   category.

21   **Q**   So I'm right, you don't track it at the product or SKU

22   level.

23   **A**   We do not track it at a product level.  Not to my

24   knowledge.

25   **Q**   And you also don't track MDF for LCD products as a class.

FRITZ - CROSS EXAMINATION / FREITAS

1   Correct, Ms. Fritz?

2   **A**   We don't.  We do track it at a category level.

3   **Q**   So, let me make up a SKU, we will call it "12345."  And

4   we'll say that is a Samsung monitor, for example.

5        Your invoices, the invoices that are issued by Samsung,

6   would show what your initial cost was.  Right?

7   **A**   Yes.

8   **Q**   And, if Samsung gave you MDF money, how would that be

9   connected, if it would be at all, to the purchase of the

10  monitors in that SKU, 12345?

11  **A**   Well, it would depend on -- on the kind of MDF it was.  So

12  typically, it would not show up on that same invoice.  So, MDF

13  would be a separate invoice.

14       As I mentioned before, if it was a DFI, which is a "deduct

15  from invoice," then it would show up on that invoice as a --

16  or a future invoice, to say this is how much we are deducting

17  for market development funds.

18  **Q**   Okay.  Let's talk about the different kinds of vendor

19  support that Best Buy receives.  You just mentioned DFI.

20  That's "deduct from invoice."  Right?

21  **A**   I did.

22  **Q**   And what does that mean, "deduct from invoice"?

23  **A**   As I said, it is an amount of dollars, usually

24  predetermined as part of our MDF, that would be deducted from

25  the invoice.  So when we're paying back the vendor for product

1    purchased, we would deduct that MDF amount from that.

2    **Q**   So that shows up on the invoice, correct?

3    **A**   If it is a DFI, yes.

4    **Q**   And that's trackable by product.  By SKU, by purchase.

5    **A**   It's trackable -- the -- the invoice would be for the SKU,

6    but the MDF DFI is not particular to that SKU.  Again, it

7    would be a product category deduction, which would show up on

8    that invoice or several invoices.

9    **Q**   But nonetheless, it would be showing up on the invoice,

10   and it would be tied to a specific purchase.  Correct?

11   **A**   I don't know if you could say it would be tied to a

12   specific purchase.  It would be simply a way of deducting it

13   from the overall amount owed.

14   **Q**   Well, let me say it this way:  There would be a stated

15   price on the invoice, there would be a deduction from that

16   price, and Best Buy would pay the net amount.  Right?

17   **A**   Correct.  But it could be for a previous MDF commitment

18   that just showed up on the next invoice to the vendor.

19   **Q**   Okay.  Then, there's price protection, which I think you

20   mentioned.  That also shows up at the invoice level, doesn't

21   it?

22   **A**   I believe so.

23   **Q**   Now, everything else, all other kinds of vendor support,

24   are they typically referred to under the MDF label, at

25   Best Buy?

FRITZ - CROSS EXAMINATION / FREITAS

1   A    Not everything, no.

2   Q    Could you take a look at Exhibit 7891, please, and see if

3   that refreshes your recollection?

4   A    Okay.  Where in the exhibit?

5   Q    It should be in the introductory part of it.

6        (Witness examines document)

7   Q    Just read it to yourself, please.

8        (Request complied with by the Witness)

9   A    Okay.

10  Q    So, does that refresh your recollection that at Best Buy,

11  all the forms of vendor support other than DFI and price

12  protection are considered MDF?

13  A    I see how it's written here.  My -- the way that we have

14  always talked about it, or I've always talked about it, is MDF

15  is back-end funding for promotional use.

16       Things like a demo allowance or a new store opening

17  allowance, I haven't referred to as MDF.  I've referred to

18  them as separate, and that's how they're listed on the program

19  agreement.  So it sounds like Sheri's interpretation is a

20  little bit different.

21  Q    Pardon me?

22  A    Sounds like Sheri's interpretation is a little bit

23  different.  I believe this is from Sheri Best.

24       (Reporter interruption)

25            THE WITNESS:  It says here, S-H-E-R-I, Best.

FRITZ - CROSS EXAMINATION / FREITAS

1  **BY MR. FREITAS:**

2  **Q**    In any event, you agree, don't you, that MDF is not

3  tracked by SKU?

4  **A**    I do agree that it's not tracked by SKU.

5        **MR. FREITAS:**  Could we see Exhibit 1274, please.

6    I would like to see the section that refers to RAM.

7    (Document displayed)

8        **MR. FREITAS:**  Right over there, there you go, right

9  there.

10    (Document displayed)

11  **BY MR. FREITAS:**

12  **Q**    When you were talking about Exhibit 1274, you were talking

13  about memory.  The RAM that's discussed there is the main

14  memory in the computer.  Right?

15  **A**    The baseline, yes.

16  **Q**    But, the RAM -- I am not talking about the quantity.  I'm

17  just saying the RAM is the main memory, the computer main

18  memory.  Isn't it?

19  **A**    Yes.

20        **MR. FREITAS:**  Could we see the video reference on the

21  same page?

22  **BY MR. FREITAS:**

23  **Q**    That was 256, right?

24  **A**    That was the baseline memory, yes.

25    (Document displayed)

FRITZ - CROSS EXAMINATION / FREITAS

1    Q    Okay.  Now.  Here, for video, it's in megabytes, and it's

2    much bigger.  But that's not the main memory of the computer,

3    is it?

4    A    That's the video memory or the graphics memory.

5    Q    Okay.

6         MR. FREITAS:  Could we see Exhibit 7111, please.

7    This is not in evidence.

8         I'm sorry.

9    BY MR. FREITAS:

10   Q    Ms. Fritz, would you look at Exhibit 7111, please.

11        (Request complied with by the Witness)

12   Q    Now, Exhibit 7111 is part of the training program used at

13   Best Buy in or about 2006, isn't it?

14   A    It looks that way, yes.

15   Q    Specifically, it's the spring training in vendor

16   management.  Right?

17   A    That's what it says.  I haven't looked through the whole

18   document, but that's what it says at the front page.

19   Q    Why don't you take a minute and see if that's what it is,

20   please.

21        (Witness examines document)

22   A    Okay.  I've looked through it.

23   Q    And, does it appear to be the spring training in vendor

24   management?

25   A    It does.

FRITZ - CROSS EXAMINATION / FREITAS

1    **Q**   Is that an online course?

2    **A**   No.  Typically, it would have been a physical training.

3    **Q**   Okay.  And on Page 2, please, it's indicated there, isn't

4    it, that this training is intended to provide an overview of

5    the entire vendor management life cycle, right?

6    **A**   I don't see that specifically.  Let me look for a second

7    here.

8        (Witness examines document)

9    **Q**   Well, there's a pretty complete discussion of all aspects

10   of Best Buy's relationships with its vendors, right?

11   **A**    In the beginning, it does say it's an overview of the

12   entire (Inaudible)

13       (Reporter interruption)

14       **THE WITNESS:**   It does say in the beginning, it's an

15   overview of the entire vendor management life cycle.

16   **BY MR. FREITAS:**

17   **Q**    Then, on Page 5, there's the baseball analogy?

18   Starting -- being on deck, near home plate, making it all the

19   way around the bases, completing the study of the vendor

20   management life cycle, right?

21   **A**    What I see is a vendor maintenance -- or vendor management

22   life cycle, the different phases.

23   **Q**   Okay.  We talked about a way to look at MDF.  And you

24   didn't completely agree with what I suggested to you.  But,

25   there are other ways to categorize MDF, aren't there?

1    For example, some MDF is done by accrual on the books of a

2    vendor, and some is cash payment.  Correct?

3    **A**    As we talked about, some of it is DFI, and some of it is

4    straight-out payment, yes.

5    **Q**    But some involves direct cash payments to Best Buy, right?

6    **A**    I believe so, yes.

7    **Q**    And would you describe the parts that aren't cash -- cash

8    payments as accruals?

9    **A**    I would describe them as either accruals or DFIs.

10   **Q**    Now, MDF includes such things as volume discounts, right?

11   **A**    It could.

12   **Q**    Volume incentive discounts?

13   **A**    I think those two are one and the same.

14   **Q**    Pardon me?

15   **A**    I think volume discounts and volume -- the last part you

16   said, are the same thing.

17   **Q**    Okay.  Display allowances?

18   **A**    I -- see, this is where, again, I would say demo

19   allowances or display allowances are listed separately, and

20   are not considered MDF, necessarily.

21   **Q**    So it's still cash to Best Buy, but you wouldn't consider

22   it to be MDF?

23   **A**    It wouldn't -- typically, demo allowances would typically

24   not be cash.

25   **Q**    New item discounts.

FRITZ - CROSS EXAMINATION / FREITAS

1    **A**    New item --

2    **Q**    Would you consider that part of MDF?

3    **A**    No.  I consider that a new item discount.

4    **Q**    Okay.  What about advertising co-ops?  Would you put that

5    in MDF?

6    **A**    Advertising co-op would go in the co-op bucket.  So we

7    have co-op, we have MDF, and we have other sources.

8    **Q**    So you consider co-op to be separate from MDF?

9    **A**    I do.  It's listed on our annual program agreement, as

10   such.

11   **Q**    Well, advertising co-ops are sometimes considered at

12   Best Buy to be MDF, aren't they?

13   **A**    By me, they're considered separate.  Again, other people

14   may interpret it differently.

15   **Q**    Take a look at Page 34 of Exhibit 7111.  Read it to

16   yourself.  And, tell me if it refreshes your recollection that

17   advertising co-ops are looked at as MDF at Best Buy.

18              **THE COURT:**  Exhibit 34?

19              **MR. FREITAS:**  Page 34, Your Honor.

20              **THE WITNESS:**  Exhibit 34?

21   **BY MR. FREITAS:**

22   **Q**    No, Page 34 of Exhibit 7111.

23   **A**    Okay.

24        (Request complied with by the Witness)

25   **A**    Yeah, I see that.

1    **Q**    Does that refresh your recollection, at Best Buy, at least

2    some folks consider advertising co-ops as part of MDF?

3    **A**    It does not, no.

4         **MR. FREITAS:**  Your Honor, I would like to offer

5    Exhibit 7111, but there's a matter we would have to approach

6    the bench on before I do that.

7         **THE COURT:**  Okay.

8      (Sidebar discussion held on the Record:)

9         **MR. FREITAS:**  So, the issue has to do with the MDF

10   totals that appear in this document.

11        **THE COURT:**  What --

12        **MR. FREITAS:**  You had previously ruled that we could

13   not get into the total amount.  And on Page 24 -- 2434, the

14   numbers appear --

15        **MR. SILBERFELD:**  Which page number do you want us to

16   look at?  Because there's three different numbers of pages

17   (Indicating).

18        **MR. FREITAS:**  Okay.  I'm always trying to --

19        **MR. SILBERFELD:**  You're talking about the --

20     (Off-the-Record discussion between counsel)

21        **MR. SILBERFELD:**  That's the exhibit number page.

22        **MR. FREITAS:**  Okay, so, there are various figures

23   that are in here.  There's a -- there is a per-product total,

24   there is an overall total.  There's several other numbers.

25     And, given that they're not able to link the numbers by

1    product, but Ms. Fritz is saying it does go by category, we

2    think we should be able to work with the numbers and try to

3    come up with an analysis of what their actual price is.

4        This has a direct bearing on damages, especially given the

5    magnitude of the vendor support that's described in Exhibit

6    7111.  It's over $1 billion in one year, as indicated in this

7    exhibit.

8        And, the true cost that's being paid by Best Buy is being

9    obscured if the actual MDF numbers are not presented to the

10   jury.

11           THE COURT:  That's a wonderful argument, and I expect

12   to hear it again.  But what does that have to do with this

13   witness and this document?

14           MR. FREITAS:  She identified -- she laid a foundation

15   for the admission of the document.

16           THE COURT:  Do you object to the document?

17           MR. SILBERFELD:  Of course.  She didn't lay a

18   foundation for this at all.

19           THE COURT:  She didn't say she hadn't seen it before?

20           MR. FREITAS:  She said it was the spring training,

21   Your Honor, for the vendor management.  She did.  She said it

22   appears to be the spring training used in 2006.

23           MR. SILBERFELD:  No, she didn't --

24           THE COURT:  That is what it says it is.

25           MR. SILBERFELD:  Yeah, she -- she doesn't know

FRITZ - CROSS EXAMINATION / FREITAS

1    anything about this.

2           **MR. FREITAS:**  I think if we look at the answer she

3    gave, she did.

4           **MR. SILBERFELD:**  Well, the --

5           **THE COURT:**  Do you want to voir dire her on this

6    document?

7           **MR. SILBERFELD:**  No.  The document can't come in

8    because there's no foundation for the document.  The numbers

9    about MDF fly right in the face of the Court's ruling about

10   the use of MDF dollars, which the witness has already

11   testified to are largely paid out to others.

12      So we have a 403 objection, on top of the foundation

13   objection to this (Indicating).

14          **THE COURT:**  In any event, I don't hear anything she

15   has said that would allow you to ask her questions to go to

16   the point you were just making.  So --

17          **MR. FREITAS:**  I was simply going to offer the

18   document, Your Honor.

19          **THE COURT:**  Okay.  So, as long as we are clear about

20   that, now we can focus on the document.

21          **MR. FREITAS:**  Yes.

22          **THE COURT:**  I don't think she has laid a foundation

23   for it.  If you want, you can ask her more questions about

24   this document.

25      And if it comes in, then you object to the numbers about

FRITZ - CROSS EXAMINATION / FREITAS

 1    MDF that are in here?

 2              **MR. SILBERFELD:**  Yes.

 3              **THE COURT:**  And that's based on --

 4              **MR. SILBERFELD:**  I would have to go back and see

 5    which

 6    in limine ruling we are talking about, but there is an

 7    in limine ruling about reference to MDF dollars, because

 8    largely, MDF dollars are used as money to pay out to others.

 9    They don't go in Best Buy's coffers.  And that's been the

10    testimony today from this witness, as well.

11        So it's confusing to say Best Buy got MDF of $1 billion,

12    allowing them to suggest that that's money that Best Buy got.

13    It didn't get that.  It received it, and paid it out for

14    things like the Sunday circular, for things like signage, for

15    things like other promotions.

16        And that was the vice with the MDF motion that we made

17    earlier.

18              **THE COURT:**  About which I now recall very little.

19              **MR. SILBERFELD:**  Me, too.

20              **THE COURT:**  So I'll have to go back and find that.

21    But what she has said so far, I think, has been quite clear

22    about her -- her use of the MDF nomenclature, and comparing it

23    to some of the other things you were talking about.

24              **MR. FREITAS:**  Uh-huh.  Well, it also -- it also

25    impeaches her on that.  But that is not the real focus of why

1    I'm offering the document.  There is terminology that is

2    different from hers, but that is a secondary point.

3        I think that she said very clearly in response to

4    Mr. Curran's questions, that MDF money is sometimes simply

5    retained by Best Buy, that it isn't paid out.  But even if

6    it's paid out, that doesn't negate our fundamental point,

7    which is, in understanding what Best Buy's cost is, one must

8    know about the money that Best Buy has received.

9        Ms. Fritz today is saying that the money is received by

10   category, as opposed to by SKU.  But that doesn't negate the

11   fact that the money's being received in respect of those

12   products.

13       And it has an effect on what Best Buy's costs are --

14       **THE COURT:**  And those are all arguments that I

15   presume you are going to make, and you are going to put on

16   some expert who is going to give some technical backup for

17   that.  But you can't do that with her.  She's given you the

18   facts.

19       **MR. FREITAS:**  But at this point, Your Honor, all I

20   propose to do is to get the exhibit in evidence.  So --

21       **THE COURT:**  Well, you keep --

22       **MR. FREITAS:**  All right.

23       **THE COURT:**  I did not hear a foundation for it.  You

24   may have to try --

25       **MR. FREITAS:**  I'll go back over it.  I thought -- I

FRITZ - CROSS EXAMINATION / FREITAS

1  thought she did.

2          **MR. CURRAN:**  Thank you.

3          **THE COURT:**  And if we -- if it does come in, I'm

4  going to have to go back and look at the motion you are

5  talking about in order to -- if we have to redact some of

6  those numbers.  I'm just not remembering it that way.

7          **MR. SILBERFELD:**  I'll have my folks go back and look

8  as well.

9          **THE COURT:**  Yeah, have the night crew do that.

10          **MR. SILBERFELD:**  Or the day crew.  But I would like,

11  if there is going to be a move to move this in (Indicating), I

12  will want to ask her some questions about it today.

13          **THE COURT:**  Okay.  Well, you may.

14      (Sidebar concluded; the following proceedings are held in

15  the presence and hearing of the Jury)

16          **MR. FREITAS:**  May I proceed, Your Honor?

17          **THE COURT:**  You may.

18  **BY MR. FREITAS:**

19  **Q**   Ms. Fritz, you were working at Best Buy in 2006?

20  **A**   I was.

21  **Q**   You are familiar with the training that was provided at

22  Best Buy in that year, and the years immediately before it?

23  **A**   Yeah, we had trainings frequently.

24  **Q**   And you participated in some of the trainings, didn't you?

25  **A**   I did.

FRITZ - VOIR DIRE EXAMINATION / SILBERFELD

1  **Q**   As a trainer, and as someone who was receiving new

2  information, herself.  Right?

3  **A**   Yeah.  I participated in the assortment management

4  training, I believe.

5  **Q**   And, one of the subjects for the training that was

6  provided at Best Buy during 2006 was vendor management, right?

7  **A**   I believe so.  I mean, there's one in the book.

8  **Q**   Over the years you worked at Best Buy, you participated in

9  or received training in vendor management, didn't you?

10  **A**   Yes.

11  **Q**   Exhibit 7111 is an example of the vendor management

12  training provided at Best Buy in or about 2006, isn't it?

13  **A**   Yes.

14        **MR. FREITAS:**  Your Honor, we offer Exhibit 7111.

15        **MR. SILBERFELD:**  Objection.

16        **THE COURT:**  Do you wish to voir dire on the document?

17  On the foundation?

18        **MR. SILBERFELD:**  Thank you, Your Honor.

19                    **VOIR DIRE EXAMINATION**

20  BY MR. SILBERFELD:

21  **Q**   Ms. Fritz, take a look at Exhibit 7111.  I think it is

22  before you there.

23  **A**   It is.

24  **Q**   Did you have anything to do with this particular vendor

25  management training?

1    **A**    I don't believe so.

2    **Q**    From looking at it -- just leaf through the pages -- can

3    you tell whether any of the information contained in here is

4    true and accurate?

5         (Witness examines document)

6    **A**    From just looking at it, it does look like our -- a vendor

7    training.  But I'm not sure who put it on.

8    **Q**    What type of people at Best Buy would have given this

9    training?

10   **A**    It would have either been someone from our training

11   department or someone from our business team.

12   **Q**    And who would attend the training like this?

13   **A**    Typically it would be our buyers and our inventory team.

14   Anyone that had frequent interaction with our vendors.

15   **Q**    So the overall format appears to you to be something that

16   has happened at Best Buy before?

17   **A**    It does appear that way, yes.

18   **Q**    But to the extent there is specific information in here

19   about specific programs or dollars or values, can you vouch

20   for us that those are accurate?

21   **A**    I can't, without looking at each of them.

22        **MR. SILBERFELD:**  That's it, Your Honor.

23        **THE COURT:**  Have you ever seen this document before?

24        **THE WITNESS:**  I don't recall this specific document,

25   but again, we did do trainings.  So, I don't recall this

FRITZ - CROSS EXAMINATION / FREITAS

1    specific one.

2            **THE COURT:**  There's no foundation for this document.

3            **MR. FREITAS:**  Your Honor, I would like to play one

4    short deposition clip.

5            **THE COURT:**  Okay.  So this will be 10000-what?

6            **THE CLERK:**  -4?  Yeah, -4?  All right.

7            **MR. SILBERFELD:**  Can I just have a moment?

8        (Off-the-Record discussion between counsel)

9            **MR. FREITAS:**  It's Page 127, Lines 18 to 22,

10   Your Honor.  I've advised Mr. Silberfeld.

11           **THE COURT:**  And this will be Exhibit 10004, Tracy

12   says.

13           **MR. SILBERFELD:**  No objection to the --

14           **THE COURT:**  Thank you.

15       (Trial Exhibit 10004 received in evidence)

16           **MR. FREITAS:**  We are going to use a clip, if that's

17   okay, Your Honor.

18           **THE COURT:**  You may.

19           **MR. FREITAS:**  It's a short one.

20       (Deposition excerpt of the Witness played in open court,

21   not reported)

22           **MR. FREITAS:**  That's it.

23                        **CROSS-EXAMINATION RESUMED**

24

25

1   **BY MR. FREITAS:**

2   **Q**   Ms. Fritz, I think you said during cross-examination by

3   Mr. Curran, that -- it might have been while Mr. Silberfeld

4   was questioning you -- that notebooks were usually on the

5   shelf only about three months.  Is that correct?

6   **A**   Generally, yes.

7   **Q**   And a lot of the life cycles for the products that you

8   were responsible for during the years before 2006 had

9   relatively short life cycles, in that range, or even shorter,

10  sometimes, right?

11  **A**   I don't know if I would say that.  I think notebooks was a

12  very short life cycle, but I also managed a lot of other

13  computer products, like accessories, which would transition

14  once or twice a year.  So, much slower.

15  **Q**   But notebooks, in particular, they stand out in your

16  recollection as having had short life cycles.

17  **A**   Notebooks had a short life cycle, yes.

18          **MR. FREITAS:**  Thank you Ms. Fritz.  Thank you,

19  Your Honor.  Nothing further at this time.

20          **THE COURT:**  Thank you.

21          **THE WITNESS:**  Thank you.

22          **THE COURT:**  How much time do you expect to spend?

23          **MR. SILBERFELD:**  Fifteen or so minutes for me.  But I

24  don't know if others have other questions.

25          **THE COURT:**  Madam Court Reporter, are we good for 15

FRITZ - REDIRECT EXAMINATION / SILBERFELD

1    more minutes?

2              **THE REPORTER:**  (Nods head)

3              **THE COURT:**  All right.  We'll take a break after you

4    finish this witness.

5              **MR. SILBERFELD:**  Thank you.

6         Good afternoon, Your Honor.

7                        **REDIRECT EXAMINATION**

8    BY MR. SILBERFELD:

9    Q    Good afternoon, Ms. Fritz.

10   A    Good afternoon.

11   Q    I just want to perhaps bounce around a little bit, and ask

12   you some questions about things you've been asked by others.

13   A    Okay.

14   Q    Let's start with the last topic, which was the MDF subject

15   matter.

16   A    Yes.

17   Q    In your almost 20 years at Best Buy -- I want to focus on

18   the period before 1998.  Okay?

19   A    Okay.

20   Q    Did Best Buy receive market development fund money in

21   support of its programs from vendors before 1998?

22   A    Yes.

23   Q    And did it receive market development fund money from

24   vendors to support its programs after the year 2006?

25   A    Yes.

FRITZ - REDIRECT EXAMINATION / SILBERFELD

1    **Q**    And I gather it also received it -- that is, market

2    development fund money -- between 1998 and 2006.

3    **A**    That would have been consistent, yes.

4    **Q**    All right.  And, for all the years that you are familiar

5    with MDF coming in, MDF money coming into Best Buy, was there

6    a change in how that program operated?

7    **A**    Not to my knowledge, no.

8              **MR. SILBERFELD:**  If we could display -- I'm going to

9    ask the defense's tech folks if they could help me -- Exhibit

10   8140, which is in evidence.

11        (Document displayed)

12             **THE CLERK:**  8140?  I'm sorry, what was the --

13             **MR. SILBERFELD:**  8140.

14             **THE CLERK:**  What am I supposed to do?  I'm sorry.

15             **MR. SILBERFELD:**  Nothing.  I was asking for technical

16   help.  Not Tracy help.

17             **THE COURT:**  I know, but she has to --

18             **THE CLERK:**  No, they actually bypassed me.  They do

19   it, themselves.

20             **THE COURT:**  Oh, okay.

21   **BY MR. SILBERFELD:**

22   **Q**    Exhibit 8140 is an email that you were asked about, I

23   think, by Mr. Curran.  It's from June of 2005.  It had

24   something to do with Thanksgiving Day or Black Friday.

25        Do you remember this, ma'am?

1424

FRITZ - REDIRECT EXAMINATION /SILBERFELD

```
 1    A    I do remember this one.

 2    Q    And, there was a discussion in the email about Best Buy's

 3    proposed price for a notebook and a Wal-Mart price.  Do you

 4    remember that?

 5    A    I do.

 6    Q    And there was some information, it said under "Other

 7    points of consideration," if we could highlight that --

 8         (Document highlighted)

 9              MR. SILBERFELD:  And the next line.

10         (Document highlighted)

11    BY MR. SILBERFELD:

12    Q    It says (As read):

13    "We have intelligence that Wal-Mart will be at 399 or less

14    instant on 256/40 15."

15         Do you see that, ma'am?

16    A    I do.

17    Q    And, up above, under "Notebooks," there is a price point

18    of 359 to 399 for 256/40 15.  Is that -- was that intended to

19    be Best Buy's intended price?

20    A    I -- I can't say for sure, but it does look like it's

21    Best Buy's.

22    Q    Okay.  And, the sense of this email was that you were

23    comparing or Ms. Juaire was comparing what Best Buy's price

24    was going to be, compared to some information that you had

25    about the Wal-Mart price.  Is that right?
```

FRITZ - REDIRECT EXAMINATION / SILBERFELD

1   **A**   Correct.

2   **Q**   Now, take a look at the third bullet down, under "Other

3   points of consideration."

4       Does that express what Best Buy was trying to achieve by

5   using the information you had about Wal-Mart?

6   **A**   I believe so, yes.

7   **Q**   Okay.  Could you just read that bullet for us?

8   **A**   Sure (As read):

9   "Ultimately with the amount of units forecasted at Wal-Mart

10  and their intent to enter the space long-term we feel it

11  necessary to win not tie thus the possibility to go to $359."

12  **Q**   When Ms. Juaire wrote "win not tie," what does that mean?

13  **A**   I would interpret it to mean that we would have the lowest

14  price in the market for this configuration.  Not the same

15  price, but the lower price.

16  **Q**   So this would be an example, then, of Best Buy using some

17  information it got to lower its price to its customer.

18  **A**   Correct.

19  **Q**   Not raise it.

20  **A**   Correct.

21  **Q**   Not maintain it.

22  **A**   Correct.

23  **Q**   And, not work with Wal-Mart to agree on a price.  True?

24  **A**   True.

25  **Q**   You were asked some questions about the price-match

FRITZ - REDIRECT EXAMINATION / SILBERFELD

1    policy.

2         I don't know if you have Exhibit 8224 in front of you.  It

3    looks like this (Indicating).

4    **A**    I do, somewhere.

5    **Q**    It is in the bottom of that stack that you have there.

6    **A**    Okay.  Let me look at it, quick.

7         (Document displayed)

8    **Q**    And in particular, you were asked by Mr. Curran about what

9    is considered proof of price.

10        If we could just blow that up, so you don't have to strain

11   your eyes, and neither do I.

12   **A**    Okay.

13        (Document displayed)

14   **Q**    It says in the last sentence (As read):

15   "We reserve the right to call the competitor's store to

16   verify..."

17        What?

18   **A**    "...the lower price."

19   **Q**    What's the object of the price-match policy, Ms. Fritz?

20   **A**    It's to provide our customers with the lowest price.

21   **Q**    So that to the extent the customer comes in, has a

22   competing ad, Best Buy's price starts out higher.  If the

23   conditions of the price-match policy are met, the customer

24   gets the lower price.

25   **A**    That's correct.

FRITZ - REDIRECT EXAMINATION / SILBERFELD

1    **Q**   Not the higher price.

2    **A**   Correct.  They wouldn't want the higher price.

3    **Q**   And you don't call a competitor's store to agree on price,

4    do you?

5    **A**   No, absolutely not.

6    **Q**   Now, in your job, your competitors, like Wal-Mart and

7    CostCo, they also have senior vice-presidents of territories,

8    do they not?

9    **A**   I believe it's a similar structure.

10   **Q**   Maybe slightly different, maybe called different things,

11   but they have senior officer-level people who do for their

12   businesses what you do for Best Buy.

13   **A**   That is my understanding.

14   **Q**   Do you ever get together with those people to talk about

15   their prices for their products?

16   **A**   No.

17   **Q**   Have you ever agreed with a competitor on the price of any

18   product for which you have had any responsibility?

19   **A**   No.

20   **Q**   Or have you ever agreed with any competitor who has the

21   same position you do in their company, that, "You know what?

22   We're not going to lower the prices; we're going to keep them

23   about the same and share the business in a reasonable way"?

24       Have you ever done that?

25   **A**   No.

FRITZ - REDIRECT EXAMINATION / SILBERFELD

1    **Q**    You were asked some questions about buying power.

2    Best Buy's big.

3    **A**    Yes.

4    **Q**    It can extract concessions from its vendors.  Is Best Buy

5    alone in that?  Or does Wal-Mart, CostCo, and perhaps others

6    do the same?

7    **A**    Yeah, I would say they're the same.  And, you know, you

8    could argue Wal-Mart's buying power or leverage is even

9    larger.

10   **Q**    What's that?

11   **A**    You could argue that Wal-Mart's buying power is even

12   greater than ours.

13   **Q**    And based on that, they would do at least as well as

14   Best Buy, perhaps better?

15   **A**    I would believe so, yes.

16   **Q**    Now, there's no doubt in your mind that Best Buy will do

17   better in terms of its buying power than a single store, for

18   example.

19   **A**    Yes.

20   **Q**    Okay.  Take a look at Exhibit 5626.  And I don't know

21   which book that's in.  I think it's the one Ms. -- it is

22   probably in the loose documents Mr. Curran gave you.

23            **THE CLERK:**  Not today.  That was from last week.

24            **MR. SILBERFELD:**  I think so.

25            **THE CLERK:**  So I don't know if it's still up there.

1          **MR. SILBERFELD:**  Good question.

2          **MR. CURRAN:**  I believe it is still up there.

3          **THE CLERK:**  Is it up there?  Okay.

4          **THE WITNESS:**  Yeah, I see it.

5          **THE CLERK:**  Okay.

6     BY MR. SILBERFELD:

7     **Q**   It's an email from Mr. Winneroski to you, March 31, 2004.

8     Do you see that?

9     **A**   I do.

10    **Q**   Now, the subject is "HP, EVA analysis."  Right?

11    **A**   Correct.

12    **Q**   And what is "EVA," again?

13    **A**   "EVA" stands for "economic value add."

14    **Q**   And is that a term within Best Buy to signify something

15    about profit or gross margin?

16    **A**   It is a term to signify overall profitability, but it is a

17    industry-wide term.

18    **Q**   And what Mr. Winneroski reported here, say, at the bottom

19    of the first page, is the EVA, the economic value add per

20    unit, that's Best Buy's experience, is it not?

21    **A**   Correct.

22    **Q**   So, he was not telling HP, for example, about Toshiba's

23    profits, was he?

24    **A**   No.

25    **Q**   What was he telling HP here?

FRITZ - REDIRECT EXAMINATION / SILBERFELD

1    **A**    About Best Buy's profits.

2    **Q**    How Best Buy was doing in terms of the money it was

3    making, across a number of brands.  Is that right?

4    **A**    That's correct.

5              **MR. CURRAN:**  Objection.  Leading, Your Honor.

6              **THE COURT:**  Overruled, but don't do it any more.

7    Don't lead the witness.

8              **MR. SILBERFELD:**   Thank you, Your Honor.

9    **BY MR. SILBERFELD:**

10   **Q**    On Page 2, you see the section at the top, that says:

11   "Uneroded POS gm"?

12   **A**    I do.

13   **Q**    Okay.  Tell us first what "Uneroded POS gm" means.

14   **A**    Uneroded POS gross margin would be the point-of-sale gross

15   margin without any mark-downs, price matches, any forms of

16   erosion.

17   **Q**    What are the percent values that are expressed here?  Are

18   they Best Buy information, or some competitor information, or

19   vendor information?

20   **A**    They would be Best Buy's information for that particular

21   vendor.

22   **Q**    Same question for the next section, "Actual Eroded gm,"

23   are those figures Best Buy figures?  Or are they vendor

24   information that Mr. Winneroski is sharing with other vendors?

25   **A**    They would be Best Buy's information, from my

FRITZ - REDIRECT EXAMINATION / SILBERFELD

1  understanding.

2  **Q**   And under the third paragraph there, it has

3  "Damage/Write-offs."   Forgetting even what is, in the interest

4  of time, is the information there Best Buy information?   Or is

5  it Toshiba's information, for example, being shared with HP?

6  **A**   It would be the vendors' information at Best Buy.   So, it

7  would be Best Buy's information.

8  **Q**   All right.   Now, you were asked some questions about

9  public information and non-public information.   Do you

10  remember that?

11  **A**   I do.

12  **Q**   Is it the case in your business that some information, at

13  least, starts out as either non-public or confidential, and

14  over time becomes public?

15  **A**   Sometimes, yes.

16  **Q**   And how within Best Buy do you treat confidential

17  information, in the first instance, before it becomes public?

18  **A**   As confidential, and information that we wouldn't share or

19  forward.

20  **Q**   You were shown some documents, I think, today, about top

21  secret.   One document was marked "Top secret"; another one was

22  marked "Confidential"?

23  **A**   Uh-huh.

24  **Q**   To the best of your company's ability and all your

25  employees' ability, do you keep those things confidential when

FRITZ - REDIRECT EXAMINATION /SILBERFELD

```
 1   they're so marked?
 2   A    Yes.
 3   Q    Do you have within Best Buy, now or ever, a document
 4   destruction policy?
 5   A    We do.
 6   Q    Retention?  Or, destruction?
 7   A    Oh, sorry.  I meant retention, yeah.
 8   Q    Do you have a document destruction policy, ma'am?
 9   A    No, we do not.
10   Q    Do you have a policy, have you ever had a policy within
11   Best Buy, to destroy documents that are legended "Destroy
12   after reading"?
13   A    No.
14   Q    How about a deletion policy?  Do you have a policy that
15   says "Delete after reading," therefore you double-delete it?
16   A    No.  We actually have a policy that we cannot delete any
17   emails or information.
18   Q    And the documents that have been shown you were, in fact,
19   documents produced in this case, were they not?
20   A    Yes.
21   Q    You were shown an email that had a few sentences written
22   at the bottom about being the intended recipient, and if
23   you're not the intended recipient, please delete this or
24   destroy it or send it back.
25        Do you remember that?
```

FRITZ - REDIRECT EXAMINATION / SILBERFELD

1   **A**   I do.

2   **Q**   Is that a common legend that is at the bottom of Best Buy

3   emails?

4   **A**   Yeah, it's pretty common.

5   **Q**   Have you seen that from other businesses and other

6   companies?

7   **A**   I have.

8   **Q**   Whether it's another business, or a law firm, or even a

9   vendor.

10  **A**   Yes.

11  **Q**   When you think about the Best Buy strategy going forward,

12  do you share that information with any person in a similar

13  position as you at a competitor, like Wal-Mart or CostCo?

14  **A**   No.

15  **Q**   Have you ever done that?

16  **A**   No.

17  **Q**   For any purpose.

18  **A**   No.

19  **Q**   You were asked some questions about Best Buy trying to

20  build its own, I think, notebook or laptop, in about 2001?

21  **A**   Yes.

22  **Q**   Did that actually happen, then?

23  **A**   I don't recall if it happened in 2001.  We did produce a

24  private-label desktop at some point, but I don't remember the

25  date.

FRITZ - REDIRECT EXAMINATION / SILBERFELD

1    Q    And you were asked whether that product competes with some

2    of the vendors that you use as vendors, like HP, for example.

3    A    Correct.

4    Q    In your experience, is that in fact the case, based on the

5    price band or price point of that product?

6    A    It could be.

7    Q    You were asked some questions about Mr. Winneroski's

8    vendor meeting recap.  Do you remember that?

9    A    I do.

10   Q    Were you in attendance at that meeting?

11   A    I don't recall.

12   Q    But in all events, as you read over his vendor meeting

13   recap, how did you take the information about the component

14   risks that were being described by Toshiba at that time?

15   A    I don't recall reading the document.  Looking at it now, I

16   took it as a reason or an excuse for their inventory

17   shortages.

18   Q    And, lastly, a question about Samsung.

19   A    Yes.

20   Q    Samsung and Best Buy now have this Samsung Experience

21   relationship, do they?

22   A    Yes.

23   Q    Do you know whether it was Samsung who went in to the

24   United States government, and told them about this conspiracy?

25   A    I did not know that.

FRITZ - RECROSS EXAMINATION / CURRAN

1      **MR. SILBERFELD:**  That's all the questions I have.

2   Thank you, Your Honor.

3      **THE COURT:**  Any recross, Mr. Curran?

4      **MR. CURRAN:**  Yes, Your Honor.  I think it will be

5   brief.

6      **THE COURT:**  Okay.

7      **MR. CURRAN:**  And I'll --

8                    <u>**RECROSS EXAMINATION**</u>

9   BY MR. CURRAN:

10  **Q**   Ms. Fritz, I'm going to follow the same issues that

11  Mr. Silberfeld addressed.

12  **A**   Okay.

13  **Q**   First, beginning with MDF.  And I think your testimony was

14  that the MDF practice was consistent after 1998 with what it

15  was before 1998?

16  **A**   Yes, that is my understanding.

17  **Q**   But you are not suggesting that the amounts of the MDF

18  were the same before and after 1998, were you?

19  **A**   No.

20  **Q**   In fact, Best Buy grew tremendously in the period after

21  1998.  Right?

22  **A**   Can you -- I'm sure I'm understanding the question.

23  **Q**   Is it not the case that Best Buy, as a business, in terms

24  of sales, grew significantly after 1998 until present?

25  **A**   Actually, no.  Best Buy did grow after 1998, but not until

FRITZ - RECROSS EXAMINATION / CURRAN

1  the present.  We've had a couple of challenging years.

2  Q  Okay, let's focus on 1998 to 2006.  Did Best Buy grow

3  significantly during that period, or not?

4  A  It did.

5  Q  And as it grew, it received more in MDF funding, correct?

6  A  Not necessarily, no.

7  Q  No.  So is it your testimony that it received the same

8  amount after 1998 in MDF funding as it did before 1998?

9  A  I don't know the actual dollar amounts, but it could have

10  been the same.

11  Q  The same raw dollar amount.

12  A  It could have been the same percentages.

13  Q  Oh, the same percentages.  Is that what you said?

14  A  Yes.

15  Q  Okay.

16  A  But, again, I don't recall specifically what those were,

17  several years ago, or even today.

18  Q  Okay, fair enough.  But, but if Best Buy was receiving the

19  same percentage in MDF, and it grew during the period 1998 to

20  2006, then the amount of MDF that it received would have grown

21  at the same rate.  Correct?

22  A  Right.  Compared -- similar to the vendor sales.

23  Q  Okay.  And, it's true, is it not, that vendor sales

24  increased significantly -- vendor sales to Best Buy increased

25  significantly from 1998 to 2006?

1    **A**    Depending on the vendor.  But overall, our business did

2    grow.  But, there were vendors that would have potentially

3    declined during that time period.

4    **Q**    Okay.  And, Mr. Silberfeld also asked you questions about

5    buying power.  Correct?

6    **A**    Correct.

7    **Q**    And, I think you referred to Wal-Mart arguably having more

8    bargaining power than Best Buy.

9    **A**    Yeah, I think I said you could argue that they have more

10   buying power.

11   **Q**    And, that's because Wal-Mart buys and sells so much

12   volume.  Right?

13   **A**    Correct.

14   **Q**    So, that's where it gets its bargaining power.

15   **A**    Correct.

16   **Q**    And its buying power.  And its buying power?

17   **A**    That's where they get their leverage.

18   **Q**    And that's also where Best Buy gets their leverage, it's

19   from the volume it buys and sells.  Right?

20   **A**    Yeah, I would say some of it is from that, yeah.  Some of

21   it is the value proposition that we offer in the market.  So,

22   no one else offers a place where you can get expertise, or you

23   can see the merchandising of the product, and you can see how

24   it works.  Those are all very different things.

25   **Q**    Okay.  And it's true, is it not, that Best Buy's

FRITZ - RECROSS EXAMINATION / CURRAN

1   bargaining power and buying power increased from 1998 to 2006,

2   as Best Buy grew significantly.  Right?

3   **A**   Yeah.  I believe you already asked me that.

4   **Q**   But it's correct, right?

5   **A**   Our -- our business grew -- I don't know if I would say

6   our buying power grew, but our revenues grew during that time

7   period.

8   **Q**   Well, don't you think that Best Buy's buying power grew

9   commensurate with its increase in revenues?

10  **A**   I think it -- it could have, yes.

11  **Q**   Mr. Silberfeld, I think, next asked you about the -- a

12  particular document, it was Exhibit 8140, which was

13  Stephanie's email to you about Wal-Mart's pricing.

14      (Document displayed)

15  **Q**   And I think Mr. Silberfeld focused in on the third bullet

16  point under "Other points of consideration," where there's a

17  reference to (As read):

18  "...win not tie thus the possibility to go to 359..."

19      Right?

20  **A**   Correct.

21  **Q**   And, do you recall, I referred to that specific bullet

22  point on Thursday.  Do you remember that?

23  **A**   I believe so, yes.

24  **Q**   So, Ms. Fritz, this is an example, is it not -- and I

25  think I asked this on Thursday -- of the use of competitive

FRITZ - RECROSS EXAMINATION / CURRAN

1    intelligence to compete better?

2    **A**    I would say this is a use of competitive intelligence to

3    make sure that our customer had the lowest price.

4    **Q**    Okay.  Do you think Best Buy is the only company that uses

5    competitive intelligence in this manner?

6    **A**    I do not.

7    **Q**    Other companies do too, right?

8    **A**    I would imagine they do.

9    **Q**    Were you here for Mr. Amano's testimony last week?

10   **A**    I was not.

11   **Q**    Mr. Silberfeld also asked you about Best Buy's price-match

12   policy.  Right?

13   **A**    Correct.

14   **Q**    And he put it up on the screen, and we can as well.  But

15   my question there is pretty brief.

16        So, that's a situation where Best Buy is matching a lower

17   price at a competitor store.  Right?

18   **A**    Or a competitor's website.

19   **Q**    Or a competitor's website.  Okay.

20        (Document displayed)

21   **Q**    So that's a situation where Best Buy is taking information

22   from the customer, and using that information to lower

23   Best Buy's price to that customer.  Right?

24   **A**    Well, the information that they're looking at from the

25   customer is usually an ad or a website.  So it's information

1    that the customer's presenting.  It's not the customer's

2    information.

3    **Q**   Okay.  But it's information that the customer is

4    presenting, and that's causing Best Buy to lower its price in

5    response.  Right?

6    **A**   Well, we -- we do have a price-match guarantee, and one of

7    our guarantees is that we will match your price.  And we want

8    to make sure that our customers are aware that we are there to

9    provide them with a competitive price.

10   **Q**   Okay.  Okay, and that's a good deal for customers, right?

11   **A**   Yeah.

12   **Q**   And, all Best Buy does is it verifies the price or the

13   availability of the product, and then it matches the lower

14   price.  Right?

15   **A**   Well, it varies from situation to situation, but in a

16   general statement, yes.

17   **Q**   Okay.  Ms. Fritz, that's a lot like Toshiba's master

18   purchase agreement with Dell, isn't it?

19   **A**   I can't speak to Toshiba's agreement with Dell.

20   **Q**   Ms. Fritz, Mr. Silberfeld asked you a number of questions

21   about whether or not you agreed with competitors as to prices

22   to charge.  Right?

23   **A**   He did ask me a few questions.

24   **Q**   Okay.  And I take it from your answers that you see a

25   distinction between agreeing with a competitor on price, as

FRITZ - RECROSS EXAMINATION / CURRAN

1    opposed to just exchanging information about price or other

2    terms of sale.  Correct?

3    A    What I believe is that there is a difference between

4    gathering competitive intelligence to appropriately price our

5    products for our customers, versus agreeing or conspiring to

6    change a price.

7    Q    Okay.  So, "information exchange" or "competitive

8    intelligence" in your mind is different from "price-fixing

9    agreement."  Right?

10   A    Absolutely.

11   Q    Ms. Fritz, Mr. Silberfeld also asked you questions about

12   Exhibit 5626, which is Mr. Winneroski's email relating to

13   margins.

14        (Document displayed)

15   Q    Do you have that handy?

16   A    I do.

17   Q    Okay, now, you and I discussed this document on Thursday,

18   right?

19   A    We did.

20   Q    And on Thursday, I think, you expressed the view that

21   Mr. Winneroski's communication of this information to HP was

22   improper.  Right?

23   A    Yeah, I believe what I said is I don't remember him

24   sending this email.  But, I would not have recommended that we

25   share this information.

FRITZ - RECROSS EXAMINATION / CURRAN

1   **Q**   Okay.  Now, Mr. Silberfeld was asking you questions, and I

2   think you were agreeing, with the suggestion that the

3   information in this email was Best Buy's information, and not

4   the other vendors' information.  Did I get that right?

5   **A**   It -- it's Best Buy's information.  I believe what he was

6   asking me is, is this Best Buy's information about that

7   particular vendor, or is it their own information.

8        And, this is Best Buy's information for that particular

9   vendor in our stores.

10  **Q**   Okay.  But, let's be more precise.  So we're talking here

11  about -- for instance, look at the top of Page 2 where there's

12  the section on uneroded point-of-sale gross margin.  Okay?

13  **A**   Yes.

14  **Q**   And let's focus in on the Toshiba percentage there,

15  11.76 percent.

16  **A**   Okay.

17  **Q**   Ms. Fritz, that is confidential information as between

18  Toshiba and Best Buy, right?

19  **A**   Again, this is Toshiba's information within Best Buy.

20       Do I agree that we should have shared it?  No.

21  **Q**   Ms. Fritz, do you still have the code of ethics, the

22  Best Buy code of ethics here?

23  **A**   I do, somewhere.

24  **Q**   Remember, it's a color-coded one?

25  **A**   I think mine's black and white.

1    **Q**    Thank you.

2    **A**    Okay.

3    **Q**    I would like to direct your attention to Page 17 of that.

4          (Document displayed)

5    **A**    Okay.

6    **Q**    The very top.  There's a little Q and A.  The very top of

7    the document.

8          (Document displayed)

9    **Q**    Do you see there, Ms. Fritz, where it says:

10   "Question..."

11         This is a Q and A, right?  It's a Q and A in the code.

12   **A**    It looks that way, yes.

13   **Q**    And the question:

14   "I want to share one vendor's price list for televisions with

15   another vendor in an attempt to negotiate a lower wholesale

16   price.  Is this ethical?"

17         And then the answer:

18   "No.  You may be improperly disclosing confidential

19   information from one vendor to another, which could be a

20   breach of contract.  Never accept a competitor's price list

21   from a vendor or competitor, even if it is offered to you

22   without your request."

23         Do you see that, Ms. Fritz?

24   **A**    I do.

25   **Q**    Now, that Q and A suggests that Mr. Winneroski's sharing

1   of margin information as to Toshiba and Sony and eMachines,

2   with Hewlett-Packard, was a violation of Best Buy's code of

3   ethics.  Right?

4   **A**   Well, actually, the code of ethics states pricing, which I

5   think is different.

6   **Q**   You think pricing is different from margin information in

7   this context?

8   **A**   I do.

9   **Q**   So, I just want to make sure I understand where you come

10  out on this.

11       Was it proper or improper of Mr. Winneroski to share

12  Toshiba, Sony and eMachines' specific margin information with

13  Hewlett-Packard?

14  **A**   My interpretation, right, again, not according to the code

15  of ethics, was I wouldn't -- I wouldn't have shared that

16  information.  I don't think it was appropriate.

17  **Q**   Okay.  Now, a different question:  Does that mean that

18  Mr. Winneroski engaged in price fixing?

19  **A**   No.  It was margin information.

20  **Q**   Okay.  So, so it may have been in your opinion an improper

21  sharing of information, but it was not price fixing.

22  **A**   No.  There was no pricing discussed.

23  **Q**   And then, you -- you were asked and answered some

24  questions about Best Buy's document retention policy.  Right?

25  **A**   Correct.

1    **Q**    Okay.  Now, Ms. Fritz, a document retention policy

2    determines how long you are supposed to hold onto documents.

3    Right?

4    **A**    That is my understanding, yes.

5    **Q**    And then, when the period of time you are supposed to hold

6    onto the documents expires, the documents get destroyed.

7    Right?

8    **A**    I don't believe so, no.

9    **Q**    Okay.  Do you still have every document you've had since

10   you started employment at Best Buy in 1995?

11   **A**    I don't, but the company does, because they regularly pull

12   that information and archive that data.

13   **Q**    Now, Ms. Fritz, do you think that Best Buy really has

14   every piece of information, every document that you've

15   generated in these 18 years?

16   **A**    I -- I believe so.

17   **Q**    Okay.  Are you aware that Best Buy could not produce

18   requested documents to us in this litigation because they

19   didn't exist any more?

20   **A**    I was not aware of that.

21   **Q**    Now, Mr. Silberfeld also asked you some questions about

22   Best Buy -- I'm sorry, about Samsung.

23   **A**    Yes.

24   **Q**    All right.  Now, in your direct testimony on Thursday, I

25   think you said that one of the factors that Best Buy considers

1    in choosing its vendor partners was whether or not the vendor

2    is ethical.  Right?

3    **A**    Yes.

4    **Q**    Remember using that word, "ethical"?

5    **A**    I do.

6    **Q**    Is it your position that Samsung, which now has Samsung

7    Experience, stores within a store throughout the United States

8    in Best Buy stores, is ethical?

9    **A**    My experience in dealing with them in the past, yes.

10   **Q**    Samsung's ethical.

11   **A**    Yes.

12              **MR. CURRAN:**  Nothing further, Your Honor.

13              **THE COURT:**  Thank you.

14              **MR. FREITAS:**  Your Honor, I have one subject, I think

15   just two or three questions, and Ms. Fritz can be excused.

16              **THE COURT:**  All right.  I'll give you three.

17              **MR. FREITAS:**  Thank you, Your Honor.

18                          <u>**RECROSS EXAMINATION**</u>

19   BY MR. FREITAS:

20   **Q**    Ms. Fritz, it's typical, isn't it, that when Best Buy

21   negotiates MDF with a vendor, the negotiations proceed on a

22   percentage basis?

23   **A**    It's typical.

24   **Q**    So, Best Buy will say, "We want you to give us X percent

25   of what we spend in MDF."  Correct?

PROCEEDINGS

1    **A**    Yeah.  As I mentioned, it's a percentage-based....

2         (Reporter interruption)

3         **THE WITNESS:**  "Percentage-based."  Sorry.  I think

4    that's what I said.

5    **BY MR. FREITAS:**

6    **Q**   So when Best Buy is bigger, buying more from a given

7    vendor, the MDF goes up.  Right?

8    **A**    The -- the MDF would increase as dollars would go up, yes.

9         **MR. FREITAS:**  That's all, Your Honor.

10        **THE COURT:**  Thank you.  May the witness be excused?

11        **MR. SILBERFELD:**  Yes, Your Honor.

12        **THE COURT:**  All right.  Thank you very much, ma'am.

13   You are excused.

14        (Witness excused)

15        **THE COURT:**  And we, ladies and gentlemen, will take

16   our afternoon recess.  But before we do that, I need to ask

17   you, I had been thinking we could go until 4:00 to try to make

18   up some of this morning's time.  Is that convenient?

19        Let me put it a different way.  Is there anyone for whom

20   that is terribly inconvenient?

21        (No response)

22        **THE COURT:**  All right, then we'll go to 4:00.  Thank

23   you.

24        (Jury excused)

25        (The following proceedings were held outside of the

PROCEEDINGS

1   presence of the Jury)

2            THE COURT:  We'll come back at 3:00.

3      Congratulations, you may step down.

4      Oh, I need to talk to counsel.  There was one more set of

5   issues having to do with the summary witness?

6            MR. SILBERFELD:  Yes.

7            THE COURT:  As I understand it, there's -- you have

8   no objection to the guilty pleas.

9            MR. CURRAN:  Correct.

10           THE COURT:  And, what is the status of the discussion

11  with respect to everything else?  Which you say, "Golly, we're

12  just having such wonderful discussions, you don't need to go

13  ahead and grant his motion."

14           MR. SILBERFELD:  The discussion is that they've asked

15  us to stipulate to the admissibility of about 70 documents.

16  Many of which have nothing to do with Best Buy.  We

17  respectfully decline to do so.

18           THE COURT:  Well, I was actually asking -- perhaps

19  it's the same thing, but I didn't mean for it to be -- about

20  the documents you want to get in.  That's what I was asking.

21           MR. SILBERFELD:  It's dependent upon -- it's a *quid*

22  *pro quo*.  They will stipulate -- Toshiba will stipulate, as I

23  understand it, if we stipulate to the admissibility of about

24  70 documents.  And we don't wish to do so.

25           THE COURT:  All right.  Now, I haven't heard from

PROCEEDINGS

```
1    you, but I will allow you to speak.

2              MR. FREITAS:  On the pleas, Your Honor, we were

3    planning to file a written opposition later today.  May we do

4    so?

5              THE COURT:  You may file it, sure.

6         Vis-a-vis the other documents, do you have a position?

7              MR. FREITAS:  We do, Your Honor, but I don't know

8    what it is.  So, maybe Mr. Angell or Ms. Leal does.

9              MR. ANGELL:  Yeah, that will be included in our

10   opposition (Inaudible)

11        (Reporter interruption)

12             MR. ANGELL:  We will file an opposition on the

13   guilty-pleas issue, and we will include commentary on the

14   ownership or control issues at the same time.

15             THE COURT:  The documents on ownership and control

16   that you wish to use are publicly-filed documents?

17             MR. SILBERFELD:  Mr. Martinez is the person most

18   knowledgeable about these documents.

19             MR. MARTINEZ:  Good afternoon, Your Honor.  Yes, they

20   are annual reports.

21             THE COURT:  I want to know something slightly

22   different.  Are they publicly filed?

23             MR. MARTINEZ:  A chunk of them are, yes.  And.

24             THE COURT:  And the ones that aren't, what are they?

25             MR. MARTINEZ:  Those are annual reports that are
```

PROCEEDINGS

1   published by various companies.

2      **THE COURT:**  Well, if they're public, those would

3   usually be filed too, wouldn't they?

4      **MR. MARTINEZ:**  Not necessarily, Your Honor.  There

5   are categories of documents that are publicly filed with the

6   SEC, and then there are documents that are just published as

7   annual reports.  But --

8      **THE COURT:**  Do you have custodian-of-records

9   declarations for all of those?

10      **MR. MARTINEZ:**  Yes, we do.  We have

11   custodian-of-records declarations establishing the

12   authenticity, nature of the documents, as well as the

13   business-records nature of the documents.

14     These are the same documents that we submitted by way of a

15   request for judicial notice in June.

16      **THE COURT:**  Right.

17      **MR. MARTINEZ:**  And, counsel has had our declarations

18   for some time now.  There's no mystery as to what the

19   documents are and what they show.

20     And so, I'm puzzled why we don't have a position even

21   today, when we have been talking about this for weeks.

22      **THE COURT:**  Now, did you say there was also an email

23   or something in there?

24      **MR. MARTINEZ:**  No, Your Honor, there is no email.

25      **THE COURT:**  So for all the documents that you wish to

PROCEEDINGS

1    have this witness --

2              MR. MARTINEZ:  Mr. Gill --

3              THE COURT:  -- Mr. Gill testify about and summarize,

4    you have declarations from custodians on all of them.

5              MR. MARTINEZ:  Correct.

6              THE COURT:  Okay.

7              MR. MARTINEZ:  And we submitted those as part of a

8    brief that we filed on Thursday.

9              MR. TOTO:  And, Your Honor, we are not contesting the

10   admissibility of the documents, nor the declarations.  We just

11   don't think it's proper to do through a summary witness.

12   There's some irrelevant information they have in there.

13        They put in information on NEC, for example.  NEC was

14   found by Your Honor not to be a valid co-conspirator in this

15   case any more, so we're not sure -- that seems prejudicial,

16   irrelevant.

17        They have information from 2011.  So it's not clear to us

18   why this summary witness needs to come in, what exactly he's

19   going to say.  And it appears that they're lining him up to

20   say things that are prejudicial and irrelevant.

21              MR. MARTINEZ:  May I just respond to that,

22   Your Honor?

23        Counsel's mistaken.  The Court, in its summary judgment

24   order, carved out three of the NEC entities, but not the panel

25   manufacturer entity an entity that is identified by us in the

PROCEEDINGS

 1   complaint.  And so, NEC is absolutely relevant for that

 2   reason.

 3      We're not interested in the underlying documents coming

 4   into evidence, although we have to show that they are

 5   admissible, and they are.  But they comprise thousands of

 6   pages.  And, under 1006, it's appropriate to have a short

 7   summary that summarizes the documents.

 8      And, it's essentially a five- or six-page PowerPoint

 9   that's part of what we submitted.  It's much like what Toshiba

10   submitted in its opening statement, showing the corporate

11   relationships.  Simplifies the issue greatly for the jury, and

12   it's a central issue in the case.

13      So the only thing we would ask to admit through Mr. Gill

14   would be that six- or seven-page PowerPoint.

15          **MR. TOTO:**  Your Honor, 1006, as I'm sure you know,

16   does not provide for a summary witness.  It provides for a

17   summary chart of evidence that's too voluminous to otherwise

18   present in court.  So, again, we object to the summary witness

19   coming in and testifying about documents that they could get

20   into evidence, and do it in the traditional way.

21          **THE COURT:**  All right.  Well, I'm inclined -- I will

22   wait until I hear from HannStar, but I'm inclined to allow the

23   witness to testify in the way that they're talking about.

24      So, if there are specific issues you think are either

25   irrelevant or incorrect, like NEC, I would suggest that you

PROCEEDINGS

1    begin to focus on that.

2        Thank you.

3        So, what are the plans for tomorrow, by the way?

4        **MR. SILBERFELD:**  The plans for the rest of the

5    afternoon are a video.  The plans for tomorrow morning is the

6    completion of that video, because it's going to --

7    unfortunately, the next video is two hours.

8        And then, we begin with Dr. Bernheim, late morning.  Or

9    thereabouts.  Whenever we finish the videos.

10       **THE COURT:**  So, you're not going to get to this

11   summary person tomorrow.

12       **MR. SILBERFELD:**  No, we're not.

13       **THE COURT:**  All right.

14       **MR. SILBERFELD:**  Thank you.

15       (Recess taken from 2:52 to 3:13 p.m.)

16       (In open court; outside the presence and hearing of the

17   jury)

18       **DEPUTY CLERK:**  Come to order.

19       **THE COURT:**  Are you ready?

20       **MR. SILBERFELD:**  Sure.

21       (The jurors enter the courtroom)

22            (The following proceedings were held in the presence.

23            of the Jury)

24       **THE COURT:**  Welcome back, ladies and gentlemen.  You

25   may all be seated.

1          Plaintiffs may call their next witness.

2               **MR. SILBERFELD:**  Your Honor, plaintiffs call

3     Kazuyoshi Nakayama.  He's with Sharp, and he's not here in

4     person.  He's here by video.  The exhibits associated with

5     this -- the video itself is 903.  And we have an agreement to

6     move into evidence the following exhibits without objection.

7     They are 117, 119, 411, 412, 413, 734, 735, 736, 1077, 1078,

8     1079, and 885.

9          And this video runs longer than the end of the day, and

10    we'll stop at a logical point, at around 4:00 o'clock.

11               **MS. BURKE:**  That's right.  No objection.

12               **MR. FREITAS:**  No objection, your Honor.

13               **THE COURT:**  All those exhibits will be allowed.

14          (Trial Exhibits 117, 119, 411, 412, 413, 734, 735, 736,

15           1077, 1078, 1079, and 885 received in evidence)

16               **THE COURT:**  What's the name of the deponent again?

17               **MR. SILBERFELD:**  It is Kazuyoshi Nakayama.

18               **THE COURT:**  All right.  Thank you.

19          **KAZUYOSHI NAKAYAMA – VIDEOTAPED DEPOSITION PLAYED**

20               (Excerpts of deposition testimony, dated July 11,

21    2010 played, not reported)

22               **MR. SILBERFELD:**  Is this a convenient point, your

23    Honor?

24               **THE COURT:**  Yes.

25          Ladies and gentlemen, we will take our afternoon recess at

PROCEEDINGS

```
1    this time.  Thank you for being patient with our rearranging

2    these schedules.  I think it was helpful.  But tomorrow we

3    will plan to be here at 8:30.

4        In the meantime, don't make up your minds or talk to

5    anybody about this case; you haven't heard all the evidence

6    yet.

7        We'll see you 8:30 tomorrow.  Thank you.

8        (The jurors exit the courtroom)

9            THE COURT:  Anything we need to do right now?

10           MR. SILBERFELD:  May we just inquire about the status

11   of the revised instruction?  Do we all still need to look at

12   that further?

13           MR. CURRAN:  I tried to review it during the video.

14   I want to discuss it with colleagues and we can address it in

15   the morning, I would propose, your Honor.  Although I do want

16   to flag one issue:

17       It's not clear to me why we're addressing this at all now.

18   I don't see how these instructions, which are final

19   instructions, I believe, affect the testimony of experts to

20   testify in the coming days.  I don't see why this particular

21   set of instructions should be dealt with now as opposed to

22   other final instructions that are also relevant.

23           THE COURT:  I can think of a lot of reasons.  So I

24   think it would be helpful to me.

25       Nothing is going to be smooth, I understand that, from
```

PROCEEDINGS

1    here on out.  So I think I need to know what we're aiming for

2    in terms of the proof on damages, as well as everybody else.

3    So I would suggest you go and work on it.

4            **MR. SILBERFELD:**  Thank you.

5            **THE COURT:**  Okay.  We're done.

6            **MR. CURRAN:**  Thank you.

7        (Proceedings concluded)

1457

1

2                              **INDEX OF WITNESSES**

3

     **PLAINTIFF'S WITNESSES**                    **PAGE**    **VOL.**
4

5

     **FRITZ, WENDY LIANN**
6    (SWORN)                                      1288       9
     Cross Examination Resumed by Mr. Curran      1288       9
7    Cross-Exam Resumed by Mr. Curran             1368       9
     Cross Examination by Mr. Freitas             1372       9
8    Voir Dire Examination by Mr. Silberfeld      1418       9
     Cross-Exam Resumed by Mr. Freitas            1420       9
9    Redirect Examination by Mr. Silberfeld       1422       9
     Recross Examination by Mr. Curran            1435       9
10   Recross Examination by Mr. Freitas           1446       9

11   **NAKAYAMA, KAZUYOSHI**
     Videotaped Deposition Testimony Played       1454       9
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**INDEX OF EXHIBITS**

2

3
| **TRIAL EXHIBITS** | **IDEN** | **VOL.** | **EVID** | **VOL.** |
|---|---|---|---|---|
| 8224 | | | 1291 | 9 |
| 8215 | | | 1307 | 9 |
| 8146 | | | 1320 | 9 |
| 8159 | | | 1323 | 9 |
| 5711 | | | 1335 | 9 |
| 5522 | | | 1352 | 9 |
| 10003 | | | 1373 | 9 |
| 10004 | | | 1420 | 9 |
| | | | 1454 | 9 |
| 117 | | | 1454 | 9 |
| 119 | | | 1454 | 9 |
| 411 | | | 1454 | 9 |
| 412 | | | 1454 | 9 |
| 413 | | | 1454 | 9 |
| 734 | | | 1454 | 9 |
| 735 | | | 1454 | 9 |
| 736 | | | 1454 | 9 |
| 1077 | | | 1454 | 9 |
| 1078 | | | 1454 | 9 |
| 1079 | | | 1454 | 9 |
| 885 | | | 1454 | 9 |

**PLAINTIFF'S WITNESSES**                    **PAGE**   **VOL.**

## CERTIFICATE OF REPORTERS

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball 

Monday, August 5, 2013


I, CONNIE KUHL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/  Connie Kuhl_____

Monday, August 5, 2013